# 13-5946

## UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

SARAH JONES,

*Plaintiff/Appellee,*

v.

DIRTY WORLD ENTERTAINMENT RECORDINGS, LLC,
*et al.,*

*Defendants/Appellants.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CASE NO. 2:09-CV-219-WOB
HON. WILLIAM O. BERTELSMAN

## APPELLANT'S OPENING BRIEF

David S. Gingras, Esq.
Gingras Law Office, PLLC
4802 East Ray Road, #23-271
Phoenix, AZ 85044
Tel: (480) 264-1400
Fax: (480) 248-3196
Email: david@gingraslaw.com

Alexander C. Ward, Esq.
Alexis B. Mattingly, Esq.
Huddleston Bolen, LLP
855 Central Avenue, Suite 301
Ashland, KY 41105
Tel.: (606) 329-8771
Fax: (606) 324-4651
award@huddlestonbolen.com
amattingly@huddlestonbolen.com

*Attorneys for Appellants*
DIRTY WORLD, LLC AND
NIK LAMAS-RICHIE

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 26.1, Defendant/Appellant Dirty World, LLC states as follows: Dirty World is not publicly traded, has no parent corporation, and no publicly traded corporation owns more than 10% in Dirty World.


Date: November 12, 2013     ___/s/ David S. Gingras___
             David S. Gingras, Esq.
             Gingras Law Office, PLLC
             4802 East Ray Road, #23-271
             Phoenix, AZ 85044
             Telephone: (480) 264-1400
             Facsimile: (480) 248-3196
             Email:  david@gingraslaw.com
             *Attorney for Appellants*
             Dirty World, LLC and
             Nik Lamas-Richie

# **TABLE OF CONTENTS**

JURISDICTIONAL STATEMENT ..................................................................1

ISSUE PRESENTED FOR REVIEW ..........................................................2

STATEMENT OF THE CASE..................................................................3

STATEMENT OF FACTS ...................................................................4

SUMMARY OF ARGUMENT ............................................................. 12

ARGUMENT .................................................................................. 14

I.    APPELLANTS ARE ENTITLED TO CDA IMMUNITY ......................... 14

    A.    Standard of Review—De Novo ...........................................14

    B.    History And Background Of The CDA ................................15

    C.    General Standards For Application Of The CDA..............................25

        1.    Appellants Are Both Providers And Users Of An Interactive Computer Service ...................................26

        2.    Appellants Were Treated As "Publishers" Or "Speakers" Of Information ....................................28

        3.    All Actionable Material Was Provided Solely By Another Information Content Provider .................................28

    D.    The District Court's CDA Analysis Was Erroneous .........................30

        1.    The District Court Applied The Wrong Standard For "Development"..........................................31

        2.    No Evidence Showed That Appellants "invitied, encouraged and adopted defamatory posts" about Ms. Jones ...............................................43

        3.    The Name Of Appellants' Site Is Irrelevant .............................45

        4.    Additional Comments ......................................56

CONCLUSION .............................................................................. 60

DESIGNATION OF DOCUMENTS ................................................... 61

# TABLE OF AUTHORITIES

## CASES

*Adelson v. Harris*,
--- F.Supp.2d ----, 2013 WL 5420973 (S.D.N.Y. 2013)....................................52

*Almeida v. Amazon.com, Inc.*,
456 F.3d 1316 (11th Cir. 2006)................................................15, 17, 25

*Ascentive, LLC v. Opinion Corp.*,
842 F.Supp.2d 450 (E.D.N.Y. 2011) ...............................................27, 49

*Barnes v. Wright*,
449 F.3d 709 (6th Cir. 2006).............................................................16

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009)....................................................17, 29, 51

*Barrett v. Rosenthal*,
40 Cal.4th 33, 146 P.3d 510 (Cal. 2006)...........................................22, 23

*Beckman v. Match.com*,
2013 WL 2355512 (D.Nev. 2013) .......................................................27

*Ben Ezra, Weinstein, and Company, Inc. v. America Online Inc.*,
206 F.3d 980 (10th Cir. 2000).....................................................17, 56

*Best Western Int'l, Inc. v. Furber*,
2008 WL 4182827 (D.Ariz. 2008).......................................................41

*Black v. Google, Inc.*,
2010 WL 3222147 (N.D.Cal. 2010) ....................................................54

*Blumenthal v. Drudge*,
992 F.Supp. 44 (D.D.C. 1998) .........................................................23

*Carafano v. Metrosplash.com, Inc.*,
339 F.3d 1119 (9th Cir. 2003).....................................................17, 51

*Chicago Lawyers Comm. For Civil Rights Under Law, Inc. v. Craigslist, Inc.*,
519 F.3d 666 (7th Cir. 2008).......................................................17, 36

*Collins v. Purdue Univ.*,
  703 F.Supp.2d 862 (N.D.Ind. 2010) ................................................... 47

*Cubby, Inc. v. CompuServe, Inc.*,
  776 F. Supp. 135 (S.D.N.Y. 1991).............................................. 18, 19

*Dart v. Craigslist, Inc.*,
  665 F.Supp.2d 961 (N.D.Ill. 2009) .................................................... 36

*DiMeo v. Max*,
  433 F.Supp.2d 523 (E.D.Pa. 2006) ......................................... 24, 51, 56

*S.C. v. Dirty World, LLC*,
  2012 WL 3335284 (W.D.Mo. 2012) ......................................... 49, 53

*Doe v. America Online, Inc.*,
  783 So.2d 1010 (Fla. 2001).............................................................. 51

*Doe v. GTE Corp.*,
  347 F.3d 655 (7th Cir. 2003)............................................................ 17

*Doe v. Sexsearch.com*,
  551 F.3d 412 (6th Cir. 2008).......................................................... 16

*Donato v. Moldow*,
  374 N.J.Super. 475, 865 A.2d 711 (N.J. 2005)............................. 24, 28

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*,
  521 F.3d 1157 (9th Cir. 2008)..................................................*passim*

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*,
  666 F.3d 1216 (9th Cir. 2012).......................................................... 37

*FCC v. Pacifica Found.*,
  438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978)....................... 41

*Gentry v. eBay*,
  99 Cal.App.4th 816, 121 Cal.Rptr.2d 703 (Cal.App. 4th Dist. 2002) .................. 28

*Giordano v. Romeo*,
  76 So.3d 1100 (Fla. 3d Dist. 2011).................................................... 42

*Global Royalties, Ltd. v. Xcentric Ventures, LLC*,
  544 F.Supp.2d 929 (D.Ariz. 2008) ........................................ 26, 42, 49

*Green v. America Online, Inc.*,
318 F.3d 465 (3rd Cir. 2003)................................................................. 17

*Hill v. StubHub, Inc.*,
727 S.E.2d 550 (N.C.App. 2012)........................................................ 17

*Johnson v. Arden*,
614 F.3d 785 (8th Cir. 2010)................................................. 15, 17, 25

*Jones v. Dirty World Entertainment Recordings, LLC*,
--- F.Supp.2d ----, 2013 WL 4068780 (E.D.Ky. 2013)............................... *passim*

*Jones v. Dirty World Entertainment Recordings, LLC*,
840 F.Supp.2d 1008 (E.D.Ky. 2012) ....................................... *passim*

*Levitt v. Yelp!, Inc.*,
2011 WL 5079526 (N.D.Cal. 2011) ................................................... 56

*M.A. v. Village Voice Holdings, LLC*,
809 F.Supp.2d 1041 (E.D.Mo. 2011)................................................. 51

*Milo v. Martin*,
311 S.W.3d 210 (Tx.App. 2010)................................................. 59, 60

*Mmubango v. Google, Inc.*,
2013 WL 664231 (E.D.Pa. 2013) ..................................................... 54

*Doe v. MySpace, Inc.*,
528 F.3d 415 (5th Cir. 2008)........................................................ 17, 30

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
591 F.3d 250 (4th Cir. 2009)........................................................ 17, 59

*Noble v. Brinker Intern., Inc.*,
391 F.3d 715 (6th Cir. 2004).......................................................... 15

*Okeke v. Cars.com*,
40 Misc.3d 582, 966 N.Y.S.2d 843 (N.Y.City Civ. Ct. 2013) ........................... 29

*Parisi v. Sinclair*,
774 F.Supp.2d 310 (D.D.C. 2011)............................................... 58, 59

*Perfect 10, Inc. v. CCBill, LLC*,
488 F.3d 1102 (9th Cir. 2007)...................................................... 17, 22

*Phan v. Pham*,
   182 Cal.App.4th 323, 105 Cal.Rptr.3d 791 (Cal.App. 3rd Dist. 2010) ............... 57

*Seaton v. TripAdvisor, LLC*,
   --- F.3d ----, 2013 WL 4525870 (6th Cir. 2013) ........................................... 17, 52

*Shiamili v. The Real Estate Group of New York, Inc.*,
   952 N.E.2d 1011, 17 N.Y.3d 281 (N.Y. 2011) .......................................... *passim*

*Smith v. Leis*,
   407 Fed.Appx. 918 (6th Cir. 2011) .................................................................... 16

*Stratton Oakmont, Inc. v. Prodigy Servs., Co.*,
   1995 WL 323710 (N.Y. Sup. Ct. 1995) .................................................. 18, 20, 21

*Texas v. Johnson*,
   491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) ................................... 41

*United States v. Alpine Indus., Inc.*,
   352 F.3d 1017 (6th Cir. 2003) ........................................................................... 15

*Universal Comm. Sys., Inc. v. Lycos, Inc.*,
   478 F.3d 413 (1st Cir. 2007) ................................................................. 17, 25, 27

*Zeran v. America Online, Inc.*,
   129 F.3d 327 (4th Cir. 1997) ......................................................... 17, 23, 25, 56

*Klayman v. Zuckerberg*,
   2012 WL 6725588 (D.D.C. 2012) ..................................................................... 27

## **STATUTES**

28 U.S.C. § 1291 ............................................................................................ 1

28 U.S.C. § 1332 ............................................................................................ 1

47 U.S.C. § 230 ..................................................................................... *passim*

47 U.S.C. § 230(f)(3) ............................................................................. 13, 32

## **SECONDARY AUTHORITIES**

David S. Ardia, *Free Speech Savior or Shield for Scoundrels: An Empirical Study of Intermediary Immunity Under Section 230 of the Communications Decency Act*, 43 Loy. L.A. L. Rev. 373 (2010) ........................................................................... 17

## <u>REQUEST FOR ORAL ARGUMENT</u>

Pursuant to Sixth Cir. R. 28(b)(1)(B) and 34(a), Appellants request that this matter be set for oral argument.   Such argument is appropriate because this appeal involves a matter of first impression for this circuit.   In addition, the questions of law necessary to the disposition of this case will have a significant impact on the operation of virtually all websites based in the United States.

# JURISDICTIONAL STATEMENT

According to the final operative pleading, the Second Amended Complaint, Doc. #22, Plaintiff/Appellee Sarah Jones ("Ms. Jones") is a citizen of Kentucky. Defendant/Appellant Dirty World, LLC ("Dirty World") is a Delaware Limited Liability Company with its principal place of business in Arizona. Defendant/Appellant Nik Lamas-Richie ("Mr. Richie") is a citizen of the State of California, although Ms. Jones alleged he was a citizen of Arizona. The Second Amended Complaint alleged damages in excess of $75,000. The district court had diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332.

Following a jury trial, on July 11, 2013 the district court entered a final judgment in favor of Ms. Jones. Doc. #208. Appellants' Notice of Appeal was timely filed on July 15, 2013. Doc. #209.

The Court of Appeals has jurisdiction pursuant to 28 U.S.C. § 1291.

## <u>ISSUE PRESENTED FOR REVIEW</u>

1.       Are Appellants entitled to immunity under the Communications Decency

Act, 47 U.S.C. 230(c)(1)?

## **STATEMENT OF THE CASE**

This action involves a single defamation claim arising from two user-generated posts appearing on a website owned and operated by Appellants called www.TheDirty.com.  In general, the posts stated that Ms. Jones was promiscuous, that her fiancé was unfaithful, that he tested positive for two sexually-transmitted diseases, and that he bragged about having sex with Ms. Jones in her workplace.

It is undisputed that these posts were created by a third party who submitted them to Appellants' website.  It is undisputed that the contents of the posts were not created or modified in any way by Appellants.  It is also undisputed that following the publication of one of the posts, Mr. Richie posted his own comment about it, asking, "Why are all high school teachers freaks in the sack?"

Appellants moved for summary judgment arguing that because Ms. Jones's claim was based on the "publication" of material created solely by a third party, the claim was barred by the Communications Decency Act, 47 U.S.C. § 230(c)(1) (the "CDA").  The district court denied the motion, finding Appellants were responsible for the "development" of the allegedly tortious material.  The court also held that Mr. Richie "adopted" the third party's speech as his own by virtue of his "freak in the sack" comment.

Following entry of a final judgment in favor of Ms. Jones, Appellants appeal the district court's denial of immunity.

## STATEMENT OF FACTS

The question presented here is whether Appellants are immune under the CDA.  At the close of discovery, Appellants moved for summary judgment on that issue but on January 10, 2012 the court denied the motion for various reasons.  *See Jones v. Dirty World Entertainment Recordings, LLC*, 840 F.Supp.2d 1008 (E.D.Ky. 2012).

Appellants sought immediate interlocutory review of the district court's order.  This Court dismissed that first appeal on May 9, 2012, finding that the order denying summary judgment was non-final and not otherwise subject to interlocutory review under the collateral order doctrine.

Due to the non-final nature of the district court's summary judgment order, Appellants re-raised the CDA in a renewed summary judgment motion (Doc. #177) and two mid-trial Rule 50(a) motions, all of which the district court denied for the reasons stated in its original summary judgment order.  *See Jones v. Dirty World Entertainment Recordings, LLC*, --- F.Supp.2d ----, 2013 WL 4068780 (E.D.Ky. 2013).  After two jury trials, a verdict was entered in favor of Ms. Jones on her defamation claim.  However, because the district court's determination that Appellants were not protected by the CDA occurred at the summary judgment stage based on the record presented at that time, the facts and evidence submitted in conjunction with that motion will be briefly summarized here.

Dirty World, LLC operates a website located at www.TheDirty.com.  *See* Affidavit of Nik Lamas-Richie ("Richie Aff.") ¶ 1, ECF Doc. #64–2 at Page ID #478.  The site originally began in 2007 as www.DirtyScottsdale.com, which at the time was primarily about Scottsdale, Arizona.  Mr. Richie is the site's founder.  *Id*.

DirtyScottsdale.com was initially created to provide a forum for Mr. Richie to express humorous satirical commentary and criticism based on his perception of moral and social decay in Scottsdale's nightlife and club scene.  Richie Aff. ¶¶ 2– 4; Page ID #478–79.  Mr. Richie's brutally honest sense of humor struck a nerve with his viewers and the site became popular overnight.  Within a short period of time, DirtyScottsdale.com expanded nationwide, eventually growing to cover more than 50 different U.S. cities and more than 20 cities in Canada receiving an average of 18 million hits per month.  Richie Aff. ¶¶ 6–7; Page ID #479–80.  In the process, the site adopted a more geographically neutral name—www.TheDirty.com—and Mr. Richie (who initially kept his true identity a secret) gained significant fame if not infamy.

As the site grew, its focus and format changed.  Among other things, Mr. Richie no longer creates every post.  Richie Aff. ¶ 8; Page ID #480.  Rather, users of the site (who colloquially refer to themselves as "The Dirty Army") are now permitted to "submit dirt" which can include news, photos, video or text on any topic, and users can comment on material submitted by others.

The site's content submission form (ECF Doc. #64–2 at Page ID #504–05) is 100% neutral; it does not ask users to post anything about any particular individual, nor does the form suggest what the author should say.  The only instructions given are: "Tell us what's happening.  Remember to tell us Who, What, When, Where, Why."  Richie Aff. ¶ 12; Page ID #481.

At the time of the first motion for summary judgment in September 2011, www.TheDirty.com contained approximately 90,000 posts on a variety of topics. As explained in a supplemental affidavit filed 18 months later, "As of March 7, 2013, www.TheDirty.com contains a total of 121,863 separate posts in more than 900 separate categories.  In addition, the site also contains a total of 3,182,200 comments about posts."  Doc. #177–1 at 1, ¶ 3; Page ID #2696.  Many posts feature gossip and commentary about local individuals who are not public figures, but not all posts are of this type.  On the contrary, material appearing on the site covers a broad array of general topics such as politics, sports, business, the economy, crime and so forth.  Richie Aff. ¶¶ 11(a)–(h); Page ID #480–81.

Users of the website can submit posts on any topic; it is not necessary that content be negative or derogatory in any way.  Doc. #177–1 at 2, ¶ 4; Page ID #2697.  According to Mr. Richie, "users can (and do) submit posts about anything or anyone, positive or negative, and as long as I think the topic is reasonably interesting and not obviously unlawful, I will approve the post for publication."  *Id*.

As part of the content submission process, users are provided with a blank box where they can enter a title for their post, along with basic information about the material they are submitting.  Specifically, users are asked to identify the "City", "College", and "Category" for their submission.  Richie Aff. ¶ 13; Page ID #481.  In terms of categories, the user is required to pick from a list of more than 40 different options provided by the site which include: "I HAVE NO IDEA", "Business", "News", "Spring Break" and so forth.  Richie Aff. ¶ 14; Page ID #481.

As the site's editor, Mr. Richie reviews/moderates all new submissions, and he rejects any that contain nudity/obscenity, vulgarity, threats, or other material that Mr. Richie deems inappropriate.  Richie Aff. ¶ 15; Page ID #481–82.  Furthermore, as a general rule, Mr. Richie will typically make a short, one-line comment about posts with some sort of humorous or satirical observation, but Mr. Richie does not materially change, create, or modify any part of the user-generated submission, nor does he "fact check" user submissions for accuracy.  *Id*.

Although Ms. Jones's operative Complaint (the Second Amended Complaint; Doc. #22) only refers to one specific posting dated December 7, 2009, this case centered primarily on two posts.  The first, a copy of which is attached to Mr. Richie's affidavit as Exhibit J (ECF Doc. 64–2, Page ID #507) appeared on the site on October 27, 2009 bearing the title: "Graham Does It Again".

The post featured two photos of Ms. Jones (who at the time was a cheerleader for the Cincinnati Bengals) appearing at a public event with a Bengals player named Shayne Graham.  The author included the following text with the post:

> Nik, this is Sara J, Cincinnati Bengal Cheerleader.  She's been spotted around town lately with the infamous Shayne Graham.  She has also slept with every other Bengal Football player.  This girl is a teacher too!!  You would think with Graham's paycheck he could attract something a little easier on the eyes Nik!

Mr. Richie did not create any part of this post, nor did he create the title of the post.  Richie Aff. ¶¶ 16–19; Page ID #482–83.  Mr. Richie made no changes whatsoever to either the text of the post or the title; all of this material was authored solely by the third party who submitted it to the site.  *Id*.  Prior to the submission of this post, Mr. Richie did not know Ms. Jones, had never met or spoken to her and had no idea who she was.  Richie Aff. ¶ 20; Page ID #483.

In keeping with his normal practice, after the post was submitted Mr. Richie added a brief sarcastic quip regarding the Bengals football player shown in the photos stating, "Everyone in Cincinnati knows this kicker is a Sex Addict.  It is so secret … he can't even keep relationships because his Red Rocket has freckles that need to be touched constantly.- nik".  Richie Aff. ¶ 21; Page ID #483.  Nothing in Mr. Richie's comment referred to or disparaged Ms. Jones in any way.

The second post, a copy of which is attached to Mr. Richie's affidavit as

Exhibit K (ECF Page ID #509), appeared on the site five weeks later on December

7, 2009.  Richie Aff. ¶ 16.  This post included a publicly-available photograph of

Ms. Jones taken from the cover of the 2007 Ben-Gals cheerleader calendar on

which she appeared.  The post included the following text:

> Nik, here we have Sarah J, captain cheerleader of the playoff
> bound cinci Bengals.. Most ppl [sic] see Sarah has [sic] a
> gorgeous cheerleader AND highschool [sic] teacher.. yes she's
> also a teacher.. but what most of you don't know is.. Her ex
> Nate..cheated on her with over 50 girls in 4 yrs.. in that time he
> tested positive for Chlamydia Infection and Gonorrhea.. so I'm
> sure Sarah has them both.. whats [sic] worse is he brags about
> doing sarah in the gym.. football field.. her class room at the
> high school she teaches at DIXIE Heights.

As with the first post, each and every word of this text was created solely by the

third party author who submitted the post.  Mr. Richie did not create any part of

this text or its title, nor did he modify any part of it.  Richie Aff. ¶¶ 16–19.

As before, after the second post was submitted, Mr. Richie made a brief

comment which read: "Why are all high school teachers freaks in the sack?- nik".

Richie Aff. ¶ 22; Page ID #483.  This comment was not a factual assertion about

Ms. Jones's character or chastity, but rather was a rhetorical and hyperbolic

expression of Mr. Richie's opinion about a common stereotype—i.e., that high

school teachers publicly portray themselves as conservative while privately they

may have a sexually wild or adventurous side.  Richie Aff. ¶ 23; Page ID #483.

On December 9, 2009, a third post about Ms. Jones appeared on the site bearing the title "Bengals Cheerleader Boyfriend".  A copy of this post is attached to Mr. Richie's affidavit as <u>Exhibit L</u>, Page ID #511.  The author of this post attached several photos of Ms. Jones and included the following text:

> Nik, ok you all seen the past posting of the dirty Bengals cheerleader/teacher… well here is her main man Nate.  Posted a few pics of the infected couple.  Oh an [sic] for everyone saying sarah is so gorgeous check her out in these non photoshopped pics.

As was true of the first post, each and every word of the above text was created solely by the third party author who submitted the post; Appellants did not create any part of this text, nor did they change any part of it.  Richie Aff. ¶¶ 16–19.  Once again, Mr. Richie added a short comment about the post: "Cool tribal tat man.  For a second yesterday I was jealous of those high school kids for having a cheerleader teacher, but not anymore.- nik".  Richie Aff. ¶ 24, Page ID #483.

After these three posts were published, Ms. Jones commenced this action on December 23, 2009.  *See* Doc. #1.  Rather than suing Dirty World, LLC or Mr. Richie, Ms. Jones initially named and served a California entity named "Dirty World Entertainment Recordings LLC" which apparently operated a website with a similar name—[www.TheDirt.com](www.TheDirt.com).  This California entity has no relationship whatsoever to [www.TheDirty.com](www.TheDirty.com), Dirty World, LLC, or Mr. Richie.  Richie Aff. ¶ 26; Page ID #484.

Due to Ms. Jones's high visibility as an NFL cheerleader, less than a week after the lawsuit was filed several national media sources began covering this case. Richie Aff. ¶ 27; Page ID #484. Following this media attention, additional posts were submitted to www.TheDirty.com which mentioned Ms. Jones, the Bengals and this case. Richie Aff. ¶¶ 28; Page ID #484. However, Ms. Jones did not allege that any of these later posts were defamatory. Rather, the only actionable material was found in the first post dated October 27, 2009 (suggesting Ms. Jones slept with the entire Bengals team) and the second one dated December 7, 2009 (suggesting that Ms. Jones's fiancé cheated on her, tested positive for two STDs, and bragged about having sex with Ms. Jones in her classroom).

Although he believed he was under no legal obligation to do so, after learning about the lawsuit, Mr. Richie removed the first three posts regarding Ms. Jones. Richie Aff. ¶ 30; Page ID #485.

## SUMMARY OF ARGUMENT

As noted above the question presented here is easily stated: *was Ms. Jones's defamation claim barred by the CDA*?  The length of this brief notwithstanding, the answer to that question turns on the meaning of a single word—development.

Under the CDA website operators and users are not liable for any speech originating from *another* "information content provider" or "ICP".  The term ICP is defined by 47 U.S.C. § 230(f)(3) as follows:

> The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service. (emphasis added)

Based on this definition, only those who "create" *or* "develop" defamatory online speech are liable for it.  All others who repeat or republish the same content are immune.

In this case, Ms. Jones never seriously argued that Appellants *created* any libelous speech about her.  Even if she had made that argument, she presented no evidence whatsoever to support it.

Instead, Ms. Jones claimed Appellants "developed" the actionable content so the CDA did not apply.  The district court fully and completely accepted that view.

The problem with the court's holding is that it construed the term "development" far too broadly to include activities like screening and selecting

content that Congress unquestionably intended to <u>protect</u> via the CDA. Under the district court's excessively liberal interpretation of "development", most website operators would qualify as "developers" of speech posted by their users thus rendering the CDA effectively worthless. For that reason, the district court's holding was legally erroneous and it cannot stand.

Instead, this Court should adopt and apply the clear and common-sense definition of "development" used by virtually all other courts. Specifically, "development" means making a <u>material contribution</u> to the unlawful nature of actionable content. To be clear—such "material contribution" does not include reviewing, screening, or selecting content for publication, nor does it include generally encouraging third parties to submit *something* to a website, nor does it include making non-material (i.e., non-libelous) changes or edits to the content or making non-actionable comments about material posted by users. Each of these actions are precisely what Congress intended to protect, not to punish.

Under the correct definition of development, rather than forcing Appellants to endure four years of litigation and two separate jury trials, the district court should have held that Ms. Jones's case was barred by the CDA. As such, the judgment of the district court should be reversed and this action should be remanded with instructions to enter final judgment in favor of Appellants.

# ARGUMENT

## I.    APPELLANTS ARE ENTITLED TO CDA IMMUNITY

### A.    Standard of Review—De Novo

In the proceedings below, Appellants raised the issue of CDA immunity multiple times, most recently in the form of a mid-trial Rule 50 Motion for Judgment as a Matter of Law.  The district court denied that motion from the bench and on August 12, 2013 it issued a written opinion explaining its reasoning.  *See Jones v. Dirty World Entertainment Recordings, LLC*, --- F.Supp.2d ---, 2013 WL 4068780 (E.D.Ky. August 12, 2013).  A district court's denial of a Rule 50 motion is reviewed de novo.  *See Noble v. Brinker Intern., Inc.*, 391 F.3d 715, 720 (6th Cir. 2004) ("We review a district court's denial of a motion for judgment as a matter of law or a renewed motion for judgment as a matter of law de novo.") (citing *United States v. Alpine Indus., Inc*., 352 F.3d 1017, 1022 (6th Cir. 2003)).

In addition, the CDA is not merely a shield against liability; it provides immunity from suit.  *See Johnson v. Arden*, 614 F.3d 785, 791 (8th Cir. 2010) (explaining, "The majority of federal circuits have interpreted the CDA to establish broad 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.'") (quoting *Almeida v. Amazon.com, Inc*., 456 F.3d 1316, 1321 (11th Cir. 2006)); *see also Jones*, 840 F.Supp.2d at 1010 (agreeing, "Section 230 of the CDA immunizes

14

providers of interactive computer services against liability arising from content created by third parties … .")

Because the district court denied Appellants' CDA immunity claim, the standard of review is also de novo; "Claims of entitlement to immunity are questions of law, therefore they are reviewed de novo." *Smith v. Leis*, 407 Fed.Appx. 918, 927 (6th Cir. 2011) (citing *Barnes v. Wright*, 449 F.3d 709, 714 (6th Cir. 2006)).

For each of these reasons, the standard of review is de novo.

## B.    History And Background Of The CDA

This appeal presents an important matter of first impression for this Circuit which has addressed the CDA only once in the past. *See Doe v. Sexsearch.com*, 551 F.3d 412 (6th Cir. 2008).[1]  However, *Sexsearch* was resolved on other grounds and a full discussion of the CDA was expressly reserved "for another day". *Sexsearch*, 551 F.3d at 16.   That day has now come.

Although it has not previously answered the question presented in this case, this Court does not write on a blank slate.  Rather, excluding only the Second, D.C.

---

[1] This Court also briefly mentioned the CDA in a footnote in *Seaton v. TripAdvisor, LLC*, --- F.3d ----, 2013 WL 4525870, *4 n.8 (6th Cir. 2013) (noting that website operator "TripAdvisor cannot be held liable for its users' statements under the Communications Decency Act, 47 U.S.C. § 230(c)(1).")

and Federal circuits, all other federal appellate courts have addressed the CDA and several (primarily the Ninth Circuit) have done so repeatedly.[2]

In addition, the CDA's legislative history and background have been exhaustively documented in hundreds of published lower-court decisions and scholarly articles.  *See*, *e.g.*, David S. Ardia, *Free Speech Savior or Shield for Scoundrels: An Empirical Study of Intermediary Immunity Under Section 230 of the Communications Decency Act*, 43 LOY. L.A. L. REV. 373 (2010) (analyzing 184 state and federal CDA cases); *Hill v. StubHub, Inc.*, 727 S.E.2d 550, 558 (N.C.App. 2012) (noting, "According to our research, there have been approximately 300 reported decisions addressing immunity claims advanced under 47 U.S.C. § 230 in the lower federal and state courts.  All but a handful of these decisions find that the website is entitled to immunity from liability.")

---

[2] *See Universal Comm. Sys., Inc. v. Lycos, Inc.,* 478 F.3d 413 (1st Cir. 2007); *Green v. America Online, Inc.*, 318 F.3d 465 (3rd Cir. 2003); *Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997); *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250 (4th Cir. 2009); *Doe v. MySpace*, 528 F.3d 413 (5th Cir. 2008); *Doe v. GTE Corp.*, 347 F.3d 655 (7th Cir. 2003); *Chicago Lawyers' Committee For Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666 (7th Cir. 2008); *Johnson v. Arden*, 614 F.3d 785 (8th Cir. 2010); *Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003); *Carafano v. Metrosplash.Com. Inc.*, 339 F.3d 1119 (9th Cir. 2003); *Perfect 10, Inc. v. CCBill, LLC*, 488 F.3d 1102 (9th Cir. 2007); *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008) (en banc); *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009); *Ben Ezra, Weinstein & Co. v. America Online, Inc.*, 206 F.3d 980 (10th Cir. 2000); *F.T.C. v. Accusearch Inc.*, 570 F.3d 1187 (10th Cir. 2009); *Almedia v. Amazon.com, Inc.*, 456 F.3d 1316 (11th Cir. 2006).

16

Because the CDA's origins, history and purpose have been so skillfully documented elsewhere, for instance in seminal cases such as *Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997), it might seem unnecessary to repeat that well-documented history here. However, the rules and policy choices established by the CDA are in many ways directly contrary to the long-standing common law principles it abrogated. For that reason, certain aspects of the CDA can be somewhat counterintuitive and hard to accept, as this case plainly illustrates. To help put the issues in context, it is thus important to begin with a brief discussion of the events which caused Congress to adopt the CDA 17 years ago.

The CDA's genesis was a pair of conflicting New York cases—*Cubby, Inc. v. CompuServe, Inc.*, 776 F. Supp. 135 (S.D.N.Y. 1991) and *Stratton Oakmont, Inc. v. Prodigy Servs., Co.*, 1995 WL 323710 (N.Y. Sup. Ct. 1995). The first case, *Cubby*, involved an online message board known as "Rumorville USA". *See Cubby*, 775 F.Supp. at 137–38. The defendant, CompuServe, hosted the message board but did not exercise any editorial control over its contents, nor did CompuServe pre-screen any user-generated content before publication. *See id*. Instead, all posts on Rumorville were unmonitored and uncensored.

A third party user posted material on the Rumorville board which allegedly defamed the plaintiff, Cubby. *See id*. at 138. In turn, Cubby sued CompuServe for defamation. Cubby's theory was founded on one of libel law's oldest tenets;

"Ordinarily, 'one who repeats or otherwise republishes defamatory matter is subject to liability as if he had originally published it.'" *Id*. at 139. This is precisely the same vintage legal theory Ms. Jones successfully asserted here.

CompuServe moved for summary judgment on the grounds that it did not review or monitor any of the content on the Rumorville board, and thus should be treated as a "distributor" rather than as a "publisher". This distinction was crucial because publishers are essentially strictly liable for any defamatory speech they publish, while distributors are liable only for content that they "knew or should have known" was defamatory. *Id*. at 141.

After reviewing the facts, the court held CompuServe was a distributor:

> Technology is rapidly transforming the information industry. A computerized database is the functional equivalent of a more traditional news vendor, and the inconsistent application of a lower standard of liability to an electronic news distributor such as CompuServe than that which is applied to a public library, book store, or newsstand would impose an undue burden on the free flow of information. Given the relevant First Amendment considerations, the appropriate standard of liability to be applied to CompuServe is whether it knew or had reason to know of the allegedly defamatory Rumorville statements.

*Id*. at 140–41.

Following that legal determination, the court held there was no evidence that CompuServe knew any material on the Rumorville page was false. As such, summary judgment was granted in its favor. *See id*. at 144.

Four years later in 1995, the opposite result occurred in *Stratton Oakmont v. Prodigy*.  In that case, like in *Cubby*, the defendant (Prodigy) hosted an online message board containing allegedly defamatory statements posted by third parties.  *See Stratton Oakmont*, 1995 WL 323710, *1.  However, unlike CompuServe which did nothing to review or screen any third party submissions, Prodigy took several steps to reduce the amount of harmful content on its network.

Among other things, Prodigy established "content guidelines" in which "users are requested to refrain from posting notes that are 'insulting' and are advised that 'notes that harass other members or are deemed to be in bad taste or grossly repugnant to community standards, or are deemed harmful to maintaining a harmonious online community, will be removed when brought to PRODIGY's attention".  1995 WL 323710, *2.  Prodigy also used software to automatically block profanity and it enlisted "board leaders" to monitor posts and enforce content guidelines.  *See id*.

Based on these efforts to *reduce* the amount of offensive content on its network, "PRODIGY held itself out as an online service that exercised editorial control over the content of messages posted on its computer bulletin boards, thereby expressly differentiating itself from its competition and expressly likening itself to a newspaper."  *Id*.  Given these facts, the court found that unlike

19

CompuServe, Prodigy was more akin to a publisher than a distributor, meaning it was strictly liable for all third party material posted on its site:

> The key distinction between CompuServe and Prodigy is two fold. First, Prodigy held itself out to the public and its members as controlling the content of its computer bulletin boards. Second, Prodigy implemented this control through its automatic software screening program, and the Guidelines which Board Leaders are required to enforce. <u>By actively utilizing technology and manpower to delete notes from its computer bulletin boards on the basis of offensiveness and "bad taste"</u>, for example, <u>Prodigy is clearly making decisions as to content, and such decisions constitute editorial control</u>. That such control is not complete and is enforced both as early as the notes arrive and as late as a complaint is made, does not minimize or eviscerate the simple fact that <u>Prodigy has uniquely arrogated to itself the role of determining what is proper for its members to post and read on its bulletin boards</u>.  Based on the foregoing, this Court is compelled to conclude that for the purposes of Plaintiffs' claims in this action, Prodigy is a publisher rather than a distributor.

*Stratton Oakmont*, 1995 WL 323710, \*4 (emphasis added).

Because Prodigy tried to block and/or remove at least *some* offensive content from its pages, the court concluded it was legally responsible for *all* remaining content; "Prodigy's conscious choice, to gain the benefits of editorial control, <u>has opened it up to a greater liability</u> than CompuServe and other computer networks that make no such choice."  *Id*. at \*5 (emphasis added). However, the court presciently observed this result might be short-lived; "the Court also notes that the issues addressed herein may ultimately be preempted by federal law if the Communications Decency Act … is enacted." *Id*.

20

Viewed together, *Cubby* and *Stratton Oakmont* reflected a troubling pair of pre-CDA standards—website owners who did <u>not</u> screen, prevent or remove harmful third party content (like CompuServe) were <u>*rewarded*</u> with protection from defamation and related tort claims. On the other hand, website owners who tried to reduce and remove offensive content (like Prodigy) were <u>*punished*</u> for doing so by facing limitless liability for any remaining material on their sites.

Eliminating this perverse result was one of the primary reasons Congress enacted the CDA a year later. Indeed, lawmakers expressly said so; "'One of the specific purposes of [Section 230] is to overrule *Stratton Oakmont v. Prodigy* and any other similar decisions … .'" *Batzel*, 333 F.3d at 1029 (quoting S.REP. NO. 104-230, at 194 (1996)) (brackets in original and also noting, "Without the immunity provided in Section 230(c), users and providers of interactive computer services who review material could be found liable for the statements of third parties, yet providers and users that disavow any responsibility would be free from liability."); H.R. CONF. REP. No. 104–458, at 194 (1996)); *see also Barrett v. Rosenthal*, 40 Cal.4th 33, 50–54, 146 P.3d 510, 520–23 (Cal. 2006) (setting forth detailed legislative history and noting that reversing "backward" result from *Stratton Oakmont* was an important goal of the CDA).

Against this backdrop, there is no question Congress intended the CDA to <u>encourage</u> website owners to <u>actively screen</u>, review and moderate third party

posts, and to remove offensive content when necessary, without fear of liability; "In some sort of tacit *quid pro quo* arrangement with the service provider community, Congress has conferred immunity from tort liability as an incentive to Internet service providers to self-police the Internet for obscenity and other offensive material, even where the self-policing is unsuccessful or not even attempted." *Blumenthal v. Drudge*, 992 F.Supp. 44, 52 (D.D.C. 1998); *see also Zeran*, 129 F.3d at 330 (concurring; "In line with this purpose, § 230 forbids the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions."); *Barrett*, 40 Cal.4[th] at 53, 146 P.3d at 522 (noting, "Both the terms of section 230(c)(1) and the comments of Representative Cox reflect the intent to promote active screening by service providers of online content provided by others.")

This protection is not all-or-nothing.  It does not require a website owner to choose between publishing *all* of a particular third party submission or *none* of it.

Rather, under the CDA website operators are free to edit, alter or modify user-generated content without losing immunity; as long as their edits do not materially change the content's original meaning, immunity still applies; "the exclusion of 'publisher' liability necessarily precludes liability for exercising the usual prerogative of publishers to choose among proffered material and to edit the material published while retaining its basic form and message." *Batzel*, 333 F.3d

at 1031; *see also Roommates*, 521 F.3d at 1163, 1169 (observing, "In passing section 230, Congress sought to spare interactive computer services this grim choice by allowing them to perform some editing on user-generated content without thereby becoming liable for all defamatory or otherwise unlawful messages that they didn't edit or delete."); *DiMeo v. Max*, 433 F.Supp.2d 523, 530 (E.D.Pa. 2006) (agreeing, "one of Congress's goals in enacting § 230 was to *promote* this kind of self-regulation. Thus, 'development of information' must mean 'something more substantial than merely editing portions of content and selecting material for publication."), *aff'd*, 248 Fed.Appx. 208 (3rd Cir. 2007); *Donato v. Moldow*, 374 N.J.Super. 475, 865 A.2d 711 (N.J. 2005) (website operator immune under CDA despite allegation that he "actively participated in selective editing, deletion and re-writing of anonymously posted messages.")

However, granting website owners the freedom to screen and edit user-generated content was *not* the CDA's only intended function.  A different yet equally important purpose was "to encourage the unfettered and unregulated development of free speech on the Internet … ."  *Batzel*, 333 F.3d at 1027.  The Fourth Circuit further explained this point in *Zeran*:

> Section 230 was enacted, in part, to maintain the robust nature of Internet communication, and accordingly, to keep government interference in the medium to a minimum … .

> The specter of tort liability in an area of such prolific speech would have an obvious chilling effect. It would be impossible for service providers to screen each of their millions of postings for possible problems. Faced with potential liability for each message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted. Congress considered the weight of the speech interests implicated and chose to immunize service providers to avoid any such restrictive effect.

*Zeran*, 129 F.3d at 330. To that end, "Section 230 therefore sought to prevent lawsuits from shutting down websites and other services on the Internet." *Batzel*, 333 F.3d at 1028; *see also Roommates*, 521 F.3d at 1175 (warning, "We must keep firmly in mind that this is an immunity statute we are expounding, a provision enacted to protect websites against the evil of liability for failure to remove offensive content … . [S]ection 230 must be interpreted to protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles.") (emphasis added).

To help ensure the CDA functions as Congress intended, "The majority of federal circuits have interpreted the CDA to establish broad 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.'" *Johnson*, 614 F.3d at 791 (quoting *Almeida*, 456 F.3d at 1321); *Universal Comm. Sys.*, 478 F.3d at 418 ("[t]he other courts that have addressed these issues have generally interpreted Section 230 immunity broadly … ."); *Global Royalties, Ltd. v. Xcentric Ventures,*

*LLC*, 544 F.Supp.2d 929, 931 (D.Ariz. 2008) (noting, "In light of Congress' goals to encourage development of the internet and to prevent the threat of liability from stifling free expression, CDA immunity has been interpreted very broadly.")

As explained further *infra*, the CDA's dual purposes—to promote unfettered speech and to encourage website owners to actively screen content—bear special significance in this case. This is so because unlike the hundreds of cases which reached the opposite result, the court here found that CDA immunity *never* applies to website owners who review, screen, and moderate third party submissions or those who fail to immediately remove all dubious content upon demand; "In the view of this Court, the Act's text indicates that it was intended only to provide protection for site owners who allow postings by third parties <u>without screening them</u> and <u>those who remove offensive content</u>." *Jones*, 2013 WL 4068780, *3 (emphasis added).

This holding was, for lack of a better term, indefensible. The district court actually punished Appellants for doing exactly what the CDA was intended to encourage and protect. This holding was wrong and it must be reversed.

## C.    General Standards For Applying CDA

Prior to discussing how the law applies to the facts here, the analysis begins with the 26 words in the relevant statute, 47 U.S.C. § 230(c)(1):

> No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

Given this simple language, courts have generally adopted an equally simple three-part test to determine whether the CDA applies in a specific case::

1.) Is the defendant a <u>provider or user</u> of an "interactive computer service"?

2.) Do the plaintiff's claims require treating the defendant as a "<u>publisher or speaker</u>" of information?

And finally:

3.) Was the allegedly actionable material provided by *another* <u>information content provider</u>?

*See Universal Comm. Sys.*, 478 F.3d at 418 (setting forth three-part test); *Beckman v. Match.com*, 2013 WL 2355512, *3 (D.Nev. 2013) (adopting similar test).

Applying these standards here, Appellants are clearly entitled to immunity.

## 1. Appellants Are Both <u>Providers</u> *And* <u>Users</u> Of An Interactive Computer Service

To begin, the first prong of the test is easily met because websites qualify as an "interactive computer service" within the meaning of the CDA; "Courts generally conclude that a website falls within 'the definition of an interactive computer service.'" *Zuckerberg*, 2012 WL 6725588, *3 (quoting *Ascentive, LLC v. Opinion Corp.*, 842 F.Supp.2d 450, 473 (E.D.N.Y. 2011) (collecting cases from the First, Fourth, and Ninth Circuits)); *see also Accusearch*, 570 F.3d at 1195.

The fact that Mr. Richie occasionally posts his own comments on www.TheDirty.com does not affect this analysis in any way. It simply means that in addition to acting as a website *provider*, Mr. Richie is also a website *user*. This makes no difference because the CDA applies equally to both; "§ 230(c)(1) confers immunity not just on 'providers' of such services, but also on 'users' of such services." *Batzel*, 333 F.3d at 1030.

Thus, as long as Mr. Richie did not create or develop *the actionable content*, he remains immune even if he created or developed *other* content; "There is nothing inconsistent or unusual about a website operator being both an interactive computer service provider or user and an information content provider. The two are not mutually exclusive." *Donato*, 374 N.J.Super. at 490, 865 A.2d at 720; *Gentry v. eBay*, 99 Cal.App.4[th] 816, 833 n.11, 121 Cal.Rptr.2d 703, 717 n.11 (Cal.App. 4th Dist. 2002) (opining, "It is not inconsistent for [a website operator] to be an interactive service provider and also an information content provider; the categories are not mutually exclusive. The critical issue is whether [the website operator] acted as an information content provider with respect to the information that … is false or misleading.").

Because Mr. Richie and Dirty World provide and run an interactive website where users can post and read messages, the answer to the first question is <u>YES</u>.

### 2.    Appellants Were Treated As "Publishers" Or "Speakers" Of Information

The second prong asks whether the claims at issue require treating the defendant as a "publisher or speaker" of information.  Here, there is no dispute this prong was satisfied because the sole cause of action was defamation.  *See* Doc. #207 (jury instructions).  Defamation claims are squarely within the scope of the CDA because they require the defendant to "publish" something defamatory.  *See Okeke v. Cars.com*, 40 Misc.3d 582, 586, 966 N.Y.S.2d 843, 846 (N.Y.City Civ. Ct. 2013) (explaining, "the CDA mandates that such providers cannot be deemed to be a 'publisher' or 'speaker' of third-party content, thereby having the practical effect of barring defamation claims, which are the most common type of tort claim associated with the CDA."); *see also Barnes*, 570 F.3d at 1101 (noting, "The cause of action most frequently associated with the cases on section 230 is defamation.")

Ms. Jones's defamation claim treated Appellants as publishers/speakers of information.  As such, the answer to the second question is also <u>YES</u>.

### 3.    All Actionable Material Was Provided Solely By *Another* Information Content Provider

The third and final prong asks whether the allegedly actionable material provided by *another* information content provider; i.e., a third party.   If so, then Appellants are immune from any claim based on their "publication" of that

material.  *See MySpace*, 528 F.3d at 419 (explaining, "[S]o long as a third party

willingly provides the essential published content, the interactive service provider

receives full immunity regardless of the specific editing or selection process.")

Here, Mr. Richie's testimony on this point was uncontroverted and

unequivocal—he played no role in the creation or development of the information

Ms. Jones alleged was false:

> ¶ 19.  To be clear—I did not create any of the posts about Plaintiff,
> nor did I create the titles to any of these posts. I did not edit, change,
> alter, or modify these posts or their titles in any manner.  I did not ask
> or encourage anyone else to submit these posts on my behalf, nor did I
> ask the site's viewers to submit anything regarding Plaintiff.  All of
> this material originated solely with a third party or parties.

ECF Doc. 64–2; Page ID #483.

What evidence did Ms. Jones offer to refute this testimony?  <u>None</u>.  In fact,

as noted above, when the court found that the CDA did not apply at the summary

judgment stage, Ms. Jones offered no evidence on this point other than Mr.

Richie's deposition transcript and an unauthenticated transcript of an interview Mr.

Richie gave to TV talk show host Dr. Phil McGraw during which Ms. Jones was

never mentioned.  *See* Doc. #66, 67.   However, nothing in those transcripts

contradicted any part of Mr. Richie's affidavit.

The undisputed evidence therefore showed that the only actionable material

in this case—comments claiming that Ms. Jones "slept with every other Bengal

football player" and implying that she had two STDs and had sex in her classroom—was created and submitted by a third party user of the site acting without any encouragement or instruction from Appellants and these comments were published exactly as they were submitted.  Given those undisputed facts, Ms. Jones's defamation claim was barred; "This is precisely the kind of situation for which section 230 was designed to provide immunity."  *Roommates*, 521 F.3d at 1174.

Of course, the district court rejected this argument.  As explained *infra*, the court's holding was factually and legally erroneous.

### D.    The District Court's CDA Analysis Was Erroneous

As noted above the district court found Appellants were not entitled to immunity because the court held they "developed" the defamatory comments about Ms. Jones, and as developers, they were not entitled to immunity.  This holding was wrong because the court construed the word "develop" so broadly that it encompassed editorial conduct the CDA was unquestionably intended to protect.

As noted above, the importance of the word "develop" derives from the phrase "information content provider" found in Section 230(c)(1).  Although many cases substitute the term "third party" or "other party" in its place, the phrase is a term of art defined by 47 U.S.C. § 230(f)(3) as follows:

> The term 'information content provider' means any person or entity that is responsible, in whole or in part, for the <u>creation or development of information</u> provided through the Internet or any other interactive computer service.  (emphasis added)

In this definition, the word "development" plays a critical role in deciding when CDA immunity is lost—if a website provider or user is responsible for creating or *developing* unlawful material, then the CDA does not apply.  Put differently, the CDA only prohibits plaintiffs from suing website owners for content that came from *another* source; i.e., a third party or other "information content provider".  Therefore, if a website owner creates or "develops" the unlawful content itself, then such material is *not* from *another* source.

Ms. Jones never seriously argued that Appellants "created" the text she claims was defamatory, nor did she offer any evidence to support that conclusion. Instead, citing just two cases—*Accusearch* and *Roommates*—she argued that Appellants "developed" the actionable content in various ways.  The district court agreed with this argument both as a matter of law and a matter of fact, but its holding was erroneous on both fronts.

### 1.    The District Court Applied The Wrong Legal Standard For "Development"

Here, the court interpreted the word "development" to mean *any act* by a website owner that somehow *encourages* users to post *offensive* content.   On that point, the court explained: "the controlling test for determining immunity [is] as

31

follows: … a service provider is 'responsible' for the development of offensive content only if it in some way specifically encourages the development of *what is offensive about the content*.'" *Jones*, 840 F.Supp.2d at 1011 (emphasis in original) (quoting *Accusearch*, 570 F.3d at 1199). As this circular statement shows, the court felt that if a website owner does anything to encourage offensive content, then it necessarily developed that content and is an "information content provider" and thus is no longer immune. This holding grossly misinterprets the law as discussed in *Accusearch*.

*Accusearch* involved an unusual set of facts none of which were present here, so the case warrants some discussion. In *Accusearch*, the defendant operated a website called www.Abika.com which sold various types of information and records to the public. *See Accusearch*, 570 F.3d at 1191. Among other things, the site sold access to private telephone records, including, "details of incoming or outgoing calls from any phone number, prepaid calling card or Internet Phone[.]" *Id*. Selling these records violated federal law and "Acquisition of this information would almost inevitably require someone to violate the Telecommunications Act or to circumvent it by fraud or theft." *Id*. at 1192. The Federal Trade Commission sued Accusearch to prohibit further sales of these "inherently unlawful" records.

Accusearch argued that even if selling private phone records was illegal, it was entitled to immunity because the records were actually obtained by third party

"researchers" not by Accusearch itself. Both the district court and the Tenth Circuit rejected this argument, finding the website operator played a direct and material role in the process such that it was responsible for "developing" the unlawful content.

Key to this holding was the fact that Accusearch itself directly participated in the unlawful conduct: "<u>Accusearch solicited requests for confidential information protected by law</u>, <u>paid researchers to find it</u>, <u>knew that the researchers were likely to use improper methods</u>, and <u>charged customers who wished the information to be disclosed</u>." *Accusearch*, 570 F.3d at 1201 (emphasis added). Under those facts, the court determined the CDA did not apply because "a website helps to develop unlawful content, and thus falls within the exception to section 230, <u>if it contributes materially to the alleged illegality of the conduct</u>." *Id*. at 1200 (emphasis added) (quoting *Roommates*, 521 F.3d at 1168).

In sum, *Accusearch* did not involve a simple online message board where comments and posts were submitted by third party users (as in this case). Instead, customers seeking to purchase illegal phone records placed orders directly with Accusearch itself and paid a fee directly to Accusearch. These unlawful transactions could not have been completed without the direct participation of Accusearch itself. Thus, Accusearch materially contributed to the unlawful conduct and was not protected.

None of these facts were present here.  Appellants did not pay or solicit third parties to create defamatory posts regarding Ms. Jones.  Rather, as explained in Mr. Richie's affidavit, Appellants operate a free website which provides users with a 100% neutral content submission form.  Unlike *Accusearch*, the undisputed evidence showed that nothing about www.TheDirty.com is "inherently unlawful".  Although it certainly contains some risqué content, the site also contains vast numbers of general news items concerning sports, politics and so forth.  Further, Appellants' Terms of Service (Doc. #177–1 at ECF Page ID # 2788–89) expressly instructed users <u>not</u> to post unlawful content; "Comments or any other material which is false, defamatory, or otherwise unlawful is not allowed."

Even if some users break the rules and submit unlawful content, it is not because Appellants "encouraged" or "caused" them to do so; "One might as well say that people who save money 'cause' bank robbery, because if there were no banks there could be no bank robberies.  An interactive computer service 'causes' postings only in the sense of providing a place where people can post." *Chicago Lawyers Comm.*, 519 F.3d at 671.  The mere presence of *some* unlawful content on Appellants' site does not mean Appellants "caused" or "induced" users to post it; "Section 230(c)(1) would serve little if any purpose if [websites] were found liable under state law for 'causing' or 'inducing' users to post unlawful content in this fashion." *Dart v. Craigslist, Inc.*, 665 F.Supp.2d 961, 969 (N.D.Ill. 2009).

In addition to citing *Accusearch* (which itself relied heavily on the Ninth Circuit's decision in *Roommates*) the district court also specifically suggested that *Roommates* supported its view. However, even a cursory inspection of that case shows the contrary is true.

*Roommates* involved allegations that the defendant (the operator of a roommate-matching website) violated federal law, specifically the Fair Housing Act, by requiring users to answer questions about their age, race, sex and marital status as a condition of using the site. *See* 521 F.3d at 1161–62. The court found that merely asking for this type of information in a housing-related transaction was inherently unlawful and thus the CDA did not apply.[3]

Thus, by creating unlawful questions and requiring all users to answer them, the website operator itself was materially involved in developing the unlawful content; "Roommate's own acts–posting the questionnaire and requiring answers to it–are entirely its doing and thus section 230 of the CDA does not apply to them." *See Roommates*, 521 F.3d at 1165. In reaching this holding, the Ninth Circuit offered a clear and simple definition of the word 'development': "we interpret the term 'development' as referring not merely to augmenting the content

---

[3] Four years after denying CDA immunity based on the *assumption* that the website's own questions were unlawful, the Ninth Circuit found that the questions were <u>not</u> unlawful. *See Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 666 F.3d 1216 (9th Cir. 2012). This outcome shows the denial of immunity was erroneous.

generally, but to <u>materially contributing</u> to its alleged unlawfulness.   In other words, <u>a website helps to develop unlawful content, and thus falls within the exception to section 230, if it contributes materially to the alleged illegality of the conduct</u>." *Id.* at 1167–68 (emphasis added).   The Ninth Circuit even offered an example of the type of material contribution that would vitiate immunity; "a website operator who edits in a manner that contributes to the alleged illegality– such as by removing the word 'not' from a user's message reading '[Name] did *not* steal the artwork' in order to transform an innocent message into a libelous one–is directly involved in the alleged illegality and thus not immune." *Id.* at 1169 (emphasis in original).

This standard—making a *material contribution* to the unlawful nature of the post by removing words to change an innocuous message into a libelous one—is clearly not the rule applied by the district court in this case.   Under the correct standard from both *Roommates* and *Accusearch*, Appellants retained their immunity because they did not create, alter, or change (materially or otherwise) any of the content that Ms. Jones claimed was false.   All such content was created by third parties and was passively displayed in its unaltered form exactly as it was submitted to the site.   *See* Doc. #64–2 at 6, ¶ 19; Page ID #483.

Again, this result is strongly supported by *Roommates*.   After finding the website owner was not entitled to protection for requiring users to answer unlawful

questions, the court addressed a separate argument—that the defendant impliedly
<u>encouraged</u> users to post unlawful content by providing a section where users
could post "Additional Comments" about themselves.  The Ninth Circuit rejected
this argument, finding that the CDA's broad protection could not be withheld on
such a "weak" basis:

> [The plaintiff] Councils argue that–given the context of the
> discriminatory questions presented earlier in the registration process–
> the "Additional Comments" prompt impliedly suggests that
> subscribers should make statements expressing a desire to discriminate
> on the basis of protected classifications; <u>in other words, Councils
> allege that, by encouraging some discriminatory preferences,
> Roommate encourages other discriminatory preferences when it gives
> subscribers a chance to describe themselves</u>.  But the encouragement
> that bleeds over from one part of the registration process to another is
> extremely weak, if it exists at all.  <u>Such weak encouragement cannot
> strip a website of its section 230 immunity, lest that immunity be
> rendered meaningless as a practical matter</u>.

*Roommates*, 521 F.3d at 1174 (emphasis added).

To eliminate any doubt, the court emphasized this point repeatedly:

> It's true that, under a pedantic interpretation of the term "develop,"
> any action by the website–including the mere act of making a text box
> available to write in–could be seen as "develop[ing]" content.
> However, we have already rejected such a broad reading of the term
> 'develop' because it would defeat the purpose of section 230.

*Id*. at 1174 n.38.

Ultimately, the Ninth Circuit found that even if users posted unlawful content in the "Additional Comments" section of their profiles, the website owner was not responsible for developing that material:

> Roommate publishes these comments as written. <u>It does not provide any specific guidance as to what the essay should contain, nor does it urge subscribers to input discriminatory preferences</u>. Roommate is not responsible, in whole or in part, for the development of this content, which comes entirely from subscribers and is passively displayed by Roommate. Without reviewing every essay, Roommate would have no way to distinguish unlawful discriminatory preferences from perfectly legitimate statements. Nor can there be any doubt that this information was tendered to Roommate for publication online. <u>This is precisely the kind of situation for which section 230 was designed to provide immunity</u>.

521 F.3d 1173–74 (emphasis added).

As these passages make clear, neither *Roommates* nor *Accusearch* support the rule applied by the district court in this case; i.e., that generally encouraging offensive[4] content makes the website owner a "developer" of all such content.

---

[4] Although it is not necessary to reach this issue, the district court's suggestion that "offensive" speech is somehow entitled to less protection than non-offensive speech raises serious constitutional concerns; "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). On the contrary, "[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection." *FCC v. Pacifica Found.*, 438 U.S. 726, 745, 98 S.Ct. 3026, 3038, 57 L.Ed.2d 1073 (1978).

Other courts share this view.  For instance, in *Best Western Int'l, Inc. v. Furber*, 2008 WL 4182827 (D.Ariz. 2008), the plaintiff (a hotel chain franchisor) sued a website operator for creating a page that contained allegedly defamed the plaintiff's business.   The plaintiff argued the CDA did not apply because defendant's site "encouraged" users to post defamatory statements.   The court rejected this argument:

> [Plaintiff] BWI also contends that [defendant] Furber is not entitled to CDA immunity because he created the website homepage to solicit content from others and therefore is a content provider.   But the homepage does not explicitly solicit *tortious material*.   BWI claims that the homepage impliedly suggests that visitors should make statements defaming BWI.   The Court does not agree.   But even if this were true, it is insufficient to strip Furber of CDA immunity.

*Id*. *10 (emphasis added) (citing *Roommates*, 521 F.3d at 1173–74).

In a similar case, a website called www.RipoffReport.com was held immune even assuming the name of the site encouraged users to post defamatory statements; "It is obvious that a website entitled Ripoff Report encourages the publication of defamatory content.   However, there is no authority for the proposition that this makes the website operator responsible, in whole or in part, for the 'creation or development' of every post on the site." *Global Royalties*, 544 F.Supp.2d at 933.  *See also Giordano v. Romeo*, 76 So.3d 1100 (Fla.3d Dist. 2011) (same).

These points are efficiently summarized by the New York Court of Appeals'

recent decision in *Shiamili v. The Real Estate Group of New York, Inc.*, 952 N.E.2d

1011, 17 N.Y.3d 281 (N.Y. 2011), a case with facts almost identical to those here.

In *Shiamili*, like in this case, the plaintiff sued a website operator claiming that it

was responsible for defamatory posts appearing on the defendant's website, even

though it was undisputed that the posts were written by a third party. *See Shiamili*,

17 N.Y.3d at 258–86, 952 N.E.2d at 1014–15. Like in this case, the plaintiff

argued that the website administrator lost immunity for three reasons: 1.) the

administrator added an anti-Semitic statement referring to the plaintiff as "King of

the Token Jews"; 2.) the administrator "promoted" the original content by moving

it from a blog comment mixed in with other comments to a stand-alone article, and

3.) the website was intended to "encourage" the posting of negative information.

Like Ms. Jones, the plaintiff in *Shiamili* cited both *Roommates* and

*Accusearch* for the idea that these actions "encouraged" defamatory material. In a

clear and concise manner, the court rejected each point, finding that none of the

website host's actions "materially contributed" to the illegality of the third party's

statements and therefore the host retained its CDA immunity:

> As an initial matter, the complaint alleges that the defamatory
> statements were first posted by anonymous users; there is no
> allegation that defendants actually authored the statements. A website
> is generally not a "content provider" with respect to comments posted
> by third-party users. We reject Shiamili's contention that defendants

> should be deemed content providers because they created and ran a
> website which implicitly encouraged users to post negative comments
> about the New York City real estate industry. Creating an open forum
> for third-parties to post content—**including negative commentary**—
> is at the core of what section 230 protects.

*Shiamili*, 17 N.Y.3d at 290–91, 952 N.E.2d at 1018 (emphasis added).

The Court explained its view of *Accusearch* and *Roommates* as follows:

> Those cases, however, are easily distinguishable. In *Roommates.com*,
> the non-parties providing the data were required to post actionable
> material to the defendant website as a condition of use, and the
> website's "work in developing the discriminatory questions,
> discriminatory answers and discriminatory search mechanism [was]
> directly related to the alleged illegality of the site". Here, in contrast,
> there are no allegations that posting false and defamatory content was
> a condition of use, or that the site worked with users to develop the
> posted commentary. This case also differs considerably from
> *Accusearch Inc.*, where the defendant website paid researchers to
> obtain information for the site to disseminate that "would almost
> inevitably require [the researcher] to violate the Telecommunications
> Act or to circumvent it by fraud or theft". There is no comparable
> allegation against these defendants.

*Id*. (emphasis added) (internal citations omitted).

This same is true here—there is no evidence in this case showing that

Appellants *require* users to post unlawful material (as in *Roommates*), nor was

there any evidence showing that Appellants paid the author of the postings

about Ms. Jones to create false or unlawful material about her (as in

*Accusearch*). In the absence of such evidence, the district court's reliance on

*Roommates* and *Accusearch* was improper.

41

The final point discussed in *Shiamili* is one of the most important of all—the court concluded that even though the website operator "added" his own comments to the third party's post by inserting an offensive anti-Semitic statement calling the plaintiff "King of the Token Jews", the court agreed that this type of non-defamatory statement was *per se* insufficient to affect the website's immunity under the CDA; "This is not a defamatory statement, since no 'reasonable reader could have concluded that ... [it was] conveying facts about the plaintiff'. The illustration was obviously satirical and, although offensive, it cannot by itself support Shiamili's claim of defamation. Nor, contrary to the dissent's view, does it 'develop' or 'contribute to the illegality' of the third-party content within the meaning of the CDA." *Shiamili*, 17 N.Y.3d at 292–93, 952 N.E.2d at 1020.

In the proceedings below, Appellants cited *Shiamili* and argued that its logic applied here. Despite this, the district court did not mention or discuss *Shiamili*, except by referencing the dissent judge's opinion from that case in a footnote. *See Jones*, 840 F.Supp.2d at 1013 n.5. If the district court followed *Shiamili*, it would have concluded Ms. Jones's claims were barred by the CDA.

As *Shiamili*, *Accusearch* and *Roommates* each demonstrate, mere general encouragement of content, offensive or banal, is not sufficient to strip a website owner of immunity. Such an amorphous standard sets the bar far too low and

"would defeat the purposes of section 230 by swallowing up every bit of the immunity that the section otherwise provides." *Roommates*, 521 F.3d at 1167.

Instead, the correct standard as explained in *Roommates* is very simple—immunity does not apply when the website operator <u>materially contributes</u> to the creation of <u>unlawful content</u>, such as by removing words to change a message from innocuous into libelous or by creating its own independently unlawful speech. Under that standard, the district court's denial of immunity in this case was clearly erroneous. This point is easily demonstrated by a simple fact—the statements Ms. Jones claimed were defamatory would be equally actionable without Mr. Richie's comments, and Mr. Richie's satirical comments, standing alone, could not have supported any claim. Accordingly, Mr. Richie's comments were immaterial and thus Appellants were, and are, immune under the CDA.

### 2.    No Evidence Showed That Appellants "invited, encouraged, and adopted defamatory posts" About Ms. Jones

As explained above, the district court's narrow construction of the CDA and the term "development" was legally erroneous. For that reason alone, the denial of immunity was improper and the judgment in favor of Ms. Jones must be reversed.

However, even assuming *arguendo* that the district court's legal analysis was correct, the court still fundamentally erred. This is so because there was no evidence to show that Appellants actually encouraged anyone to submit any

offensive or defamatory material about Ms. Jones. *See Collins v. Purdue Univ.*, 703 F.Supp.2d 862, 879 (N.D.Ind. 2010) (finding that even if website operator "invit[ed] readers' comments" about an online article, the CDA still applied because "none of the facts before the court show any encouragement by for readers to comment on the website articles *in a defamatory way*.") (emphasis added).

Specifically, after adopting the incorrect legal test for development discussed above, the court identified three specific points to show that Appellants "encouraged" the posts about Ms. Jones:

1.) The name of Appellants' website; www.TheDirty.com; "First, the name of the site in and of itself encourages the posting only of 'dirt,' that is material which is potentially defamatory or an invasion of the subject's privacy." *Jones*, 840 F.Supp.2d at 1012.

2.) The manner in which Mr. Richie operates the site; "He reviews the postings but does not verify their accuracy. If someone objects to a posting, he decides if it should be removed. It is undisputed that Richie refused to remove the postings about plaintiff that are alleged to be defamatory or an invasion of privacy." *Id*.

3.) Mr. Richie's Own Comments; "Most significantly, Richie adds his own comments to many postings, including several of those concerning the plaintiff. In these comments, he refers to 'the fans of the site' as 'the Dirty Army.' He also adds his own opinions as to what he thinks of postings." *Id.*

Taking each separately, it is clear that none of these points supported the court's decision to deny immunity.

## A.    The Name Of Appellants' Site Is Irrelevant

Without citing any legal authority, the district court held that the *name* of Appellants' website—www.TheDirty.com—meant they were responsible for developing every post on the site because "the name of the site in and of itself encourages the posting only of 'dirt,' that is material which is potentially defamatory or an invasion of the subject's privacy." *Jones*, 840 F.Supp.2d at 1012. The court went even further, stating, "The principal content of 'the dirty.com' web site is not only offensive but tortious." *Id*. at 1011.  This holding was wrong as a matter of law and wrong as a matter of fact.

First, as a matter of law, every other court that has considered the same argument has reached the opposite conclusion.  For instance, after the Kentucky court denied summary judgment in this case, a different federal court in Missouri granted summary judgment in Appellants' favor in *S.C. v. Dirty World, LLC*, 2012 WL 3335284 (W.D.Mo. 2012).  In that case under virtually identical facts, the court explained the name of Appellants' website was irrelevant; "the CDA focuses on the specific content at issue and not the name of a website." *Id*. at *5 (emphasis added) (citing *Global Royalties, supra*, 544 F.Supp.2d at 933);  *Ascentive, LLC v. Opinion Corp*., 842 F.Supp.2d 450, 473 (E.D.N.Y. 2011) (holding website named www.pissedconsumer.com was entitled to CDA immunity despite offensive name); *Shiamili, supra*, 952 N.E.2d 1011, 17 N.Y.3d 281, 2011 WL 2313818

(N.Y. 2011) (finding operator of website called www.shittyhabitats.com entitled to CDA immunity despite offensive name of site).

These holdings make perfect sense because as the Court of Appeals recognized in *Shiamili*, the CDA was not intended to protect websites that host only non-controversial material. On the contrary, "Creating an open forum for third parties to post content—including negative commentary—is at the core of what section 230 protects." *Shiamili*, 952 N.E.2d at 1018, 17 N.Y.3d at 290–91.

This leads to an important yet subtle point overlooked by both Ms. Jones and the district court: websites that do not contain any offensive content—e.g., http://butterflies-and-rainbows.blogspot.com—do not need the CDA to survive. This is so because people rarely file lawsuits over excessively positive or laudable speech. Rather, they only sue when the speech is negative, offensive or hurtful.

Thus, as a practical matter the CDA can only be implicated when the speech at issue is negative rather than positive. For that reason, the district court's logic was completely backwards—rather than giving protection to those websites which need it most, the court would offer CDA protection only to those sites which need it least (or not at all).

This Court should reject this inverted view and follow the sensible logic of cases such as *Shiamili* by holding, as a matter of law, that the name of Appellants' website is irrelevant to the question of whether they "developed" the content at

issue.[5]   Such a rule is appropriate because if a website's name was somehow relevant to its CDA immunity, this would lead to freakish and almost certainly unconstitutional results wherein the owner of a website with a benign name such as www.The*Clean*.com or an arbitrary name such www.Abika.com would be entitled to immunity for publishing the exact same content that appears on www.TheDirty.com.   Nothing in the language or legislative history of the CDA would support such an arbitrary and capricious result.

Furthermore, granting or withholding immunity based on a single judge's subjective opinion about the tastefulness of a website's name ignores a simple truth—for better or for worse, offensive Internet speech is common.  *See DiMeo*, 433 F.Supp.2d at 533 (recognizing, "Some of the dialogue on the Internet surely tests the limits of conventional discourse.  Speech on the Internet can be unfiltered, unpolished, and unconventional, even emotionally charged, sexually explicit, and vulgar–in a word, 'indecent' in many communities.  But we should expect such speech to occur in a medium in which citizens from all walks of life have a voice.")  For better or worse, it is a fact of modern life that offensive online speech is extremely pervasive, even on mainstream websites with non-offensive names. *See*, *e.g.*, *Carafano*, 339 F.3d at 1120 (describing "cruel and sadistic" material

---

[5] For obvious reasons, the court need not consider the question of how to treat a website entitled: www.PleasePostDefamatoryContentAboutSarahJones.com.

posted    anonymously    on    website    with    non-offensive    name,

www.matchmaker.com); *Barnes*, 570 F.3d at 1098 (noting, "This case stems from

a dangerous, cruel, and highly indecent use of the internet for the apparent purpose

of revenge" although name of website—www.yahoo.com—was not offensive);

*M.A. v. Village Voice Holdings, LLC*, 809 F.Supp.2d 1041, 1043 (E.D.Mo. 2011)

(describing "horrific victimization" of plaintiff, a minor, who was victim of online

sex trafficking although the name of website—www.backpage.com—was not

offensive); *Doe v. America Online, Inc*., 783 So.2d 1010 (Fla. 2001) (finding CDA

barred claims against website operator arising from child pornography marketed

and sold via website with non-offensive name; www.aol.com).

As these cases show, regardless of a website's name, offensive online

content is common.  Thus, denying immunity based simply on a website's mildly

derogatory name would do little or nothing to reduce harmful speech while

creating an arbitrary exception to the CDA larger than the rule itself.

However, even if the CDA permitted courts to deny immunity if they found

the website's name was inherently unlawful, that rule would still not apply here.

This is so because as this court recently noted in *Seaton v. TripAdvisor*, there is

nothing unlawful about referring to someone or something as "dirty", even when

using the superlative term "dirtiest".  Either word is a non-factual expression of

opinion; "the meaning of 'dirtiest' is not easily pinned down when read beside

these quotations; therefore, readers would not interpret 'dirtiest' as making an assertion of fact." *Seaton*, 2013 WL 4528570, *5; *see also Adelson v. Harris*, --- F.Supp.2d ----, 2013 WL 5420973, *19 (S.D.N.Y. 2013) (finding words "dirty" and "tainted", although derogatory, "are 'concepts whose content is so debatable, loose and varying, that they are insusceptible to proof of truth or falsity.'")

Again, this point is easily demonstrated by looking at the facts of this case. Contrary to the district court's holding, the undisputed summary judgment evidence here showed that www.TheDirty.com is *not* devoted solely or even primarily to tortious content, just as www.Amazon.com is not devoted exclusively to South American rainforests, www.Apple.com has little to do with pomaceous fruit, and www.TheDailyBeast.com is not about wild animals.

Rather, as explained in Mr. Richie's two uncontroverted affidavits, www.TheDirty.com contains a wide variety of non-defamatory and non-controversial news stories about sports, politics, celebrities, and so forth. Ms. Jones offered no evidence to refute this testimony. It is therefore not surprising that the district court cited no evidence to support its conclusion that "[t]he principal content of 'the dirty.com' web site is not only offensive but tortious." *Jones*, 840 F.Supp.2d at 1011. That aspect of the court's holding had no evidentiary basis, as the Missouri court rightly observed in *S.C.*; "Factually, the Plaintiff has not presented any evidence that the Website is devoted to 'dirt' about

private citizens or is merely 'a portal for defamatory material.' To the contrary, the Defendant has shown that the Website contains posts on a number of topics, including sports, politics, and other world events." *S.C.*, 2012 WL 3335284. The same is true here. For these reasons, the district court plainly erred when it held that CDA immunity was lost due to the name of Appellants' website.

### B.    Appellants Operate www.TheDirty.com In A Manner The CDA Was Intended To Encourage And Protect

The second reason immunity was denied focused on "the manner in which [www.TheDirty.com] is managed." On this point, the court explained: "Richie acts as editor of the site and selects a small percentage of submissions to be posted. He adds a 'tagline.' He reviews the postings but does not verify their accuracy. If someone objects to a posting, he decides if it should be removed." *Jones*, 840 F.Supp.2d at 1012.[6] Based on these facts, the court found Mr. Richie should be treated as a "developer" of all content appearing on the site.

---

[6] The court also stated: "It is undisputed that Richie refused to remove the postings about plaintiff that are alleged to be defamatory or an invasion of privacy." *Jones*, 840 F.Supp.2d at 1012. This conclusion was factually untrue. *See* Doc. #64–2 at 8, ¶ 30. However, this point is irrelevant because the CDA protects website operators even when they refuse to remove material upon request. *See Mmubango v. Google, Inc.*, 2013 WL 664231, *3 (E.D.Pa. 2013) ("Google cannot be held liable for failing to withdraw this statement once it has been published."); *Black v. Google, Inc.*, 2010 WL 3222147, *3 (N.D.Cal. 2010) (same); (*Shrader v. Biddinger*, 2012 WL 97632, *8 (D.Colo. 2012) (same); *Global Royalties*, 54 F.Supp.2d at 931–32 (same).

There is little need to belabor this point—the court essentially disregarded the CDA and applied the same pre-1996 standards used in *Stratton Oakmont*. In this way, the court not only ignored the law, it punished Mr. Richie for doing exactly what Congress intended to encourage—screening and moderating third-party submissions so that at least *some* offensive content is curtailed.

Once again, it was undisputed that in his role as the website's moderator, Mr. Richie invoked the CDA's broad protection to actively review and remove at least some offensive content such as "nudity/obscenity, threats of violence, profanity, racial slurs, etc." Doc. #64–2 at 4, ¶ 15. In addition, Mr. Richie explained that since mid-2009, he has removed more than 2,200 posts from the site after receiving requests from users. Doc. 177–1 at 4, ¶¶ 10–12, Page ID #2699.

Since the CDA was adopted in 1996, no court anywhere has agreed that immunity could be lost based on such conduct. On the contrary, unanimous authority (including the same authority cited by the district court) holds these are precisely the types of editorial actions Congress intended to *encourage* with the CDA; "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230." *Roommates*, 521 F.3d at 1171; *see also Zeran*, 129 F.3d at 330 (agreeing, "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions--such as deciding whether to publish, withdraw,

postpone or alter content--are barred."); *Ben Ezra, Weinstein, and Company, Inc. v. America Online Inc.*, 206 F.3d 980, 986 (10th Cir. 2000) (concurring, "Congress clearly enacted § 230 to forbid the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions.")

Mr. Richie's decisions concerning the selection and removal of content are classic editorial choices which are *per se* protected by the CDA.  *See DiMeo*, 433 F.Supp.2d at 530 (rejecting argument that defendant "developed" content by selecting which posts to publish and by editing their contents; "If 'development of information' carried the liberal definition that [plaintiff] suggests, then § 230 would deter the very behavior that Congress sought to encourage."); *see also Levitt v. Yelp!, Inc.*, 2011 WL 5079526 (N.D.Cal. 2011).

As such, the court's decision to deny immunity on the basis of Mr. Richie's editorial conduct and management of the site was wrong and must be reversed.

## C.    Mr. Richie's Own Comments Are Irrelevant

The final point referenced by the district court was this—by adding a rhetorical remark—asking "why are all high school teachers freaks in the sack?"— Mr. Richie "effectively ratified and adopted the defamatory third-party post." 2013 WL 4068780, *4.  Yet again, this holding was wrong both as a matter of fact and law.

Factually, the court's conclusion is simply not an accurate characterization of the evidence.  Mr. Richie's obviously sarcastic quip did not "adopt" or "ratify" the facts in the post.  Mr. Richie did not express any personal knowledge that the facts submitted by the post's author were true, nor did he say "I agree with these statements and adopt them as my own."

Instead, Mr. Richie did essentially the same thing as the website operator in *Shiamili*; he expressed his own personal viewpoint which was arguably mildly derogatory but he did not change the meaning of the original post in any way.  In addition to *Shiamili*, other courts have agreed the CDA fully protects such conduct. *See Phan v. Pham*, 182 Cal.App.4[th] 323, 328, 105 Cal.Rptr.3d 791, 795 (Cal.App. 3rd Dist. 2010) (holding CDA protected defendant who added introductory sentence to allegedly defamatory email before forwarding it to others; "using the material contribution test from *Roommates*, it is evident that defendant … made no material contribution to the alleged defamation in the e-mail … .  That is, the only possible defamatory content is to be found in the e-mail was the original content received by defendant … from [the author].  Nothing 'created' by defendant … was itself defamatory."); *see also Batzel*, 333 F.3d at 1022.

The same is true here.  Mr. Richie's "freak in the sack" comment was plainly not actionable on its own.  The only actionable content was the original content submitted to the site by the author.  Under the material contribution test

from *Roommates*, Mr. Richie's after-the-fact quip did not materially contribute to the unlawfulness of the original post. Thus, suggesting that Mr. Richie "ratified" the original post is simply an impermissible effort to treat him as the "publisher or speaker" of words created by another person, exactly what the CDA prohibits.

Legally, despite hundreds of cases interpreting the CDA, no court anywhere has recognized the existence of an exception based on a website owner "ratifying" or "adopting" content submitted by a third party user. On the contrary, all courts to considered this argument have rejected it.

For instance, in *Parisi v. Sinclair*, 774 F.Supp.2d 310 (D.D.C. 2011) the plaintiff sued various defendants for defamation arising from the online marketing and sale of a book. Although it was undisputed that one of the defendants (a bookstore called "Books-A-Million" or "BAM") did not create the actionable material, the plaintiff argued that BAM lost CDA immunity because it "adopted" the false statements as its own. The district court rejected this argument:

> Plaintiffs also attempt to claim that CDA immunity should be withheld because BAM adopted the promotional statements as its own. However, they cite no applicable law for this proposition. Indeed, it would be contrary to the purpose of the CDA, which sought to encourage the "'vibrant and competitive free market' of ideas on the Internet," by establishing immunity for internet publication of third-party content to require a fact-based analysis of if and when a defendant "adopted" particular statements and revoke immunity on that basis.

*Parisi*, 774 F.Supp.2d at 316 (emphasis added) (citing *Nemet Chevrolet*, 591 F.3d at 253 (quoting 47 U.S.C. § 230(b)(2)).

Similarly, in *Milo v. Martin*, 311 S.W.3d 210 (Tx.App. 2010), the plaintiff argued that the defendant (a website operator) lost its immunity by "endorsing and vouching" for the truthfulness and veracity of material posted on its site by anonymous third parties. This theory was based on the defendant's description of his site: "*The Watchdog* is a monthly publication by newsletter and website. It contains facts believed to be totally accurate by sources with character and truthfulness as their primary attributes. Our agenda is the truth and nothing less." *Milo*, 311 S.W.3d at 216. Based on this comment, the plaintiff argued that "by vouching for the truthfulness of the third party statements, [defendant] contributed to the development of the material and is therefore not immune from liability." *Id.*

The Texas court wisely rejected this argument, finding that a reasonable person viewing posts on the site would not interpret the website owner's comment as meaning that he "had investigated the information contained within the posts on that portion of the site, and there is nothing to indicate that [defendant] had vouched for the truth of any of the statements within the 'Guest Book' itself." *Id.* For that reason, the court found the defendant remained immune under the CDA because it did not "materially contribute" to the alleged unlawfulness of the content within the meaning of *Roommates*. *Id.* at 217. As these cases show, the CDA simply does not contain an exception permitting the denial of immunity based on "adopting" or "ratifying" content submitted by others.

### D.    Additional Comments

As noted above, in its original order denying CDA immunity, the district court suggested that Mr. Richie generally "encouraged" users to submit offensive content, and thus he was responsible for the "development" of every post on the site.  As explained above, Appellants dispute the <u>legal</u> conclusion that immunity can be lost on this basis.

However, the court also suggested that Mr. Richie went further and actually encouraged users to submit posts about Ms. Jones in particular.  Specifically, when it initially denied immunity, the court pointed to several comments created by Mr. Richie including one which read: "I love how the Dirty Army has war mentality."  In the court's view, "One could hardly be more encouraging of the posting of such content than by saying to one's fans (known not coincidentally as "the Dirty Army"): 'I love how the Dirty Army has war mentality.'"  *Jones*, 840 F.Supp.2d at 1012–13.    In  this  way,  the  court  believed  that  Mr.  Richie's  comments "encouraged" users to submit *more* posts defaming Ms. Jones.

The court's conclusion was, in fact, self-disproving for one simple reason— at the time the first post about Ms. Jones (suggesting that she "slept with the entire Bengals  team")  was  submitted  on  October  27,  2009,  there  was  not  a  single comment regarding Ms. Jones anywhere on the site from Mr. Richie or anyone else.    Additionally,  Mr.  Richie's  "war  mentality"  and  similar  comments  were

published *after* the two allegedly defamatory posts were submitted and, most importantly, Ms. Jones offered no evidence showing that any *more* defamatory statements were submitted after Mr. Richie's comments were made.

Unfortunately, the district court apparently misunderstood or ignored the evidence on this point. Specifically, in its final CDA ruling, the court attempted to support its position as follows:

> Richie made other comments which encouraged further defamatory posts concerning plaintiff, such as: "I love how the DIRTY ARMY has war mentality;" "Never try to battle the DIRTY ARMY;" and "You dug your own grave here Sarah." <u>Following these comments, an additional defamatory post was made on the site on January 9, 2010, accusing plaintiff of "sle[eping] with every other Bengals Football player</u>." (Doc. 64–2 at 30).

*Jones*, 2013 WL 4068780, *5 (emphasis added).

The court's conclusion was simply mistaken as a matter of fact. The post cited above was not submitted in January 2010; it was submitted on October 27, 2009—more than a month *before* Mr. Richie's "war mentality" and other remarks.

The evidence on this point was both clear and undisputed. The post referenced by the court which accused Ms. Jones of sleeping with every Bengals player was actually the <u>very first post</u> submitted to the site on October 27, 2009. Although the exhibit (ECF Doc. #64–2, Page ID #507) referenced by the district court does appear to be dated January 9, 2010, that date represented the last time the post was "updated", not the original date it was first posted on the site.

57

This issue was explained in footnote 1 of Mr. Richie's summary judgment affidavit filed months before the district court initially denied immunity:

> The first post about Plaintiff appeared on the site on October 27, 2009 bearing the title "Graham Does It Again". This post was subsequently updated on January 9, 2010 when I added an additional editorial comment to the bottom of the page as reflected by several asterisks. Other than this update, the October 27, 2009 and January 9, 2010 posts were identical. Because any pages on the site are automatically overwritten once an update or revised version is published, the original version of the October 27, 2009 post (i.e., the one without the January 9, 2010 update) is not available.

Doc. #64–2 at 5, Page ID #482.

Again, Ms. Jones offered no evidence to controvert Mr. Richie's testimony on this point. Thus, the undisputed evidence showed the post accusing Ms. Jones of sleeping with the entire Bengals team was submitted on October 27, 2009, and Mr. Richie's "war mentality" comment was made regarding a different post (in which Ms. Jones did not even appear) dated December 19, 2009—nearly two months later. *See* ECF Doc. #64–2 at Page ID #519.

Given these facts, there was absolutely no basis for the district court to conclude that Mr. Richie's <u>later</u> comments somehow "encouraged *further* defamatory posts concerning plaintiff" because no *further* defamatory comments were ever submitted. Thus, even if the district court was correct in holding that immunity could be denied based on a showing that Mr. Richie somehow

encouraged users to submit material about Ms. Jones, there is no evidence that any such encouragement actually occurred here.

## II.    CONCLUSION

For all the foregoing reasons, the judgment of the district court should be reversed and this matter remanded with instructions to enter judgment in favor of Appellants.

Date: November 12, 2013    ___/s/ David S. Gingras___
         David S. Gingras, Esq.
         Gingras Law Office, PLLC
         4802 East Ray Road, #23-271
         Phoenix, AZ 85044
         Telephone: (480) 264-1400
         Email:  David@GingrasLaw.com

         Alexander C. Ward, Esq.
         Alexis B. Mattingly, Esq.
         Huddleston Bolen, LLP
         855 Central Avenue, Suite 301
         Ashland, KY 41105
         Tel.: (606) 329-8771
         Fax: (606) 324-4651
         award@huddlestonbolen.com
         amattingly@huddlestonbolen.com

         *Attorney for Appellants*
         Dirty World, LLC and
         Nik Lamas-Richie

<u>**CERTIFICATE OF COMPLIANCE**</u>

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because the brief contains <u>13,976</u> words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word in fourteen-point Times New Roman font.

Date: November 12, 2013                    ____/s/ David S. Gingras____
                                           David S. Gingras, Esq.
                                           Gingras Law Office, PLLC
                                           4802 East Ray Road, #23-271
                                           Phoenix, AZ 85044
                                           Telephone: (480) 264-1400
                                           Facsimile: (480) 248-3196
                                           Email:  David@GingrasLaw.com
                                           *Attorney for Appellants*
                                           Dirty World, LLC and
                                           Nik Lamas-Richie

## APPELLANTS' DESIGNATION OF DOCUMENTS
(6th Cir. Rule 30(g)(1))

| ECF Doc. # | Filing Date | Description | ECF Page ID # |
|---|---|---|---|
| 1 | 12/23/2009 | Complaint With Jury Demand | 1–7 |
| 20 | 8/27/2010 | Motion for Leave to Amend | 61–63 |
| 22 | 8/31/2010 | Second Amended Complaint | 74–81 |
| 64–1 | 9/21/2011 | Defendants' Motion For Summary Judgment | 442–477 |
| 64–2 | 9/21/2011 | Affidavit Of Nik Lamas-Richie In Support Of Defendants Motion For Summary Judgment | 478–519 |
| 68 | 10/12/2011 | Plaintiff's Memorandum Contra Defendants Motion To Dismiss [sic] | 804–814 |
| 70 | 10/26/2011 | Reply In Support of Defendants' Motion For Summary Judgment | 818–830 |
| 76 | 1/10/2012 | Order Denying Defendants' Motion For Summary Judgment | 845–855 |
| 177 | 3/07/2013 | Defendants' Renewed Motion For Summary Judgment | 2676–2695 |
| 177–1 | 3/07/2013 | Affidavit of Nik Lamas-Richie In Support Of Defendants' Renewed Motion For Summary Judgment | 2696–2789 |
| 186 | 4/01/2013 | Plaintiff's Memorandum Contra Defendants Motion For Summary Judgment | 2993–3001 |
| 187 | 4/11/2013 | Reply In Support Of Defendants' Renewed Motion For Summary Judgment | 3002–3022 |
| 188 | 4/18/2013 | Order Denying Defendants' Renewed Motion For Summary Judgment | 3023–3024 |
| 192 | 5/18/2013 | Defendants' Proposed Jury Instructions | 3033–3054 |
| 207 | 7/11/20132 | Jury Instructions (As Given) | 3116–3133 |
| 208 | 7/11/2013 | Final Judgment | 3134 |
| 209 | 7/15/2013 | Notice Of Appeal | 3135–3137 |
| 210 | 8/12/2013 | Memorandum Opinion Denying Defendants' Motion For Judgment As A Matter Of Law | 3138–3149 |

## **<u>CERTIFICATE OF SERVICE</u>**

U.S. Court of Appeals Docket Number: 13-5946

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system on <u>November 12, 2013</u>.

<u>/s/David S. Gingras       </u>