Case No. 13-5946

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

**SARAH JONES,**
**Plaintiff/Appellee,**

vs.

**DIRTY WORLD ENTERTAINMENT RECORDINGS, LLC,**
**et al.,**
**Defendants/Appellants**

On Appeal from the United States District Court
for the Eastern District of Kentucky
Case No. 09-CV-219-WOB, District Court Judge William O. Bertelsman

## AMICUS CURIAE BRIEF BY ONLINE SERVICE PROVIDERS

BRUCE E.H. JOHNSON
JAMES C. GRANT
AMBIKA K. DORAN
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, Washington 98101
Tel: (206) 622-3150
Fax: (206) 757-7700

JOHN C. GREINER
NICHOLAS J. ZIEPFEL
GRAYDON HEAD & RITCHEYLLP
1900 Fifth Third Center
511 Walnut Street
Cincinnati, OH 45202-3157
Tel: (513) 629-2731
Fax: (513) 651-3836

THOMAS R. BURKE
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California 94111
Tel: (415) 276-6500
Fax: (415) 276-6599

JAMES ROSENFELD
DAVIS WRIGHT TREMAINE LLP
1633 Broadway, 27th Floor
New York, NY 10019
Tel: (212) 489-8230
Fax: (212) 489-8340

Attorneys for *Amici Curiae* Advance Publications, Inc., Amazon.com, Inc.,
Avvo, Inc., Buzzfeed, Inc., Cable News Network, Inc., Curbed.com LLC,
Gawker Media, LLC, Magazine Publishers of America, Inc.,
The McClatchy Company, The Reporters Committee for Freedom of the Press,
TripAdvisor LLC, Yahoo! Inc., and Yelp Inc.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Sixth Circuit Rule 26.1, Amici Advance Publications, Inc., Amazon.com, Inc., Avvo, Inc., Buzzfeed, Inc., Cable News Network, Inc., Curbed.com LLC, Gawker Media, LLC, Magazine Publishers of America, Inc., The McClatchy Company, The Reporters Committee for Freedom of the Press, TripAdvisor LLC, Yahoo! Inc., and Yelp Inc. make the following disclosures:

**Advance Publications, Inc.; Avvo, Inc.; Buzzfeed, Inc.; Curbed.com LLC; Gawker Media, LLC; Magazine Publishers of America, Inc.; The Reporters Committee for Freedom of the Press; Yahoo! Inc.; and Yelp Inc.**

1.      Is said party a subsidiary or affiliate of a publicly owned corporation?  No.

2.      Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  Not to the knowledge of said party.

**Amazon.com, Inc.**

1.      Is said party a subsidiary or affiliate of a publicly owned corporation? Amazon.com, Inc. is a publicly owned corporation.

2.      Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  Not to the knowledge of said party.

**The McClatchy Company**

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  The McClatchy Company is a publicly owned corporation.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  Not to the knowledge of said party.

**Cable News Network, Inc.**

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  Yes. Cable News Network, Inc. is a wholly owned subsidiary of Turner Broadcasting System, Inc., which is a wholly owned subsidiary of Time Warner Inc., a publicly traded corporation.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  Not to the knowledge of said party.

**TripAdvisor LLC**

1.    Is said party a subsidiary or affiliate of a publicly owned corporation? Yes.  TripAdvisor LLC is a subsidiary of TripAdvisor, Inc.  TripAdvisor, Inc. is publicly traded.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  Not to the knowledge of said party.

# **TABLE OF CONTENTS**

**Page**

I.    INTEREST OF AMICI CURIAE ................................................................. 1

II.   AUTHORITY TO FILE.............................................................................. 1

III.  INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 1

IV.  ARGUMENT .............................................................................................. 4

     A.     Congress Intended Section 230 to Promote Free Speech on the Internet and Encourage Online Service Providers to Police Content. ................................................................................... 4

     B.     Section 230 Provides Broad Immunity to Online Service Providers for Claims Based on Third-Party Content. ............................................ 6

     C.     The District Court Mischaracterized Prior Cases to Interpret Section 230 Immunity More Restrictively Than Any Other Court. ...... 9

     D.     The District Court's Interpretation Threatens to Strip Online Service Providers of Section 230 Immunity Based on Common and Laudable Practices. ...................................................................... 16

           1.     *Exercising Traditional Editorial Functions.* ........................... 16

           2.     *Failing to Remove Allegedly Unlawful Content after Notice.* . 17

           3.     *Focus on Entire Website Rather than Specific Content.* .......... 18

           4.     *Website Name.* ........................................................................ 21

           5.     *Inconsistency with Common Law Defamation.* ........................ 22

           6.     *Implicitly Adopting Third-Party Content.* ............................... 23

     E.     The District Court's Unprecedented Interpretation of Section 230 Threatens Speech Across the Internet. ............................................... 24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ascentive, LLC v. Opinion Corp.,*
   842 F. Supp. 2d 450 (E.D.N.Y. 2011) ...................................................... 22

*Atlantic Recording Corp. v. Project Playlist, Inc.,*
   603 F. Supp. 2d 690 (S.D.N.Y. 2009) ...................................................... 13

*Batzel v. Smith,*
   333 F.3d 1018 (9th Cir. 2003) ..................................................... *passim*

*Ben Ezra, Weinstein, & Co. v. Am. Online Inc.,*
   206 F.3d 980 (10th Cir. 2000) ...................................................... 4, 11

*Carafano v. Metrosplash, Inc.,*
   339 F.3d 1119 (9th Cir. 2003) .......................................... 6, 8, 19, 23

*Chicago Lawyers' Comm. for Civil Rights Under Law,*
   519 F.3d 666 (7th Cir. 2008) ...................................................... 10

*Doe v. MySpace, Inc.,*
   528 F.3d 413 (5th Cir. 2008) .................................................... 6, 23

*Doe v. MySpace, Inc.,*
   629 F. Supp. 2d 663 (E.D. Tex. 2009) ...................................... 13

*Doe v. SexSearch.com,*
   551 F.3d 412 (6th Cir. 2008) ........................................................ 8

*Eckert v. Microsoft Corp.,*
   2007 WL 496692 (E.D. Mich. Feb. 13, 2007) ............................. 9

*Energy Automation Sys., Inc. v. Xcentric Ventures, LLC,*
   2007 WL 1557202 (M.D. Tenn. May 25, 2007) .......................... 9

*Fair Housing Council of San Fernando Valley v. Roommates.com LLC,*
   521 F.3d 1157 (9th Cir. 2008) (en banc) ................................. *passim*

*Federal Trade Commission v. Accusearch*,
    570 F.3d 1187 (10th Cir. 2009) ............................................................ *passim*

*Gentry v. Ebay, Inc.*,
    99 Cal. App. 4th 816, 121 Cal. Rptr. 2d 703 (2002) ......................... 19

*Global Royalties, Ltd. v. Xcentric Ventures, LLC*,
    544 F. Supp. 2d 929 (D. Ariz. 2008) ................................................. 22

*Goddard v. Google, Inc.*,
    640 F. Supp. 2d 1193 (N.D. Cal. 2009) ............................................ 13

*GW Equity LLC v. Xcentric Ventures LLC*,
    2009 WL 62173 (N.D. Tex. Jan. 9, 2009) ......................................... 22

*Hill v. StubHub, Inc.*,
    727 S.E.2d 550 (N.C. App. 2012) ......................................... 8, 15, 20

*Johnson v. Arden*,
    614 F.3d 785 (8th Cir. 2010) ........................................................ 7, 10

*Jones v. Dirty World Entertainment Recordings, L.L.C.*,
    766 F. Supp. 2d 828 (E.D. Ky. 2011) ................................... 9, 17, 19

*Jones v. Dirty World Entertainment Recordings, L.L.C.*,
    840 F. Supp. 2d 1108 (E.D. Ky. 2012) ......................................... *passim*

*Jones v. Dirty World Entertainment Recordings, L.L.C.*,
    2013 WL 4068780 (E.D. Ky. Aug. 12, 2013) ............................... *passim*

*Levitt v. Yelp! Inc.*,
    2011 WL 5079526 (N.D. Cal. Oct. 26, 2011) ................................... 26

*M.A. v. Village Voice Media Holdings, LLC*,
    809 F. Supp. 2d 1041 (E.D. Mo. 2011) ............................................ 17

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
    591 F.3d 250 (4th Cir. 2009) ........................................................... 6, 8

*Parisi v. Sinclair*,
    774 F. Supp. 2d 310 (D.D.C. 2011) ................................................. 24

*Reno v. American Civil Liberties Union,*
    521 U.S. 844 (1997) ................................................................. 2, 27

*S.C. v. Dirty World, LLC,*
    2012 WL 3335284 (W.D. Mo. Mar. 12, 2012) ........................... 19, 22

*Seaton v. TripAdvisor, LLC,*
    728 F.3d 592 (6th Cir. 2013) ......................................................... 8

*Shiamili v. Real Estate Group of New York, Inc.,*
    17 N.Y.3d 281, 952 N.E.2d 1011 (N.Y. 2011) ................................ 15

*Snyder v. Phelps,*
    131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011) ...................................... 21

*Speiser v. Randall,*
    357 U.S. 513 (1958) ................................................................... 27

*Stratton Oakmont, Inc. v. Prodigy Services Co.,*
    1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) ................................ 4

*United States v. Playboy Ent. Group, Inc.,*
    529 U.S. 803 (2000) ................................................................... 21

*Universal Comm'n Sys., Inc. v. Lycos, Inc.,*
    478 F.3d 413 (1st Cir. 2007) ............................................... 7, 8, 17

*Whitney Info. Network v. Xcentric Ventures, LLC,*
    2008 WL 450095 (M.D. Fla. Feb. 15, 2008) .............................. 19, 22

*Zeran v. Am. Online, Inc.,*
    129 F.3d 327 (4th Cir.1997) ............................................... *passim*

## Constitution and Statutes

U.S. Const., Amend. I ............................................................. 2, 21

47 U.S.C. § 230 ........................................................... *passim*

**Other Authorities**

S. Conf. Rep. No. 104-230 (1996) ........................................................... 4

E-COMMERCE & INTERNET LAW 37.05[3][D][ii] ....................................... 9

## I.    INTEREST OF AMICI CURIAE

Amici are websites, news organizations, technology companies, and search engines that host and disseminate millions of posts and other content authored by users every day.[1] As online service providers, they have a strong interest in preserving the protections of Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230, for themselves and their users, consistent with Congress's intent to promote the robust free flow of information on the Internet.[2]

## II.    AUTHORITY TO FILE

Appellee has declined to consent to the filing of this brief.  Amici have concurrently filed a motion for leave to file this brief.

## III.    INTRODUCTION AND SUMMARY OF ARGUMENT

The Internet has effected one of the greatest expansions of free speech and communications in history.  It is "a tool for bringing together the small contributions of millions of people and making them matter."[3]  Today, more than *2.7 billion* people use the Internet, submitting and viewing hundreds of millions of

---

[1]  A more detailed description of the Amici and their interests in the issues raised by the underlying lawsuit is contained in Exhibit A to the concurrently filed motion for leave to file this brief.

[2] Pursuant to Fed. R. App. P. 29(c)(5), no party's counsel authored this brief in whole or in part.  No person other than Amici or their counsel contributed money that was intended to fund the preparation or submission of this brief.

[3] Lev Grossman, *You – Yes, You – Are TIME's Person of the Year*, TIME MAGAZINE (Dec. 25, 2006).

posts, comments, photos, videos and other content every day.[4]  As the Supreme

Court put it, "the content on the Internet is as diverse as human thought."  *Reno v.*

*American Civil Liberties Union*, 521 U.S. 844 (1997).

This is no accident.  In 1996, to promote the free flow of information on the

Internet, Congress resolved to protect websites and other online providers from

state-law liability for their users' content.  Section 230 of the Communications

Decency Act embodies that command, prohibiting treating such a provider as the

"publisher or speaker" of third-party content or holding it liable for taking steps to

screen such material.  47 U.S.C. § 230.  Grounded in core First Amendment

standards, Section 230 offers strong protection for innovation and expansion of

free speech on the Internet.  Since its enactment, federal and state courts have

interpreted it to provide broad immunity to providers for claims stemming from

user content.

The district court departed from this well-established precedent, apparently

because of its distaste for the defendants' website, TheDirty.com.  The court found

that the law does not supplant common law defamation rules, yet that is ***exactly***

---

[4] International Telecommunications Union, 2013 ICT Facts & Figures,
http://www.itu.int/en/ITU-D/Statistics/Documents/facts/ICTFactsFigures2013.pdf;
Pew Research Center, Pew Internet and American Life Project,
http://pewinternet.org/Reports/2011/Social-Networking-Sites.aspx (as of 2011,
65% of online adults used social networking sites); DOMO, *How Much Data Is
Created Every Minute?* http://www.domo.com/blog/2012/06/how-much-data-is-
created-every-minute/?dkw=socf3.

what Congress chose to do. The court suggested that a website can be liable just because it selects posts to publish, does not verify their accuracy, and fails to remove them upon notice. But these are *all* "publisher" functions within Section 230's scope. The court also found a website may be liable merely because of its name and tenor, but the case law prohibits holding a provider liable for "implicitly encouraging" content. Ultimately, the court concluded Section 230 "only provide[s] protection for site owners who allow postings by third parties without screening them and those who remove offensive content." 2013 WL 4068780, at *3 (Aug. 12, 2013). But this is *not* what Section 230 says. This standard directly contravenes Congress's intent, and if it is upheld, providers will have the perverse incentive *not* to review third-party content at all, for fear of liability.

Eight circuits have enforced these core Section 230 protections. This Court now has an opportunity to reinforce the same clear guidance about the law's broad immunity. At bottom, the district court's interpretation upends that guidance, imposing instead the nebulous view that if a judge or jury finds a website is somehow offensive and encourages users to submit content, the website provider loses immunity. This would threaten online service providers across the Internet and significantly chill online speech. Section 230 requires just the opposite.

# IV.    ARGUMENT

**A.    Congress Intended Section 230 to Promote Free Speech on the Internet and Encourage Online Service Providers to Police Content.**

In enacting Section 230, Congress had two express goals.  First, it sought to "encourage the unfettered and unregulated development of free speech on the Internet, and to promote the development of e-commerce."  *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003); *see also Ben Ezra, Weinstein, & Co. v. Am. Online Inc.*, 206 F.3d 980, 985 n.3 (10th Cir. 2000) (Section 230 is meant "to promote freedom of speech"); 47 U.S.C. § 230(b)(2)(3) ("Section 230 is intended to "preserve the vibrant and competitive free market that presently exists for the Internet.").  Second, it hoped to "encourage service providers to self-regulate the dissemination of offensive material over their services."  *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir.1997); *see Batzel*, 333 F.3d at 1028 (citing 47 U.S.C. § 230(b)(4), and 141 Cong. Rec. H8469-70).

Congress made these goals manifest in overruling *Stratton Oakmont, Inc. v. Prodigy Services Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995), a case holding online service Prodigy liable for defamatory comments posted by a user to one of its bulletin boards. *See* S. Conf. Rep. No. 104-230 (1996) (expressing intent to overrule *Stratton Oakmont* and "any other similar decisions").  Because Prodigy actively screened and edited bulletin board messages to prevent offensive content, the court applied common law publisher (rather than distributor) principles,

meaning that Prodigy could be liable for posts even if it did not know or have any reason to know they were defamatory. *Id.* at *5.

By overruling this result, Congress eliminated the "grim choice" such a rule would present to online service providers, *i.e.*, those that voluntarily filter content would be responsible for all posts, while "providers that bury their heads in the sand and ignore problematic posts would escape liability altogether." *Fair Housing Council of San Fernando Valley v. Roommates.com LLC*, 521 F.3d 1157, 1163 (9th Cir. 2008) (en banc); *see also Batzel*, 333 F.3d at 1029 ("If efforts to review and omit third-party defamatory, obscene or inappropriate material make a computer service provider or user liable for posted speech, then website operators and Internet service providers are likely to abandon efforts to eliminate such material from their site[s]." (citation omitted)).

Section 230 recognizes the Internet's practical realities. "Interactive computer services have millions of users [and the] amount of information communicated … is … staggering." *Zeran*, 129 F.3d at 331. It is simply impossible for online service providers to screen all of their user content. *Id.* "Section 230 therefore sought to prevent lawsuits from shutting down websites and other services on the Internet," *Batzel*, 333 F.3d at 1028, and it did so by "bar[ring] state-law plaintiffs from holding interactive computer service providers legally responsible for information created and developed by third parties," *Nemet*

*Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009).

"The specter of tort liability in an area of such prolific speech would have an obvious chilling effect," because "faced with potential liability for each message republished …, providers might choose to severely restrict the number and type of messages posted." *Zeran*, 129 F.3d at 331.

Section 230 also reflects the reality that some material posted on the Internet might be offensive or harmful. But Congress made a choice that, while injured parties may sue the users who created the content, they may not sue the interactive computer service that enabled users to publish the content. *See, e.g., Doe v. MySpace, Inc.*, 528 F.3d 413, 419 (5th Cir. 2008) (finding social networking site immune for claims premised on sexual assault resulting from online meeting); *Carafano v. Metrosplash, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003) (matchmaking website immune from claims stemming from fake profile that led to threats made against the plaintiff, whom a user had impersonated); *Zeran*, 129 F.3d at 331 (AOL immune for publishing false advertisements created by users and failing to remove them promptly even though plaintiff received death threats as a result).

### B. Section 230 Provides Broad Immunity to Online Service Providers for Claims Based on Third-Party Content.

Section 230 states: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Courts have interpreted this

language to create a three-part test, under which a defendant is immune if: (1) it is a "provider ... of an interactive computer service," (2) the plaintiff's claim treats it "as the publisher or speaker" of information, and (3) that information is "provided by another information content provider." *See Batzel*, 333 F.3d at 1037; *Universal Comm'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 418 (1st Cir. 2007).

There is no dispute in this case that the defendants satisfied the first two parts of this test. Instead, the plaintiff argued, and the court agreed, that the defendants were themselves "information content provider[s]" for the allegedly defamatory posts. Section 230 defines "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3).

Consistent with Congress's intent, "[t]he majority of federal circuits have interpreted the CDA to establish broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service." *Johnson v. Arden*, 614 F.3d 785, 791 (8th Cir. 2010) (internal quotation omitted); *Lycos*, 478 F.3d at 418 ("courts that have addressed these issues have generally interpreted Section 230 immunity broadly ...."). Perhaps more important here, in treating Section 230 immunity as "quite robust," courts have "adopt[ed] a relatively expansive definition of 'interactive computer service'

7

and a relatively restrictive definition of 'information content provider.'" *Carafano*, 339 F.3d at 1123 ("§ 230(c) provides broad immunity for publishing content provided primarily by third parties").[5]

To date, some 300 reported decisions have construed Section 230, and "[a]ll but a handful … find that the website is entitled to immunity from liability." *Hill v. StubHub, Inc.*, 727 S.E.2d 550, 558 (N.C. App. 2012). Eight circuit courts have found online service providers exempt from liability under Section 230 in all but two cases (discussed below). The Sixth Circuit has stated that Section 230 protects websites from liability for user content, *Seaton v. TripAdvisor, LLC*, 728 F.3d 592, 599 (6th Cir. 2013), but has not yet applied the law, *see Doe v. SexSearch.com*, 551 F.3d 412, 415 (6th Cir. 2008) (declining to "reach the question of whether the [CDA] provides [defendant] with immunity from suit"). However, district courts in this Circuit have recognized the "[n]ear-unanimous case law" enforcing Section 230 immunity for online service providers against suits seeking to hold them liable for third-party content. *Eckert v. Microsoft Corp.*, 2007 WL 496692, at *3 (E.D.

---

[5] Moreover, Section 230 creates "*an immunity from suit* rather than a mere defense to liability and it is effectively lost if a case is erroneously permitted to go to trial." *Nemet Chevrolet*, 591 F.3d at 254 (internal quotations omitted; emphasis in original); *Roommates.com*, 521 F.3d at 1175 (Section 230 "must be interpreted to protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles."). Thus, courts should apply Section 230 "at the earliest possible stage of the case ...." *Nemet Chevrolet*, 591 F.3d at 255.

Mich. Feb. 13, 2007); *see also Energy Automation Sys., Inc. v. Xcentric Ventures, LLC*, 2007 WL 1557202, at *12 n.6 (M.D. Tenn. May 25, 2007).

### C.    The District Court Mischaracterized Prior Cases to Interpret Section 230 Immunity More Restrictively Than Any Other Court.

The district court departed significantly from this clear precedent, finding instead that the defendants did not have immunity under Section 230 for allegedly defamatory user posts because they helped "develop" content.[6]  In so finding, the court "appl[ied] a standard for evaluating development that [is] broader than any circuit court has ever recognized."  3 E-COMMERCE & INTERNET LAW 37.05[3][D][ii] ("*Jones* … likely would have been decided differently by other courts….").

The district court asserted that its ruling "represents the weight of authority," 2013 WL 4068780, at *1, but that is simply not true.  For example, it cited cases from the Seventh and Eighth Circuits that **upheld** Section 230 immunity, but focused on their *dicta*.[7]  More significantly, the court misconstrued a statement in

---

[6] The court declined to apply Section 230 immunity four times.  *See Jones v. Dirty World Entertainment Recordings, L.L.C.*, 766 F. Supp. 2d 828, 836 (E.D. Ky. 2011) (denying motion to dismiss); 840 F. Supp. 2d 1008 (2012) (denying motion for summary judgment); Case No. 2:09-cv-00219-WOB-CJS, Dkt. 188 (Apr. 18, 2013) (denying second summary judgment motion); and 2013 WL 4068780 (Aug. 12, 2013) (post-trial supplemental opinion denying defendants' motion for judgment as a matter of law under Fed. R. Civ. P. 50).

[7] *See, e.g.*, 2013 WL 4068780, at *1 (discussing *Chicago Lawyers' Comm. for Civil Rights Under Law*, 519 F.3d 666, 671 (7th Cir. 2008), in which the Seventh

the Tenth Circuit's opinion in *Federal Trade Commission v. Accusearch*, 570 F.3d

1187, 1199 (10th Cir. 2009), that "to be 'responsible' for the development of

offensive content, one must be more than a neutral conduit for that content."  The

district court read into this quote a ***requirement*** that an online service provider's

conduct be "neutral" to retain Section 230 immunity, stating that a provider can

avail itself of Section 230 "***only*** if [its] conduct was neutral with respect to the

offensiveness of the content."  2013 WL 4068780, at *2 (emphasis added) (quoting

*Accusearch*, 570 F.3d at 1199).

Until now, no court has ever held that a website must be a purely neutral

conduit for third-party content and loses Section 230 immunity if it selects,

reviews, edits or fails to remove offensive content.  This is ***precisely*** the result

Congress sought to avoid.  Section 230 protects and encourages online service

providers to review, edit, and block content.  *See Zeran*, 129 F.3d at 330 ("lawsuits

seeking to hold a service provider liable for its exercise of a publisher's traditional

editorial functions – such as deciding whether to publish, withdraw, postpone or

alter content – are barred"); *see also Ben Ezra*, 206 F.3d at 986; *Batzel*, 333 F.3d at

---

Circuit held Craigslist immune for allegedly discriminatory housing ads, but
focusing on the court's comment that "[n]othing in the service craigslist offers
induces anyone to post any particular listing or express a preference for
discrimination"); *id.* at *2 (discussing *Johnson v. Arden*, 614 F.3d at 792, and
acknowledging that the Eighth Circuit "upheld … immunity," but focusing on its
comment that "[t]he record contains no evidence that [the internet service provider]
designed its website to be a portal for defamatory" content).

1031. *See also* 47 U.S.C. § 230(c)(1) (prohibiting treatment of online service provider as "publisher" of information provided by a third party).

To find otherwise, the district court relied almost entirely on misapplications of the Ninth and Tenth Circuits' decisions in *Roommates.com*, 521 F.3d 1157, and *Accusearch*, 570 F.3d 1187, *see* 840 F. Supp. 2d at 1010-11; 2013 WL 4068780, at *1-2, the only circuit court cases declining to apply Section 230 immunity on the basis that online service providers participated in developing unlawful content. But the facts and holdings of these cases do not support the court's conclusion.

*Roommates.com* concerned a website designed to match prospective roommates. One portion of the site required users to answer questions by making selections from drop-down menus, including queries about their gender, sexual orientation, and whether they would bring children into the household. *Roommates.com*, 521 F.3d at 1160. The site also required users to specify whether they would prefer to live with someone based on the same criteria and created profile pages searchable by the criteria. *Id.* Two housing groups sued Roommates.com, arguing it did online what a real estate agent could not lawfully do in person, *i.e.*, facilitate the rental of housing based on discriminatory factors.

Roommates.com argued that Section 230 provided immunity from these claims, but the Ninth Circuit disagreed because, it found, as to certain of its features, the site was "responsible … for the creation or development" of the

11

allegedly unlawful content. *See* 47 U.S.C. § 230(f)(3). The court held that "a website helps to develop unlawful content, and thus falls within the exception to Section 230, ***if it contributes materially to the alleged illegality of the content***." *Id.* at 1168 (emphasis added). Roommates.com did this, the court found, because it authored questions designed to elicit discriminatory preferences and required users to answer them. *Id.* at 1166. "By ***requiring*** subscribers to provide the information as a condition of accessing its service, and by providing a limited set of pre-populated answers," the court wrote, "Roommate becomes much more than a passive transmitter of information provided by others; it becomes the developer, at least in part, of that information." *Id.* (emphasis added).

As the Ninth Circuit emphasized, the crux of its decision was the site's ***requirement*** that users submit allegedly unlawful content to its site.[8] Courts applying *Roommates.com* have interpreted it the same way—as "carv[ing] out only a narrow exception" that "turned entirely on the website's decision to force subscribers to divulge protective characteristics and discriminatory preferences as a

---

[8] *See, e.g.*, 521 F.3d at 1167 ("Roommate designed its search system … based on the preferences and personal characteristics that Roommate itself forces subscribers to disclose."); *id.* at 1170, n.26 ("it is Roommate that forces users to express a preference and Roommate that forces users to disclose the information that can form the basis of discrimination by others."); *id.* at 1172 ("Roommate does not merely provide a framework that could be utilized for proper or improper purposes; rather, Roommate's work in developing the discriminatory questions, discriminatory answers and discriminatory search mechanism is directly related to the alleged illegality of the site.").

condition of using its services." *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193,

1201-02 (N.D. Cal. 2009); *see also Atlantic Recording Corp. v. Project Playlist,*

*Inc.*, 603 F. Supp. 2d 690, 701 (S.D.N.Y. 2009) (finding *Roommates.com* "readily

distinguishable" because it "was based solely on the fact that the content on the

website that was discriminatory was supplied by Roommates.com itself"); *Doe v.*

*MySpace, Inc.,* 629 F. Supp. 2d 663, 665 (E.D. Tex. 2009) (distinguishing

*Roommates.com* because "[t]he Ninth Circuit repeatedly stated … that the

Roommates.com website ***required*** its users to provide certain information as a

condition of its use …." (emphasis added)).

   At the same time, the *Roommates.com* court emphasized that courts must not

read the term "develop" so broadly as to sap Section 230 of its meaning:  "It's true

that the broadest sense of the term 'develop' could include … just about any

function performed by a website. But to read the term so broadly would defeat the

purposes of section 230 by swallowing up every bit of the immunity that the

section otherwise provides." *Id.* at 1167.

   Even more relevant here, the Ninth Circuit found Roommates.com ***was***

***immune*** from claims stemming from a different part of its website, a section for

users to provide "Additional Comments."  Roommates.com was "not responsible,

in whole or in part, for the development of this content," because the website could

not review every post, making it "precisely the kind of situation for which section

13

230 was designed to provide immunity." *Id*. The plaintiffs contended the site

***encouraged*** subscribers to make discriminatory statements in the "Additional

Comments" field because it required the selection of discriminatory preferences in

its registration process. *Id*. at 1174. The Ninth Circuit rejected this argument and

emphasized that theories of "implicit encouragement" would gut Section 230:

> [T]here will always be close cases where a clever lawyer could argue
> that ***something*** the website operator did encouraged the illegality.
> Such close cases, we believe, must be resolved in favor of immunity,
> lest we cut the heart out of section 230 by forcing websites to face
> death by ten thousand duck-bites, fighting off claims that they
> promoted or encouraged – or at least tacitly assented – to the illegality
> of third parties. Where it is very clear that the website directly
> participates in developing the alleged illegality – as it is clear here
> with respect to Roommate's questions, answers and the resulting
> profile pages – immunity will be lost. ***But in cases of enhancement***
> ***by implication or development by inference*** – such as with respect to
> the "Additional Comments" here – ***section 230 must be interpreted to***
> ***protect websites*** not merely from ultimate liability, but from having to
> fight costly and protracted legal battles.

*Id*. at 1174-75 (emphasis added). Contrary to the Ninth Circuit's holding in

*Roommates.com*, the district court decided that a website ***can*** be liable as a content

developer merely because it implicitly encourages users to post offensive content.

In *Accusearch*, the defendant operated a website that offered to sell

individuals' private telephone records, allegedly in violation or unlawful

circumvention of the Telecommunications Act. 570 F.3d at 1192. Accusearch

invoked Section 230, arguing that it obtained the records from third-party

"researchers" it hired, but the Tenth Circuit rejected this argument. *Id*. at 1191.

Alluding to *Roommates.com*, it found that "[b]y paying its researchers to acquire telephone records, knowing the confidentiality of the records was protected by law, it contributed mightily to the unlawful conduct." *Id.* at 1200. At the heart of the court's decision was its finding that "[a]cquisition of this information would almost inevitably require someone to violate the [law]." *Id.* at 1192. *See also Hill*, 727 S.E.2d at 561 (reading *Roommates.com* and *Accusearch* to require that an online provider "effectively control the content posted by … third parties or take other actions which essentially ensure the creation of unlawful material" to lose Section 230 immunity); *Shiamili v. Real Estate Group of New York, Inc.*, 17 N.Y.3d 281, 290, 952 N.E.2d 1011 (N.Y. 2011) (refusing to interpret *Accusearch* to create an exception to immunity where defendants "created and ran a Web site which implicitly encouraged users to post negative comments").

The district court here ignored the holding of *Accusearch* and mistakenly latched on to one statement: "We therefore conclude that a service provider is 'responsible' for the development of offensive content only if it in some way specifically encourages the development of what is offensive about the content." 840 F. Supp. 2d at 1011 (quoting *Accusearch*, 570 F.3d at 1199). The court interpreted this to mean that a website is beyond Section 230 protections if the site is offensive and encourages users to post content. That is not what *Accusearch*

held, it is not what Section 230 states, and no court has ever adopted such a
sweeping exception to Section 230 immunity.

### D.    The District Court's Interpretation Threatens to Strip Online Service Providers of Section 230 Immunity Based on Common and Laudable Practices.

In its opinions, the district court pointed to several factors that purportedly
established the defendants "encouraged" offensive content and thus were not
entitled to Section 230 immunity.  In its order denying defendants' motion for
judgment as a matter of law, it summarized:

> This Court holds by reason of the very name of the site, the manner in
> which it is managed, and the personal comments of defendant Ritchie,
> the defendants have specifically encouraged development of what is
> offensive about the content of the site.

840 F. Supp. 2d at 1012.  This ill-defined "encouragement" test is based on factors
that cannot defeat Section 230 immunity and would undermine its very purpose.

### 1.    *Exercising Traditional Editorial Functions.*

The district court concluded that defendants are content providers based on
"the manner in which [the website] was managed," explaining:

> Ritchie acts as editor of the site and selects a small percentage of
> submissions to be posted.  He adds a "tagline."  …  He reviews the
> postings but does not verify their accuracy.  …  If someone objects to
> a posting, he decides if it should be removed.

840 F. Supp. 2d at 1012.

But, as discussed above, Congress expressly intended Section 230 to
preserve and promote online service providers' rights to exercise these traditional

editorial functions. *See supra* Section IV.C.  In selecting, reviewing, editing, and deciding whether to include content, websites act as publishers and expressly have immunity under Section 230 when doing so.  Section 230, by its terms, precludes treating online service providers as a "***publisher*** or speaker" of third-party content. 47 U.S.C. § 230(c)(1) (emphasis added); *see Zeran*, 129 F.3d at 330.

### 2.    *Failing to Remove Allegedly Unlawful Content after Notice.*

The district court also repeatedly noted that the plaintiff complained about posts but defendants did not remove them.  *See* 840 F. Supp. 2d at 1009 ("After initially receiving a response stating that the web site would remove the post, plaintiff was told that the post would not be removed."), *id.* at 1010 ("Again plaintiff emailed the web site requesting that the posts be removed, but her requests were ignored."); *see also* 766 F. Supp. 2d at 830-31.

To the extent the district court viewed the failure to remove posts as a basis for denying Section 230 immunity, it again erred.  As the First Circuit stated, "[i]t is, by now, well established that notice of the unlawful nature of the information provided is not enough to make it the service provider's own speech." *Lycos,* 478 F.3d at 420; *see also Zeran,*129 F.3d at 333; *M.A. v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041, 1051 (E.D. Mo. 2011), ("[E]ven if a service provider knows that third parties are posting illegal content, the service provider's failure to intervene is immunized." (internal quotation omitted)).

17

Notice-based liability also runs directly counter to the purposes of Section 230. If the law requires providers either to remove unlawful content or risk liability, notice of potentially unlawful content would require "a legal judgment … and an on-the-spot editorial decision whether to risk liability by allowing the continued publication of that information," giving providers a "natural incentive simply to remove messages upon notification, whether the contents were [unlawful] or not." *Zeran*, 129 F.3d at 333.[9]

### 3.    *Focus on Entire Website Rather than Specific Content.*

The district court also consistently focused on its view that the defendants created, developed, or materially contributed to developing the content of TheDirty.com website as a whole, rather than the specific posts the plaintiff challenged. *See, e.g.*, 840 F. Supp. 2d at 1011 ("The principal content of 'the dirty.com' web site is not only offensive but tortious."); *id.* at 1012 ("[T]he defendants … 'specifically encourage development of what is offensive about the content' of 'the dirty.com' web site."); 2013 WL 4068780, at *3 ("[D]efendants here received postings on their website which would be actionable even by a public figure, i.e., that they were knowingly false or in reckless disregard for the truth.").

---

[9] In this regard, the district court's opinions put online providers in a Catch 22. If a provider reviews and blocks user content, it can be the "developer" of that content. But if it fails to take down content ***after*** someone complains, that too makes it a "developer" outside Section 230 protections.

This approach contradicts established law holding that online service providers can be liable only for directly participating in creating, requiring, or developing ***the specific content that is unlawful***.  For example, in *S.C. v. Dirty World, LLC*, 2012 WL 3335284 (W.D. Mo. Mar. 12, 2012), another federal district court dismissed defamation claims against TheDirty.com under Section 230, "distance[d] itself" from the *Jones* court's "narrow interpretation of CDA immunity," and held that the plaintiff could not challenge the website as a whole "because the CDA focuses on the specific post at issue." *Id.* at *4.  It found:  "As a matter of law, and even if true, merely encouraging defamatory posts is not sufficient to defeat CDA immunity." *Id.* (citations omitted). *See also Whitney Info. Network v. Xcentric Ventures, LLC*, 2008 WL 450095, at *12 (M.D. Fla. Feb. 15, 2008) ("The issue … is whether Defendants are responsible, in whole or in part, for the creation or development ***of the particular postings*** relating to [Plaintiff] that are the subject of this lawsuit." (emphasis added)); *Carafano*, 339 F.3d at 1125 (noting the key issue is whether the online service provider "created or developed the particular information at issue"); *Gentry v. Ebay, Inc.*, 99 Cal. App. 4th 816, 833, n.11, 121 Cal. Rptr. 2d 703 (2002) ("The critical issue is whether eBay acted as an information content provider with respect to the information that appellants claim is false or misleading.").

Likewise, in *Hill v. Stubhub,* 727 S.E.2d at 550, a trial court held that the ticket exchange website Stubhub was not entitled to Section 230 immunity because it found the website as a whole promoted ticket scalping. But the appellate court reversed, concluding that the "'entire website' approach was fatally flawed." Indeed, both cases the district court principally relied upon – *Roommates.com* and *Accusearch* – make plain that online service providers lose Section 230 protections only if they directly create or develop the ***specific*** content alleged to be unlawful. *See Roommates.com*, 521 F.3d at 1174 (immunity is lost where "the website directly participates in developing the alleged illegality"); *Accusearch*, 570 F.3d at 1199 (provider is responsible for user content "only if it … specifically encourages the development of what is offensive about the content").

In this case, as the district court noted, the "plaintiff ultimately declined to pursue [the] tagline [added by defendant Ritchie, stating "Why are all high school teachers freaks in the sack?"] as an independently actionable statement …." 2013 WL 4068780, at *4. Rather than focus on whether the content Ritchie admittedly created was defamatory (or protected opinion or rhetoric), the court mistakenly analyzed whether defendants' website as a whole was "offensive."

This entirely subjective approach not only contradicts the law, it puts all online providers at risk for allowing or encouraging provocative, controversial, or negative content, subject to the vagaries of whether a judge or jury will deem the

20

site or some of its content offensive. Yet, as the long history of the First

Amendment teaches, "speech cannot be restricted simply because it is upsetting or

arouses contempt." *Snyder v. Phelps*, 131 S. Ct. 1207, 1219, 179 L. Ed. 2d 172

(2011). Quite the opposite, important principles are born from speech that some

may consider "shabby, offensive, or even ugly." *United States v. Playboy Ent.*

*Group, Inc.*, 529 U.S. 803, 826 (2000).

### 4.     *Website Name.*

The district court concluded that "the name of the site in and of itself

[TheDirty.com] encourages the posting only of 'dirt,' that is material which is

potentially defamatory or an invasion of the subject's privacy." 840 F. Supp. 2d at

1012; *see also* 2013 WL 4068780, at *3 ("the evidence conclusively demonstrates

that these postings and others like them were invited and encouraged by the

defendants by using the name 'Dirty.com'"). But courts have repeatedly rejected

claims against websites whose names might allegedly invite negative content, such

as PissedConsumer.com, RipoffReport.com, Badbusinessbureau.com, and even

TheDirty.com.

In *S.C. v. Dirty World, LLC*, 2012 WL 3335284, the court rejected this same

argument with respect to TheDirty.com because "the CDA focuses on the specific

content at issue and not the name of a website." *Id. See also Ascentive, LLC v.*

*Opinion Corp.*, 842 F. Supp. 2d 450, 475-76 (E.D.N.Y. 2011)

(PissedConsumer.com was not liable for user review, even though it invited others to submit and prominently displayed negative reviews, which is "not unlike the targeted solicitation of editorial material engaged in by a narrow genre of publishers"); *GW Equity LLC v. Xcentric Ventures LLC*, 2009 WL 62173 (N.D. Tex. Jan. 9, 2009) (granting summary judgment to ripoffreport.com and badbusinessbureau.com for claims premised on user reviews, even though sites required users to select category for posts, including one for "corrupt companies"); *Global Royalties, Ltd. v. Xcentric Ventures, LLC*, 544 F. Supp. 2d 929 (D. Ariz. 2008) (same for ripoffreport.com); *Whitney Information Network, Inc.,* 2008 WL 450095 (same).

### 5.     *Inconsistency with Common Law Defamation.*

The district court opined that permitting defendants to invoke Section 230 immunity would "allow it to be used to subvert the law of defamation which has existed at common law for centuries, as well as the laws protecting the right of privacy …." 2013 WL 4068780, at *3. The court clearly was influenced by common law principles that make it libelous to "impute unchastity to a woman," or state that a woman is "sexually promiscuous." 840 F. Supp. 2d at 1011.

But Congress intentionally abrogated the common law in Section 230. At common law, publishers could be held liable for republication of defamatory statements, whether or not they knew they were defamatory. Congress recognized

22

this rule was unworkable for the vast amounts of user content on the Internet and would destroy the robust flow of information and innovation online.  It made a policy choice to provide immunity for entities that host third-party content, and it is not for the district court, this Court, or any other court to substitute a different choice.  *See Doe v. MySpace, Inc.*, 528 F.3d at 419; *Carafano*, 339 F.3d at 1123. *See also supra* Section IV.A.

### 6.    *Implicitly Adopting Third-Party Content.*

Finally, the district court concluded that defendants were not entitled to Section 230 immunity because they "ratified and adopted" the content the plaintiff challenged.  2013 WL 4068780, at *4 ("[T]he salient point about Ritchie's tagline is not that it was defamatory itself and thus outside CDA immunity, but rather that it effectively ratified and adopted the third-party post."); *see also* 840 F. Supp. 2d at 1012 (asserting that "a jury could certainly interpret" Ritchie's tagline, "Why are all high school teachers freaks in the sack?" "as adopting the preceding allegedly defamatory comments concerning [plaintiff's] sexual activity").

The district court's decision to preclude Section 230 immunity based on its views that defendants "*implicitly* adopt[ed] an offensive posting" and thereby "*effectively* ratified and adopted" the post, 2013 WL 4068780, at *2 (emphasis added), dangerously restricts the scope and availability of Section 230 immunity and creates an ambiguous and unworkable standard.  Any website or online

23

platform that hosts user content related to speech that someone might find objectionable – whether political commentary, consumer reviews, celebrity gossip, or countless other topics – would risk liability on the theory that it has "encouraged" unlawful content. *See Parisi v. Sinclair*, 774 F. Supp. 2d 310, 316 (D.D.C. 2011) ("it would be contrary to the purpose of the CDA … to require a fact-based analysis of if and when a defendant 'adopted' particular statements and revoke immunity on that basis"). Websites allowing give-and-take about user-submitted views and comments are "[t]he prototypical service[s] qualifying for [Section 230] statutory immunity …." *Accusearch*, 570 F.3d at 1195. And, as the Ninth Circuit held in *Roommates.com*, courts should reject theories of development "by implication or … inference," or that a website "tacitly assented" to content, because otherwise "we cut the heart out of section 230." 521 F.3d at 1174.

### E.    The District Court's Unprecedented Interpretation of Section 230 Threatens Speech Across the Internet.

Circuit courts have carefully delineated the boundaries of Section 230 immunity consistent with Congress's intent, recognizing that in limited circumstances, online service providers may "develop" actionable content if they require users to submit it or retain third parties to create it. This Court now has the opportunity to consider the issue, and it likewise should interpret Section 230 consistent with its aims and established case law.

24

If the district court's unprecedented interpretation of Section 230 is accepted, the predictability that Section 230 now provides will be lost. No provider will know whether someone might subjectively determine its service is "offensive" or implicitly "encourages" offensive user content. The effects of such uncertainly would be far-ranging, as user content is a central feature of countless online services, including ones operated by Amici. Online providers rely on the protections of Section 230 to manage their services and provide vibrant forums for speech and commerce. The risks of the district court's decisions are perhaps as varied as the breadth of third-party content itself, but Amici offer some examples.

First, if online providers are subject to liability for "encouraging" content by exercising editorial discretion and deciding to delete some posts but not others, *every* provider that reviews and edits user content is at risk of losing immunity. But websites across the Internet do just that. For example, the review website yelp.com (operated by Amicus Yelp Inc.) has received more than 47 million reviews about local businesses, government services, and other establishments from its users, and uses automated software to decide which of these reviews to recommend to the public in an effort to weed out reviews that may be fake, overly offensive, or otherwise unhelpful. *See Levitt v. Yelp! Inc.*, 2011 WL 5079526 (N.D. Cal. Oct. 26, 2011) (finding Yelp immune for these acts because exposure to liability could cause it to "resist filtering out false/unreliable reviews … or to

25

immediately remove all negative reviews about which businesses complained").
Amicus TripAdvisor LLC displays millions of user comments about hotels and
travel services, and Amicus Amazon.com provides millions of customer reviews
about books and other products. These sites, like countless others, reserve rights to
remove, screen, and edit user-generated content, and to exercise the editorial
discretion to remove some posts while allowing others to remain posted. Under
the district court's interpretation, such efforts could *contribute* to liability, rather
than protect against it. If this is the rule, online service providers are better off *not*
reviewing, editing, or blocking content – a result that would be exactly contrary to
Section 230's intent to encourage self-policing.

Additionally, if websites lose Section 230 immunity based on a decision that
either the site or some of its content is "offensive," online providers
understandably will fear even coming close to this line.[10] For example, Amicus
Gawker Media LLC operates a website called "Defamer"
(www.defamer.gawker.com), which posts content about celebrities. The website
reddit.com provides items posted by users, ranked according to votes by other

---

[10] As the Supreme Court has recognized, "where particular speech falls close to the
line separating the lawful and the unlawful, the possibility of mistaken factfinding
– inherent in all litigation – will create the danger that the legitimate utterance will
be penalized," for "[t]he man who knows that he must bring forth proof and
persuade another of the lawfulness of his conduct necessarily must steer far wider
of the unlawful zone." *Speiser v. Randall*, 357 U.S. 513, 526 (1958).

users and organized by various categories, including for items that are "controversial." And again, many websites display reviews of businesses or professionals, including Amici Amazon.com, TripAdvisor, Avvo, and Yelp. Anytime online service providers invite input that may be controversial or critical, someone may consider something offensive. But providers are protected by Section 230 and they should be, because open and free speech on the Internet is what Congress meant to foster.

If websites are subject to liability for failing to remove third-party content whenever someone objects, they will be subject to the "heckler's veto," giving anyone who complains unfettered power to censor speech. *See Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 880 (1997). For example, Avvo.com hosts user reviews of attorneys (www.avvo.com) and would risk liability if it did not remove client comments and reviews whenever a disgruntled attorney did not like them. The same would be true for Amazon.com if an author objected to reviews of her work, or TripAdvisor.com if a hotel disliked reviews from its guests. Under the district court's interpretation, any website that receives a complaint about third-party content would have little choice but to remove it, and the candid exchange of information would suffer as a result.

Finally, if online service providers "adopt" or "ratify" user content merely by responding to posts or adding comments that are not actionable, that could

dissuade websites from interacting with users altogether. For example, news websites that solicit citizen journalism about public events, crime tips, or users' experiences (such as Amicus CNN's ireport.com), often encourage conversations between users and editors about developing news events. Similarly, Amicus Gawker believes that interaction among submitters and editors is integral to finding and publishing accurate information. The district court's opinions offer no clear guidance about when an online service provider's own input has "adopted" or "ratified" arguably offensive content, necessarily causing them to be more reticent about providing *any* feedback or comments, regardless of the value of doing so.

It is not Amici's place in this case to condone or condemn defendants' website or conduct. Certainly, an online service provider may lose Section 230 immunity if it creates or directly participates in authoring unlawful content. But the lines should be clear, as online service providers across the Internet need to understand and rely on the protections of Section 230 that Congress intended. This Court should be careful not to destroy the law's broad immunity and defeat its very purposes by creating theories of "implicit" encouragement or adoption, as the district court found.

Respectfully submitted this 19th day of November, 2013

_s/ John C. Greiner_

| | |
|---|---|
| BRUCE E.H. JOHNSON | JOHN C. GREINER (0005551) |
| JAMES C. GRANT | NICHOLAS J. ZIEPFEL (0086584) |
| AMBIKA K. DORAN | _Co-counsel for amici_ |
| _Co-counsel for amici_ | GRAYDON HEAD & RITCHEY LLP |
| DAVIS WRIGHT TREMAINE LLP | 1900 Fifth Third Center |
| 1201 Third Avenue, Suite 2200 | 511 Walnut Street |
| Seattle, Washington 98101 | Cincinnati, OH 45202-3157 |
| Tel: (206) 622-3150 | Tel: (513) 629-2731 |
| Fax: (206) 757-7700 | Fax: (513) 651-3836 |
| | |
| THOMAS R. BURKE | JAMES ROSENFELD |
| _Co-counsel for amici_ | _Co-counsel for amici_ |
| DAVIS WRIGHT TREMAINE LLP | DAVIS WRIGHT TREMAINE LLP |
| 505 Montgomery Street, Suite 800 | 1633 Broadway, 27th Floor |
| San Francisco, California 94111 | New York, NY 10019 |
| Tel: (415) 276-6500 | Tel: (212) 489-8230 |
| Fax: (415) 276-6599 | Fax: (212) 489-8340 |

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P.

29(d)(7) and 32(a)(7)(B)(i) because it contains 6,849 words of text as calculated by

the word-processing program used to prepare it, excluding the parts of the brief

exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and 6 Cir. R. 32(b)(1).

This brief complies with the typeface requirement of Fed. R. App. P.

32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has

been prepared in a proportionally spaced typeface using Microsoft Word 2011 in

14-point Times New Roman font.

*s/ John C. Greiner*
John C. Greiner (0005551)

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was served on all counsel of record, this 19th day of November, 2013, by means of the Court's electronic filing system.

_s/ John C. Greiner_
John C. Greiner (0005551)
