No. 13-5946

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

SARAH JONES,

*Plaintiff-Appellee,*

*v.*

DIRTY WORLD ENTERTAINMENT RECORDINGS, LLC, *ET AL.*,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Eastern District of Kentucky No. 2:09-CV-219-WOB
Before the Honorable William O. Bertelsman

**BRIEF FOR *AMICI CURIAE* AOL INC., EBAY INC., FACEBOOK, INC.,
GOOGLE INC., LINKEDIN CORP., MICROSOFT CORP., TUMBLR, INC.,
TWITTER, INC., AND ZYNGA INC.**

PATRICK J. CAROME
SAMIR C. JAIN
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000

November 19, 2013

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Sixth Circuit Rule 26.1, Amici Curiae certify the following information:

AOL Inc. states that it does not have a parent corporation; as of September 30, 2013, Dodge & Cox owned more than 10% of AOL's stock. AOL Inc. is not a subsidiary or affiliate of any publicly held corporation, and no other publicly held corporation has a financial interest in the outcome of the litigation by virtue of its participation.

eBay Inc. states that it does not have a parent corporation and that no publicly held corporation owns 10% or more of its stock. eBay Inc. is not a subsidiary or affiliate of any publicly held corporation, and no other publicly held corporation has a financial interest in the outcome of the litigation by virtue of its participation.

Facebook, Inc. states that it does not have a parent corporation, and no publicly traded corporation owns more than 10% of Facebook's stock. Facebook, Inc. is not a subsidiary or affiliate of any publicly held corporation, and no other publicly held corporation has a financial interest in the outcome of the litigation by virtue of its participation.

Google Inc. states that it does not have a parent corporation and that no publicly held corporation owns 10% or more of Google stock. Google Inc. is not a

subsidiary or affiliate of any publicly held corporation, and no other publicly held corporation has a financial interest in the outcome of the litigation by virtue of its participation.

LinkedIn Corp. states that it does not have a parent corporation and that no publicly held corporation owns 10% or more of LinkedIn stock.  LinkedIn Corp. is not a subsidiary or affiliate of any publicly held corporation, and no other publicly held corporation has a financial interest in the outcome of the litigation by virtue of its participation.

Microsoft Corp. states that it does not have a parent corporation and that no publicly held corporation owns 10% or more of Microsoft stock.  Microsoft Corp. is not a subsidiary or affiliate of any publicly held corporation, and no other publicly held corporation has a financial interest in the outcome of the litigation by virtue of its participation.

Tumblr, Inc. states that its parent corporation is Yahoo! Inc., which does not have a parent corporation, and that no publicly held corporation owns 10% or more of Yahoo! Inc.'s stock.  Tumblr is not a subsidiary or affiliate of any other publicly held corporation, and no other publicly held corporation has a financial interest in the outcome of the litigation by virtue of its participation.

Twitter, Inc. states that it does not have a parent corporation and that no publicly held corporation owns 10% or more of Twitter stock.  Twitter, Inc. is not a

subsidiary or affiliate of any publicly held corporation, and no other publicly held corporation has a financial interest in the outcome of the litigation by virtue of its participation.

Zynga Inc. states that it does not have a parent corporation and that no publicly held corporation owns 10% or more of Zynga stock.  Zynga Inc. is not a subsidiary or affiliate of any publicly held corporation, and no other publicly held corporation has a financial interest in the outcome of the litigation by virtue of its participation.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ................................................................v

INTEREST OF AMICI CURIAE ................................................................1

SUMMARY OF ARGUMENT ................................................................4

ARGUMENT ................................................................7

I.    SECTION 230 BROADLY IMMUNIZES ONLINE SERVICE PROVIDERS FROM LIABILITY FOR CONTENT PROVIDED BY THIRD PARTIES ........................7

II.   THE DISTRICT COURT'S NARROW CONSTRUCTION OF SECTION 230 IS ERRONEOUS ........................................................11

      A.    The District Court Applied the Wrong Standard ................................12

      B.    The Factors on Which the District Court Relied Do Not Establish a Basis for Losing Section 230 Immunity ..........................17

III.  THE PREVAILING INTERPRETATION OF SECTION 230 PROMOTES ITS PURPOSES AND HAS BEEN CRITICAL TO THE DEVELOPMENT AND GROWTH OF THE INTERNET ........................................................20

      A.    Section 230 Promotes Free Speech and Online Commerce ........................................................20

      B.    Section 230 Immunity Gives Service Providers Room To Self-Regulate ........................................................24

CONCLUSION ........................................................29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

### CASES

Page(s)

*Atlantic Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690 (S.D.N.Y. 2009)............................................................................................15

*Backpage.com, LLC v. Cooper,* 939 F. Supp. 2d 805 (M.D. Tenn. 2013) .......................................................................................................10

*Barrett v. Rosenthal*, 146 P.3d 510 (Cal. 2006).......................................................11

*Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003) .......................................8, 20, 21, 22

*Ben Ezra, Weinstein, & Co. v. America Online Inc.*, 206 F.3d 980 (10th Cir. 2000) ...................................................................................9

*Blumenthal v. Drudge*, 992 F. Supp. 44 (D.D.C. 1998) .............................10, 15, 16

*Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003) ...........18, 20, 25

*Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. craigslist, Inc*., 519 F. 3d 666 (7th Cir. 2008)...........................................9, 16

*Courtney v. Vereb & Angie's List, Inc*., 2012 WL 2405313 (E.D. La. June 25, 2012)..................................................................................9

*Dimeo v. Max*, 433 F. Supp. 2d 523 (E.D. Pa.), *aff'd*, 2007 WL 217865 (3d Cir. 2006) ...................................................................9

*Doe v. America Online*, 783 So. 2d 1010 (Fla. 2001) .............................................11

*Doe v. MySpace, Inc.*, 474 F. Supp. 2d 843 (W.D. Tex. 2007) .................................9

*Doe v. MySpace, Inc.*, 528 F.3d 413 (5th Cir. 2008) .................................................8

*Doe v. MySpace, Inc.*, 629 F. Supp. 2d 663 (E.D. Tex. 2009) ................................15

*Eckert v. Microsoft Corp.*, 2007 WL 496692 (E.D. Mich. 2007)............................10

*Fair Housing Council v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008) ...............................................................5, 12, 13, 14, 19, 28

*FTC v. Accusearch Inc.*, 570 F.3d 1187 (10th Cir. 2009) .......................................16

*Gentry v. eBay, Inc.*, 121 Cal. Rptr. 2d 703 ...........................................................18

*Goddard v. Google, Inc.,* 2008 WL 5245490 (N.D. Cal. Dec. 17, 2008) ...........................................................................................................28

*Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193 (N.D. Cal. 2009) ....................9, 15

*Green v. America Online, Inc.*, 318 F.3d 465 (3d Cir. 2003) ...........................9, 28

*Hill v. StubHub*, 727 S.E.2d 550 (N.C. Ct. App. 2012) .........................................10

*Johnson v. Arden*, 614 F.3d 785 (8th Cir. 2010) .........................................8, 16, 28

*Jones v. Dirty World Entertainment Recordings, LLC* 2013 WL 4068780 (E.D. Ky. Aug. 12, 2013) ............... 11, 12, 17, 18, 24, 27

*Jones v. Dirty World Entertainment Recordings, LLC* 840 F. Supp. 2d 1008 (E.D. Ky. 2012) ..................................11, 12, 17, 18, 19

*Jurin v. Google Inc.*, 695 F. Supp. 2d 1117 (E.D. Cal. 2010) ...............................15

*Klayman v. Zuckerberg*, 910 F.Supp.2d 314 (D.D.C. 2012) ....................................9

*Murawski v. Pataki*, 2007 WL 2781054 (S.D.N.Y. 2007) .......................................9

*Nemet Chevrolet Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250 (4th Cir. 2009) ...........................................................................8, 15, 17, 18

*Noah v. AOL Time Warner Inc.*, 261 F. Supp. 2d 532 (E.D. Va. 2003), *aff'd*, 2004 WL 602711 (4th Cir. Mar. 24, 2004)...........................................9

*Parisi v. Sinclair*, 774 F.Supp.2d 310 (D.D.C. 2011)............................................17

*Parker v. Google, Inc.*, 422 F. Supp. 2d 492 (E.D. Pa. 2006) ..................................9

*Seaton v. TripAdvisor LLC*, 728 F.3d 592 (6th Cir. 2013) .....................................10

*Shiamili v. The Real Estate Group of New York*, 952 N.E.2d 1011 (N.Y. 2011) .....................................................................................................10

*Stratton Oakmont, Inc. v. Prodigy Services Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) .......................................................................24

*Universal Communications Systems, Inc. v. Lycos, Inc.,* 478 F.3d 413
(1st Cir. 2007) ..................................................................9

*Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997) ........................*passim*

## STATUTES

28 U.S.C. § 4102(c)(1) ...........................................................11

47 U.S.C.
§ 230(a)(3) ...............................................................21
§ 230(a)(4) ...............................................................21
§ 230(b)(2) ...............................................................21
§ 230(b)(2) ...............................................................17
§ 230(c)(1) ...........................................................*passim*
§ 230(c)(2) ...............................................................27
§ 230(e) ...................................................................6
§ 230(e)(3) ...............................................................8
§ 230(f)(3) .........................................................5, 7, 12
§ 941 ....................................................................11

## LEGISLATIVE MATERIALS

H.R. Rep. No. 107-449 (2002) ..................................................11

S. Rep. No. 104-230 (1996) ....................................................24

141 Cong. Rec. 22,046 .........................................................25

## OTHER AUTHORITIES

Booz & Co., *The Impact of U.S. Internet Copyright Regulations on
Early-Stage Investment* (2012), *available at* http://www.booz.
com/global/home/what-we-think/reports-white-papers/article-
display/impact-internet-copyright-regulations-early-2 ................................23

eBay, *How to Report inappropriate buying and selling*, *available at*
http://pages.ebay.com/help/buy/ report-trading.html#wont .........................27

eBay, *When eBay may remove or adjust Feedback*, *available at* http://
pages.ebay.com/help/policies/feedback-removal.html..................................27

Facebook Community Standards, *available at* https://www.facebook.
com/communitystandards ...............................................................................26

Facebook, *Report a Violation*, *available at* https://www.facebook.
com/help/263149623790594/ .......................................................................26

Google Terms of Service, *available at* https://www.google.com/intl/
en/policies/terms/ ...........................................................................................26

LinkedIn Professional Community Guidelines, *available at* http://
help.linkedin.com/app/answers/detail/a_id/34593 ........................................27

LinkedIn User Agreement, *available at* http://www.linkedin.com/
legal/user-agreement.......................................................................................26

LinkedIn, *Complaints Regarding Content Posted on the LinkedIn
Website*, *available at* http://www.linkedin.com/legal/copyright-
policy#pri-2.....................................................................................................26

Microsoft Code of Conduct, *available at* http://windows.microsoft.
com/en-us/windows-live/code-of-conduct ....................................................26

The Twitter Rules, *available at* http://support.twitter.com/articles/
18311-the-twitter-rules# ................................................................................26

Tumblr Community Guidelines, *available at* http://www.tumblr.com/
policy/en/community .......................................................................................26

Twitter, *I'm reporting an abusive user*, *available at* https://support.
twitter.com/forms/abusiveuser .......................................................................26

YouTube Reporting and Enforcement Center, *available at* http://
www.youtube.com/yt/policyandsafety/ reporting.html..................................26

## INTEREST OF AMICI CURIAE

Amici curiae AOL Inc., eBay Inc., Facebook, Inc., Google Inc., LinkedIn Corp., Microsoft Corp., Tumblr, Inc., Twitter Inc., and Zynga Inc. ("Amici") file this brief to respectfully urge the Court to adhere to the broad interpretation of 47 U.S.C. § 230(c)(1) that has been adopted by courts throughout the nation during the seventeen years since its enactment.[1]

Amici are providers of interactive computer services:

AOL Inc. is a brand company, committed to continuously innovating, growing, and investing in brands and experiences that inform, entertain, and connect the world. The home of a world-class collection of premium brands, AOL creates original content that engages audiences on a local and global scale.  AOL helps marketers connect with these audiences through effective and engaging digital advertising solutions.

eBay Inc. is a global commerce platform and payments leader, whose businesses include the core ecommerce platform located at www.eBay.com, PayPal, StubHub, and eBay Enterprise (a leading provider of ecommerce and interactive marketing services to enterprise clients).  In 2012, eBay's marketplaces

---

[1]    No party or its counsel authored this brief in whole or in part.  No person other than Amici and their counsel contributed money that was intended to fund the preparation or submission of this brief.  Defendants-Appellants have consented to the filing of this brief, but Plaintiff-Appellee has not.  Amici are simultaneously filing a motion for leave to file this brief.

platforms had more than 110 million active users, and its payments platforms had more than 120 million active registered accounts.  Collectively, in 2012, eBay enabled $175 billion of global commerce.

Facebook, Inc. provides a free Internet-based social media service that enables its more than one billion users to connect with their friends and family, to discover what is going on in the world around them, and to share what matters to them and to the people they care about.

Google Inc. offers a suite of web-based products and services to billions of people worldwide—most notably, its eponymous search engine, as well as other products such as its video-sharing service, YouTube, the Google Play store, Google Maps, Blogger, and its social networking product, Google+.

LinkedIn Corp. is the world's largest professional network on the Internet with more than 259 million members.

Microsoft Corp. is a worldwide leader in software, services, and solutions that help people and businesses realize their full potential. These include the Bing search engine and the Windows 8 and Windows Phone 8 app stores.

Tumblr, Inc. was founded in 2007 by its CEO David Karp in New York City, and is now a wholly owned subsidiary of Yahoo! Inc.  Tumblr's mission is to serve creators by providing the best products and services, on all platforms, to enable them to create and distribute their work online to the audience that they

deserve.  Tumblr is home to nearly 150 million blogs and over 65 billion posts, which reach an audience of hundreds of millions of people worldwide each month.

Twitter, Inc. is a global platform for public self-expression and conversation in real time.  Twitter has more than 230 million monthly active users creating approximately 500 million Tweets every day.

Zynga Inc. develops, markets, and operates online social games as live services played over the Internet and on social networking sites and mobile platforms.  Zynga is a leading online social game developer with approximately 133 million average monthly active users for the three months ending September 30, 2013.

Each of the Amici has a substantial interest in the rules governing whether providers of interactive computer services may be liable for unlawful online content generated by third parties.  Because they serve as platforms for the online communications and transactions of hundreds of millions of users, Amici have been and/or inevitably will be parties to controversies in which they must raise Section 230 immunity.  The vitality of online discourse and commerce made possible by these companies' interactive services depends in part on their ability to avoid the burdens of litigation and potential liability in cases in which it is alleged that one or more of their users has misused their services to create and disseminate tortious or otherwise unlawful content.  As discussed herein, aspects of the district

court decision in this case significantly depart from the settled interpretation of Section 230 and, if adopted by this Court, would not only contravene Congress's policies as declared in the statute, but also introduce substantial uncertainty regarding a law that has been a pillar for the growth and success of America's Internet industry.

## SUMMARY OF ARGUMENT

Amici urge this Court to join the overwhelming consensus of other courts that have interpreted Section 230 as providing interactive computer services with broad immunity against liability for content provided by third parties.  The protection afforded by Section 230 has been and remains critical to the development and robustness of the Internet and interactive services such as those provided by Amici.  The district court, perhaps in reaction to the particular facts of this case, interpreted Section 230 narrowly and in a manner contrary to the established case law.  If upheld, that interpretation would significantly undermine the immunity afforded by Section 230 and undercut Congress's express intentions when passing the statute.

Since Section 230's enactment in 1996, courts throughout the nation have consistently held that 47 U.S.C. § 230(c)(1) provides interactive computer service providers with broad protection from liability for unlawful content created or developed by their users or other third parties.  In particular, as these courts have

recognized, Section 230 bars a claim whenever (i) the defendant asserting

immunity is an interactive computer service provider, (ii) the particular

information at issue was provided by "another information content provider," and

(iii) the claim seeks to "treat" the defendant as a "publisher or speaker" of that

information.

The district court's decision focused on the second element of Section 230

immunity. Specifically, it addressed the question of what activity by a service

provider is sufficient to make it also an "information content provider" of content

originating from a third-party user, thereby forfeiting its statutory protection from

liability. Under the express terms of the statute, the answer to this question turns

on whether the service provider was "responsible, in whole or in part, for the

creation or development" of the content at issue. 47 U.S.C. § 230(f)(3). Clearly,

Section 230 provides no protection for content a service provider itself authors.

Thus, in this case, Section 230 would not apply to claims that the "taglines"

created by the defendants were themselves tortious.

But the district court went much farther. It held that a service provider is an

"information content provider" merely if it "encourages" the submission of a

particular type of content. That conclusion is contrary to the case law, including

what the district court itself characterized as the principal authority on which it

relied, the Ninth Circuit's *en banc* decision in *Fair Housing Council v.*

*Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008). As that court recognized, such an interpretation would undermine the immunity afforded by Section 230. So long as the service provider does not itself participate in creating or developing the particular content alleged to be unlawful—which did *not* occur here with respect to the allegedly tortious material submitted by users of appellants' website—and does not otherwise require or force users to submit unlawful content (as happened in *Roommates* but not here), the language of Section 230 and case law establish that the service provider is immune from claims arising from content provided by a third party.[2]

As Congress intended, and as Amici can attest from experience, the broad protection provided by Section 230(c)(1) has served as a foundational underpinning for the development and growth of the Internet as a medium for free expression and commerce. It has enabled innumerable online platforms and services through which users can engage in vibrant online speech and interactions. If Section 230's protection were narrowed, many service providers likely would have to curb such services (e.g., by offering only moderated services) and often would have little choice but to yield to a "heckler's veto" whenever someone complains that particular content is tortious or unlawful in order to avoid the risk of liability.

---

[2]     Section 230 provides several express exceptions to this immunity, such as for claims under intellectual property laws, but none of those is applicable here. *See* 47 U.S.C. § 230(e).

The Internet also has enabled new and innovative forms of commerce, including online marketplaces. Again, consistent with Congress's declared policies, the prevailing interpretation of Section 230(c)(1) allows myriad service providers, ranging from start-ups to established companies with household names, to operate services that support these virtual marketplaces. Such services likely would exist only in much more limited forms if they were faced with a constant threat of litigation and liability for every fraudulent, misleading, or otherwise unlawful listing that any one of their millions of users might post.

Amici cannot emphasize enough the degree to which the protection afforded by Section 230(c)(1), as consistently interpreted by courts, has played a critical role in fostering the development and growth of interactive services that both empower users and encourage innovation and self-regulation. Amici therefore respectfully urge this Court to embrace the settled interpretation of Section 230 and to reject the undue limits that the district court decision would place upon it.

## ARGUMENT

### I. SECTION 230 BROADLY IMMUNIZES ONLINE SERVICE PROVIDERS FROM LIABILITY FOR CONTENT PROVIDED BY THIRD PARTIES

The plain language of Section 230 bars suits against web sites and other interactive service providers predicated on content that was "creat[ed] or develop[ed]" by third parties and not by the provider. 47 U.S.C. § 230(f)(3). The key provision of Section 230 states that "[n]o provider or user of an interactive

computer service shall be treated as the publisher or speaker of any information provided by another information content provider." *Id.* § 230(c)(1). Section 230(e)(3) further provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." Under Section 230, "[s]tate-law plaintiffs may hold liable the person who creates or develops unlawful content, but not the interactive computer service provider who merely enables that content to be posted online." *Nemet Chevrolet Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009).

Even as long as decade ago, the Ninth Circuit noted a "consensus developing across other courts of appeal that § 230(c) provides broad immunity for publishing content provided primarily by third parties." *Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003). That consensus has since hardened, with each of the eight United States Courts of Appeal that has considered the question interpreting Section 230 as broadly insulating interactive service providers from liability for third-party content. *See Johnson v. Arden*, 614 F.3d 785, 791 (8th Cir. 2010) ("The majority of federal circuits have interpreted the CDA to establish broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service."); *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008) ("Courts have construed the immunity provisions in § 230 broadly in all cases arising from the publication of user-generated content"); *Zeran*

8

*v. America Online, Inc.*, 129 F.3d 327, 328 (4th Cir. 1997) ("Section 230 … plainly immunizes computer service providers like AOL from liability for information that originates with third parties"); *Green v. America Online, Inc*., 318 F.3d 465, 471 (3d Cir. 2003) ("By its terms, § 230 provides immunity to AOL as a publisher or speaker of information originating from another information content provider"); *Ben Ezra, Weinstein, & Co. v. America Online Inc.*, 206 F.3d 980, 984-985 (10th Cir. 2000) (§ 230 "creates a federal immunity to any state law cause of action that would hold computer service providers liable for information originating with a third-party"); *Universal Commc'n Sys., Inc. v. Lycos, Inc.,* 478 F.3d 413, 419 (1st Cir. 2007) ("[W]e too find that Section 230 immunity should be broadly construed"); *Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. craigslist, Inc*., 519 F. 3d 666, 671 (7th Cir. 2008) (finding that "[a]n interactive computer service 'causes' postings only in the sense of providing a place where people can post" and such a role cannot give rise to liability given Section 230).[3]

---

[3]     Numerous district courts have likewise held that Section 230 broadly immunizes interactive services from liability for third-party content. *See, e.g.*, *Klayman v. Zuckerberg*, 910 F.Supp.2d 314, 318 (D.D.C. 2012) ("By its plain terms, then, the CDA immunizes internet computer service providers from liability for the publication of information or speech originating from third parties."); *Courtney v. Vereb & Angie's List, Inc*., 2012 WL 2405313, at *4-6 (E.D. La., June 25, 2012); *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1197 (N.D. Cal. 2009); *Murawski v. Pataki*, 2007 WL 2781054, at *10-11 (S.D.N.Y. 2007); *Doe v. MySpace, Inc.*, 474 F. Supp. 2d 843, 851-852 (W.D. Tex. 2007); *Parker v. Google, Inc.*, 422 F. Supp. 2d 492, 500-501 (E.D. Pa. 2006); *Dimeo v. Max*, 433 F. Supp. 2d 523, 530-531 (E.D. Pa.), *aff'd*, 2007 WL 217865 (3d Cir. 2006); *Noah v. AOL*

This Court too has recognized the protection afforded by Section 230.  In a case involving the interactive computer service TripAdvisor, this Court noted that, while the case generally concerned content provided by the service itself, "if the complaint or proposed amended complaint had alleged that TripAdvisor's users' statements are defamatory, TripAdvisor cannot be held liable for its users' statements under the Communications Decency Act, 47 U.S.C. § 230(c)(1)." *Seaton v. TripAdvisor LLC*, 728 F.3d 592, 598 n.8 (6th Cir. 2013).[4]

Numerous state appellate and trial-level courts similarly have concluded that Section 230 broadly immunizes providers of interactive computer services from liability for third-party content.  For example, the Court of Appeals of New York has explained that "we follow what may fairly be called the national consensus and read section 230 as generally immunizing Internet service providers from liability for third-party content wherever such liability depends on characterizing the provider as a 'publisher or speaker' of objectionable material."  *Shiamili v. The Real Estate Group of New York*, 952 N.E.2d 1011, 1017 (N.Y. 2011); *see also Hill v. StubHub*, 727 S.E.2d 550, 561 (N.C. Ct. App. 2012) (StubHub entitled to

*Time Warner Inc.*, 261 F. Supp. 2d 532, 538-540 (E.D. Va. 2003), *aff'd*, 2004 WL 602711 (4th Cir. Mar. 24, 2004); *Blumenthal v. Drudge*, 992 F. Supp. 44, 50-52 (D.D.C. 1998).

[4]     District courts within the Sixth Circuit also have applied Section 230 to bar claims against interactive service providers.  *See, e.g.*, *Eckert v. Microsoft Corp.*, 2007 WL 496692, at *3 (E.D. Mich. 2007); *see also Backpage.com, LLC v. Cooper,* 939 F. Supp. 2d 805, 824-825 (M.D. Tenn. 2013) (enjoining state statute because it likely was preempted by Section 230).

immunity even if it "encouraged the posting of 'market-based' prices on its website or was cognizant of the risk that tickets sold on its website would be priced in excess of face value" in contravention of state anti-scalping laws); *Barrett v. Rosenthal*, 146 P.3d 510, 522-523 (Cal. 2006) (Section 230 "broadly shield[s] *all* providers from liability for 'publishing' information received from third parties"); *Doe v. America Online*, 783 So. 2d 1010, 1018 (Fla. 2001).

Congress has twice ratified this substantial body of case law by enacting follow-on legislation extending the protections of Section 230 into new areas. *See* 47 U.S.C. § 941 (extending Section 230 protections to new class of entities); 28 U.S.C. § 4102(c)(1) (providing that U.S. courts "shall not recognize or enforce" foreign defamation judgments that are inconsistent with Section 230); *see also* H.R. Rep. No. 107-449, at 13 (2002) ("[t]he courts have correctly interpreted section 230(c)"); *Barrett*, 146 P.3d at 523 n.17 (statements in H.R. Rep. No. 107-449 "reflect the Committee's intent that the existing statutory construction … be maintained in a new legislative context").

## II.    THE DISTRICT COURT'S NARROW CONSTRUCTION OF SECTION 230 IS ERRONEOUS

The district court incorrectly interpreted this established body of Section 230 jurisprudence as establishing a vague protection that vanishes whenever the service provider merely "encourage[s]" the content at issue. *Jones v. Dirty World Entm't Recordings, LLC*, 840 F. Supp. 2d 1008, 1012 (E.D. Ky. 2012) ("*Jones I*"); *Jones*

*v. Dirty World Entm't Recordings, LLC*, 2013 WL 4068780, at *2 (E.D. Ky. Aug. 12, 2013) ("*Jones II*").  This unprecedented standard is inconsistent with the plain language of Section 230 and contrary to the case law.  Indeed, the very case that the district court characterized as "[t]he principal precedent" on which it relied[5] warned that "close cases … must be resolved in favor of immunity" to avoid "forcing websites to face death by ten thousand duck-bites, fighting off claims that they promoted or encouraged—or at least tacitly assented to—the illegality of third parties." *Roommates.com*, 521 F.3d at 1174.

### A.    The District Court Applied the Wrong Standard

The text of Section 230 deprives a service provider of statutory protection only where it is "responsible, in whole or in part, for *the creation or development*" of the particular alleged unlawful content that is at issue—not where the provider merely "encourage[s]" content provided by a third party.  47 U.S.C. § 230(f)(3) (emphasis added).  The district court's standard would expand the meaning of "development" to the point of negating the very protection that Congress intended to erect.  Virtually every website includes features that invite and encourage users to enter particular types of content.  For example, online marketplaces generally include functions for a third-party seller to set a price for an item, to state whether the item is new or used, to categorize the nature or use of the item, and a variety of

---

[5]    *Jones II*, 2013 WL 4068780, at *1; *Jones I*, 840 F. Supp. 2d at 1010.

other information designed to help other users search for items in which they may be interested and to learn more about those items. Likewise, a site devoted to reviews of restaurants or other businesses might well have specific language explaining the value and importance readers place on "negative" reviews and soliciting users to submit details of their negative experiences with a business.

Under the district court's standard, however, a website could lose Section 230 immunity on the theory that such characteristics meant that the site "encouraged" the submission of particular third-party content. That is not a reasonable interpretation of the terms "creation" or "development." Indeed, the *en banc* decision in *Roommates.com* specifically cautioned that "the broadest sense of the term 'develop' could include … just about any function performed by a website," but that "to read the term so broadly would defeat the purposes of section 230 by swallowing up every bit of the immunity that the section otherwise provides." *Roommates.com*, 521 F.3d at 1167. The standard conjured by the district court here would have exactly that effect.

In addition, the trial court's standard has no basis in Section 230 precedent. In *Roommates.com*, the *en banc* court adopted a far narrower standard for what constitutes "creation or development" of user content. It held that "development" refers "not merely to augmenting the content generally, but to *materially contributing to its alleged unlawfulness*." 521 F.3d at 1167-1168 (emphasis

added).  The court explained that a web site does not "materially contribute" to the

unlawfulness of third-party content where it merely provides "a framework that

could be utilized for proper or improper purposes" by the user.  *Id.* at 1169, 1172.

Rather, *Roommates.com* held only that the website operator was not entitled

to immunity with respect to allegedly unlawful content that it effectively *required*

its users to submit.  In that case, as a condition for using an online roommate-

finding service, each user seeking to offer living space had to create a profile

describing his/her desired roommate and, in doing so, was "*require[d]* … to

disclose his sex, sexual orientation and whether he would bring children to a

household" and to "describe his preferences in roommates with respect to the same

three criteria."  521 F.3d at 1161 (emphasis added).  The site also designed its

search functions to "steer" users to listings based on users' answers to the

discriminatory questions posed by the site.  *Id.* at 1167.  In those circumstances,

the Ninth Circuit held that Roommates.com had "materially contributed" to the

content at issue because it "force[d]" users to answer "discriminatory questions"

allegedly in violation of housing discrimination laws.  *Id.* at 1166-1167.  In other

words, that specific discriminatory content was the direct and necessary result of

the site operator's own discriminatory questions.

Courts have consistently interpreted *Roommates.com* as recognizing "only a

narrow exception" to Section 230's broad grant of immunity, applicable only

where the service provider materially contributed to the content that is alleged to be unlawful by requiring the user to provide that specific content. *Goddard*, 640 F. Supp. 2d at 1198. In *Nemet Chevrolet*, for example, the Fourth Circuit expressly distinguished *Roommates.com* on this ground, refusing to strip a website operator of immunity based on a claim that the operator had "structured its website and its business operations to develop" third-party complaints about businesses, even where the operator was alleged to have solicited and asked questions about the complaints and revised or redrafted user content. 591 F.3d at 257.

Other courts have held, since *Roommates.com*, that a search engine provider retains its immunity where the provider offers a tool that suggests keywords to potential advertisers—even when those keywords allegedly contributed to fraud—because the tool "does nothing more than provide options that advertisers may adopt or reject at their discretion." *Goddard*, 640 F. Supp. 2d at 1198; *see also Jurin v. Google Inc.*, 695 F. Supp. 2d 1117, 1123 (E.D. Cal. 2010) (same); *Doe v. MySpace, Inc.*, 629 F. Supp. 2d 663, 665 (E.D. Tex. 2009) (*Roommates.com* "not applicable" because "users of MySpace.com are not *required* to provide any additional information to their profiles" (emphasis added)); *Atlantic Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 701 (S.D.N.Y. 2009).[6]

---

[6]      *Blumenthal v. Drudge*, 992 F. Supp. 44, also illustrates how the district court's "encouragement" standard is contrary to longstanding Section 230 precedent. There, the Internet service provider AOL had contracted with the

The district court's reliance on *FTC v. Accusearch Inc.*, 570 F.3d 1187 (10th Cir. 2009), was similarly misplaced.  In that case, the website offered to provide users with detailed telephone records for any phone number and then paid "researchers" to obtain those records.  *Id.* at 1199.  The court held the website was not entitled to immunity because acquisition of such confidential telephone records is inevitably unlawful (*e.g.*, because federal law generally prohibits telephone companies from disclosing such information).  *Id.* at 1200.  Once again, the site required the dissemination of content that was *necessarily* unlawful.[7]

---

author of an online gossip column, Matt Drudge, to carry the column on its online service; paid Drudge substantial royalties; promoted him as a "Runaway Gossip Success" and his column as a source for "gossip and rumor"; and reserved (but did not exercise) the right to edit Drudge's content.  *Id.* at 51.  Notwithstanding these facts—which go well beyond those at issue here—the court found that AOL was not an "information content provider" of allegedly defamatory content in the column written by Drudge.  The court held that AOL was immune under Section 230 because Congress had made a "policy choice" in Section 230 to "provid[e] immunity even where the interactive service provider has an active, even aggressive role in making available content prepared by others."  *Id.* at 52.

[7]    The district court's also erroneously relied on *Johnson*, 614 F.3d 785, and *Chicago Lawyers' Comm.*, 519 F. 3d 666.  In those cases, the courts held that Section 230 immunized the service providers from liability.  Both courts noted in support of those holdings that the providers had done nothing that could even be said to induce unlawful content.  *Johnson*, 614 F.3d at 792; *Chicago Lawyers' Comm.*, 519 F.3d at 671-672.  But neither court held that such inducement could deprive a service provider of immunity—indeed, given the absence of any facts suggesting such inducement, neither court was even faced with that question.

**B.    The Factors on Which the District Court Relied Do Not Establish a Basis for Losing Section 230 Immunity**

Under the correct Section 230 standard, the factors on which the court below relied cannot deprive a service provider of the statute's protections.  The district court pointed to certain remarks or "taglines" made by the website operator in response to the third-party postings.  *Jones I*, 840 F. Supp. 2d at 1012; *Jones II*, 2013 WL 4068780, at *3-4.  To be sure, if the plaintiff had established that the taglines themselves were tortious, Section 230 would not bar imposition of liability on the website operator for those taglines, because they were not "provided by *another* information content provider."  The court below, however, did not hold that the taglines were tortious.  *Jones II*, 2013 WL 4068780, at *4.  Instead, the district court concluded that those remarks "effectively ratified and adopted the defamatory third-party post" and on that basis held defendants liable for that third-party post.  *Id.*  But the court below created this standard out of whole cloth.  Another court recently rejected this same argument:

> Indeed, it would be contrary to the purpose of the CDA, which sought to encourage the 'vibrant and competitive free market' of ideas on the Internet,' *Nemet Chevrolet*, 591 F.3d at 253 (quoting 47 U.S.C. § 230(b)(2)), by establishing immunity for internet publication of third-party content, to require a fact-based analysis of if and when a defendant 'adopted' particular statements and revoke immunity on that basis.

*Parisi v. Sinclair*, 774 F.Supp.2d 310, 316 (D.D.C. 2011).

The only relevant question under the statute is whether the website operator was responsible for the "*creation or development*" of the allegedly tortious content. *See, e.g.*, *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1125 (9th Cir. 2003) (key issue is whether service provider "created or developed the particular information at issue"); *Nemet*, 591 F.3d at 260 (affirming dismissal where plaintiff failed to show defendant "was responsible for the creation or development of the allegedly defamatory content *at issue* " (emphasis added)); *Gentry v. eBay, Inc.*, 121 Cal. Rptr. 2d 703, 717 n.11 ("The critical issue is whether eBay acted as an information content provider with respect to the information that appellants claim is false or misleading.").

By definition, remarks that a website operator adds in response to a third-party post are made *after* that post has been created and developed and therefore cannot have played a role in that post's creation or development. To the extent the court below was suggesting that the site operator's own remarks could encourage *future* unlawful postings, as discussed above, such encouragement—even assuming it exists—is a far cry from the "creation or development" of any such postings.

The same is true of the name of the site, which the court below also cited as a factor that encouraged submission of unlawful content. *Jones I*, 840 F. Supp. 2d at 1012; *Jones II*, 2013 WL 4068780, at *3. However distasteful the site at issue here may be, gossip posted on the site is not necessarily unlawful (e.g., it may be true),

and, unlike the facts in *Roommates.com*, nothing about the site operator's own remarks in any way required or forced users to post unlawful content.  If a service provider were at risk of losing the protection of Section 230 based on speculation that the name of its site, some features of its service, or some content it originated could be interpreted to have indirectly encouraged unlawful content, service providers would, as the Ninth Circuit warned, "face death by ten thousand duck-bites, fighting off claims that they promoted or encouraged—or at least tacitly assented to—the illegality of third parties."  *Roommates.com*, 521 F.3d at 1174.

The court below also pointed to several editorial considerations that it suggested should deprive a service provider of the protections of Section 230, noting in particular that the defendant selects which submissions will be posted, "reviews the postings but does not verify their accuracy," and decides whether a posting should be removed in response to an objection.  *Jones I*, 840 F. Supp. 2d at 1012.  But, as discussed below, Congress intended Section 230 to *encourage* precisely these forms of self-regulation.  If service providers were to face the threat of losing Section 230 immunity by reviewing third-party content and deciding whether to remove it when someone objects to it, the provider would have a perverse incentive simply to eschew all review and ignore all objections.  It was exactly this incentive that Congress sought to eliminate by enacting Section 230.  *See infra* pp. 24-26.  Moreover, the case law is clear that service providers do not

19

lose the protections of Section 230 for engaging in routine editorial functions such as selecting what third-party content to post or remove.  As the Fourth Circuit explained, under Section 230 "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred."  *Zeran*, 129 F.3d at 330.  The court in *Batzel* likewise held:

> Nor do [defendant's] minor alterations of [an] e-mail prior to its posting or his choice to publish the e-mail (while rejecting other e-mails for inclusion in the listserv) rise to the level of 'development.'  As we have seen, a central purpose of the Act was to protect from liability service providers and users who take some affirmative steps to edit the material posted.  Also, the exclusion of 'publisher' liability necessarily precludes liability for exercising the usual prerogative of publishers to choose among proffered material and to edit the material published while retaining its basic form and message.

333 F.3d at 1031.

## III.  THE PREVAILING INTERPRETATION OF SECTION 230 PROMOTES ITS PURPOSES AND HAS BEEN CRITICAL TO THE DEVELOPMENT AND GROWTH OF THE INTERNET.

### A.    Section 230 Promotes Free Speech and Online Commerce

Congress enacted Section 230 both to protect free speech on the Internet and to foster the growth of online marketplaces and exchanges free from state laws and regulations that, if applied to online intermediaries, would threaten to cripple vibrant discourse and commerce on the Internet.  *Carafano,* 339 F.3d at 1122 (Section 230 enacted "to promote the free exchange of information and ideas over

the Internet"); *Zeran*, 129 F.3d at 330 (Congress enacted Section 230 to promote "freedom of speech in the new and burgeoning Internet medium" by eliminating the "threat [of] tort-based lawsuits" against interactive services for injury caused by "the communications of others"); *Batzel*, 333 F.3d at 1018 (Section 230 intended to "promote the development of e-commerce").

Congress expressly found that the Internet and interactive computer services offer "a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity," 47 U.S.C. § 230(a)(3), and that such services "have flourished, to the benefit of all Americans, with a minimum of government regulation." *Id.* § 230(a)(4). Congress further stated that it is "the policy of the United States … to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, *unfettered by Federal or State regulation*." *Id.* § 230(b)(2) (emphasis added). As the Fourth Circuit explained in *Zeran*,

> The imposition of tort liability on service providers for the communications of others represented, for Congress, simply another form of intrusive government regulation of speech. Section 230 was enacted, in part, to maintain the robust nature of Internet communication and, accordingly, to keep government interference in the medium to a minimum.

129 F.3d at 330.

Courts have repeatedly recognized that Congress's enacted policy declarations support a broad reading of Section 230(c)(1). The Ninth Circuit

explained that "making interactive computer services … liable for the speech of third parties would severely restrict the information available on the Internet." *Batzel*, 333 F.3d at 1027.  Given the "staggering" volume of third-party content that they carry, and "[f]aced with potential liability for each message republished by their services," *see Zeran*, 129 F.3d at 331, such services likely would be forced, absent Section 230's protection, to restrict or abandon many of the features that enable the dissemination of third-party content.  Moreover, to avoid risks of litigation and liability, service providers often would have little choice but to remove third-party content claimed by anyone to be tortious or unlawful, effectively creating a "heckler's veto" of a kind that courts have routinely recognized is antithetical to free speech values.  Thus, as the Fourth Circuit recognized, "[t]he specter of tort liability in an area of such prolific speech would have an obvious chilling effect."  *Id.*; *see also Batzel*, 333 F.3d at 1028 (Section 230 was passed "to prevent lawsuits from shutting down websites and other services on the Internet").

Under the protection of Section 230—and consistent with Congress's intent—interactive computer services that allow users to speak, interact, and transact have experienced tremendous growth in the 17 years since the statute's enactment.  The Amici are now household names with hundreds of millions of users, and collectively they serve as platforms for billions of dollars in transactions

22

among users annually and innumerable communications in the forms of postings, tweets, blogs, comments, and other third-party expression.  Some or all of the Amici might have to change their business models or curtail their services in significant ways if the prevailing interpretation of Section 230 were narrowed.[8] The district court's "encouragement" standard, for example, would blur the line between content provided by third parties and content created or developed by the service provider itself, opening the door to burdensome litigation and possibly crushing liability based merely on factors such as a site's name or features designed to facilitate third-party content submission.  Even the threat of such litigation and liability would chill service provider offerings and steer them away from innovative or controversial subjects—the opposite of what Congress intended.

---

[8]    Indeed, several of the Amici have done just that when operating online services in countries that lack the equivalent of Section 230 protection.  For instance, some Amici remove content from non-U.S. services based on allegations of defamation by businesses subject to critical reviews, even though Amici are not in a position to determine whether those reviews are truthful.  This undoubtedly leads to the blocking of valuable speech.  Additionally, removing liability protection could significantly curtail investment in interactive service providers. *See, e.g.*, Booz & Co., *The Impact of U.S. Internet Copyright Regulations on Early-Stage Investment* 21 (2012) (finding, in the copyright context, that 81% of angel investors would prefer to invest under current U.S. liability rules with a weak economy than under a regime with increased liability even with a strong economy), *available at* http://www.booz.com/global/home/what-we-think/reports-white-papers/article-display/impact-internet-copyright-regulations-early-2.

**B.    Section 230 Immunity Gives Service Providers Room To Self-Regulate**

The court below erroneously suggested that a broad interpretation of Section 230 would undermine the statute's purposes, apparently on a supposition that it would discourage service providers from blocking or removing offensive content. *See Jones II*, 2013 WL 4068780 at \*2-3. But just the opposite is true. Congress specifically enacted Section 230 to address the perverse effects of applying pre-existing liability regimes, such as the common law of defamation, to online intermediaries. Those effects were exemplified by a 1995 court ruling, *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995), which held that, under traditional common law doctrine, the provider of an electronic message board service was potentially liable for its user's defamatory message specifically because it had engaged in voluntary self-policing of the third-party content available through its service. One purpose of Section 230 was to overturn this precedent, which created disincentives for online intermediaries to engage in *self*-regulation. S. Rep. No. 104-230, at 194 (1996) ("One of the specific purposes of [Section 230] is to overrule *Stratton Oakmont v. Prodigy* and any other similar decisions … ."); *see also, e.g.*, *Zeran,* 129 F.3d at 331 ("Another important purpose of § 230 was to encourage service providers to self-regulate the dissemination of offensive material over their services. In this respect, § 230 responded to [*Stratton Oakmont v. Prodigy*].").

24

Congress concluded that service providers may voluntarily and constructively self-regulate so as to restrict the availability of objectionable third-party material in ways that are appropriately tailored to the nature, design, and user-base of their services.  Congress sought to achieve this goal by "encourag[ing] service providers to self-regulate the dissemination of offensive material over their services."  *Zeran*, 129 F.3d at 331; *Carafano* 339 F.3d at 1122 (Congress enacted Section 230 "to encourage voluntary monitoring for offensive or obscene material"); 141 Cong. Rec. 22,046 (Section 230 was designed to give interactive service providers "a reasonable way to … help them self-regulate themselves without penalty of law") (statement of Rep. Barton).

Congress recognized that a legal regime in which liability may accrue when a service provider has notice of allegedly unlawful content but fails to act would perversely "reinforce[] service providers' incentives to … abstain from self-regulation," for fear of being held liable for anything a jury determines they should have uncovered in the course of their efforts to monitor their services.  *See Zeran*, 129 F.3d at 333 ("Any efforts by a service provider to investigate and screen material posted on its service would only lead to notice of potentially defamatory material more frequently and thereby create a stronger basis for liability.").  By enacting Section 230, Congress freed service providers to adopt robust self-regulatory regimes, experiment with different approaches to self-regulation,

implement novel technical solutions, and otherwise respond to the demands of the marketplace and the possibilities of technology without fear that by doing so they would expose themselves to liability.

This is precisely what these Amici and many other service providers have done.  For example, many service providers take steps such as

- supplying links, e-mail addresses, flagging and "report abuse" buttons, and other mechanisms for users to report complaints about particular content;[9]

- specifying and enforcing "community guidelines," terms of service, and other rules and standards for third-party content;[10]

---

[9]   *See, e.g.*, Twitter, *I'm reporting an abusive user* (form for filing complaint about, among other things, threats, abuse, and posting of private information), *available at* https://support.twitter.com/forms/abusiveuser; LinkedIn, *Complaints Regarding Content Posted on the LinkedIn Website* (describing mechanisms for submitting complaints), *available at* http://www.linkedin.com/legal/copyright-policy#pri-2; Facebook, *Report a Violation*, *available at* https://www.facebook.com/help/263149623790594/; YouTube Reporting and Enforcement Center, *available at*  http://www.youtube.com/yt/policyandsafety/ reporting.html.

[10]   *See, e.g.*, Facebook Community Standards, *available at* https://www.facebook.com/communitystandards; Google Terms of Service ("We may suspend or stop providing our Services to you if you do not comply with our terms or policies or if we are investigating suspected misconduct."), *available at* https://www.google.com/intl/en/policies/terms/; Microsoft Code of Conduct, *available at* http://windows.microsoft.com/en-us/windows-live/code-of-conduct; The Twitter Rules, *available at* http://support.twitter.com/articles/18311-the-twitter-rules#; Tumblr Community Guidelines, *available at* http://www.tumblr.com/policy/en/community; LinkedIn User Agreement (containing list of "DOS and DON'Ts"), *available at*

- employing technological means to detect and remove or block particular kinds of content, such as child pornography; and

- monitoring message boards, chat rooms, and other areas with third-party content; responding to complaints; and removing third-party content for violations of law or the service's rules or policies.[11]

Thus, the district court's apparent supposition that a broad reading of the scope of Section 230(c)(1)'s protections would cause service providers to eschew self-policing of their services is demonstrably wrong.

At the same time, the district court's suggestion that Section 230 protects only "those who remove offensive content," *Jones II*, 2013 WL 4068780 at *3, finds no support in the statutory language or case law.[12]  To the contrary, service providers have repeatedly been held immune under Section 230 even when they allegedly received notice of the offending content and failed to remove it.  *See,*

---

http://www.linkedin.com/ legal/user-agreement; LinkedIn Professional Community Guidelines, *available at* http://help.linkedin.com/app/answers/detail/a_id/34593.

[11]    *See, e.g.*, eBay, *When eBay may remove or adjust Feedback* (describing certain circumstances under which eBay will remove third-party), *available at* http://pages.ebay.com/help/policies/feedback-removal.html; eBay, *How to Report inappropriate buying and selling*, *available at* http://pages.ebay.com/help/buy/report-trading.html#wont.

[12]    Section 230 contains a *separate* immunity provision that generally protects service providers from liability for actions "*voluntarily*" taken in good faith to remove unlawful or objectionable content.  47 U.S.C. § 230(c)(2) (emphasis added).  But nothing in that immunity provision or elsewhere in Section 230 *requires* service providers to take such actions in order to retain the protection of section 230(c)(1).

*e.g.*, *Zeran*, 129 F.3d at 331-332; *Roommates.com*, 521 F.3d at 1169 n.24 (immunity extends to claims "based on a website operator's passive acquiescence in the misconduct of its users"); *Green*, 318 F.3d at 471 (ISP not liable for failing to monitor, screen, or delete allegedly defamatory third-party content); *Johnson*, 614 F.3d at 791 ("The district court, following majority circuit precedent, held that § 230(c)(1) blocks civil liability when web hosts and other ISPs refrain from filtering or censoring the information that third parties created on their sites."); *Goddard v. Google, Inc.,* 2008 WL 5245490, at *3 (N.D. Cal. Dec. 17, 2008) ("[E]ven if a service provider knows that third parties are using such tools to create illegal content, the service provider's failure to intervene is immunized.").

In sum, Congress created a regime that removed legal disincentives to self-regulation of objectionable content, while at the same time declining to impose government regulation imposing particular steps a service provider must take to remove third-party content.  The prevailing interpretation of Section 230 implements Congress's policy choice; the district court's interpretation would undermine it.

## CONCLUSION

Amici respectfully urge the Court to reject the district court's unduly narrow interpretation of Section 230(c)(1) and to reaffirm that Section 230(c)(1) broadly protects interactive computer service providers from liability for unlawful content supplied by others.

Respectfully submitted,

/s/  Patrick J. Carome

PATRICK J. CAROME
SAMIR C. JAIN
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 663-6000

*Attorneys for Amici AOL Inc., eBay Inc., Facebook, Inc., Google Inc., LinkedIn Corp., Microsoft Corp., Tumblr, Inc., Twitter, Inc., and Zynga Inc.*

# CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief complies with the type-volume limitation

provided in Federal Rule of Appellate Procedure 32(a)(7)(B).  The foregoing brief

uses Times New Roman (14-point) proportional type, and contains 6,924 words,

exclusive of exempted portions.


/s/  Patrick J. Carome                    
PATRICK J. CAROME

## CERTIFICATE OF SERVICE

I certify that on November 19, 2013, I electronically filed the foregoing Brief for Amici Curiae AOL Inc., eBay Inc., Facebook, Inc., Google Inc., LinkedIn Corp., Microsoft Corp., Tumblr, Inc., Twitter, Inc., and Zynga Inc. with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the Court's CM/ECF System. Counsel for all parties are registered CM/ECF users and will be served with the foregoing document by the Court's CM/ECF system.

/s/ Samir C. Jain
SAMIR C. JAIN