Case No.  13-5946

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

SARAH JONES
*Plaintiff-Appellee*

v.

DIRTY-WORLD ENTERTAINMENT RECORDINGS, LLC, dba
THEDIRTY.COM, HOOMAN KARAMIAN aka NIK RICHIE aka CORBIN
GRIMES, DIRTY WORLD, LLC dba THEDIRTY.COM, AND DIRTY WORLD
ENTERTAINMENT, LLC dba THEDIRTY.COM
*Defendants-Appellants*

On Appeal from the United States District Court
For the Eastern District of Kentucky at Covington
Originating Case No. 2:09-cv-00219-WOB

BRIEF OF *AMICUS CURIAE* AMERICAN CIVIL LIBERTIES UNION,
AMERICAN CIVIL LIBERTIES OF KENTUCKY, ELECTRONIC
FRONTIER FOUNDATION, CENTER FOR DEMOCRACY &
TECHNOLOGY, DIGITAL MEDIA LAW PROJECT, PUBLIC
PARTICIPATION PROJECT, WENDY SELTZER,
AND ADAM HOLLAND

Junis L. Baldon
Mark A. Flores
Brandon W. Gearhart
FROST BROWN TODD LLC
400 West Market Street, 32nd Floor
Louisville, KY  40202
PH:  (502) 589-5400
*ACLU of Kentucky Cooperating Attorneys*

Lee Rowland
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street, 18th Floor
New York, NY  10004

William E. Sharp*
ACLU OF KENTUCKY
315 Guthrie Street, Suite 300
Louisville, KY  40202

Matthew Zimmerman
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA  94109

*Additional counsel on signature page*

*\*Lead Counsel of Record*

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT
## CASE NO. 13-5946


SARAH JONES                                                        APPELLANT

v.

DIRTY WORLD ENTERTAINMENT
RECORDINGS, LLC
DIRTY WORLD, LLC
NIK LAMAS-RICHIE                                                   APPELLEES


### DISCLOSURE OF CORPORATE AFFILIATIONS
### AND FINANCIAL INTEREST

In accordance with 6th Cir. R. 26.1, *Amici* makes the following disclosures:

1.    Are said parties subsidiaries or affiliates of a publicly owned corporation?

   **No.**

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

   **No.**


s/ Junis L. Baldon_____          Date:  11/19/13_____
Junis L. Baldon
*Counsel for Amicus Curiae,*
*American Civil Liberties Union of Kentucky*

## Table of Contents

INTRODUCTION ......................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ...............................3

INTERESTS OF AMICI.............................................................................4

ARGUMENT ..............................................................................................7

    A.    Section 230 Broadly Immunizes Content Providers Against
           Liability for Information Created by Others ...........................7

    B.    A Broad Application of Section 230 Immunity Is Consistent
           With Congressional Intent..................................................9

    C.    The District Court Erred In Refusing to Extend Section 230
           Immunity to Appellants.....................................................13

        1.    The District Court Misapplied Relevant Case Law in
              Determining that Appellants Developed Unlawful Material....14

        2.    The District Court's Application of an "Encouragement
              Test" Was an Error of Law ...................................18

        3.    The District Court's Application of a "Neutrality Test"
              Was an Error of Law................................................23

        4.    The District Court Should Have Determined the
              Applicability of Section 230 at the Earliest Possible Stage......24

    D.    The District Court Opinion Threatens Other Online Platforms
           That Make Available a Wide Range of Divergent and Valuable
           Speech..................................................................25

CONCLUSION .........................................................................................29

## Table of Authorities

**CASES**

*Almeida v. Amazon.com, Inc.*, 456 F.3d 1316 (11th Cir. 2006) ...............................8

*Asia Economic Institute v. Xcentric Ventures, LLC*, No. CV 10-01360
SVW (PJWX), 2011 WL 2469822 (C.D. Cal. May 4, 2011)...........................21

*Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003) ........................................13

*Ben Ezra, Weinstein, and Company, Inc. v. America Online, Inc.*, 206
F.3d 980 (10th Cir. 2000) .................................................................8

*Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003) ........................8

*Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v.
Craigslist, Inc.*, 519 F.3d 666 (7th Cir. 2008) ...................................................12

*Cubby, Inc. v. CompuServe, Inc.*, 776 F. Supp. 135 (S.D.N.Y. 1991) ...................11

*DiMeo v. Max*, 248 F. App'x 280 (3d Cir. 2007) ....................................................25

*Doe v. MySpace, Inc.*, 528 F.3d 413 (5th Cir. 2008) .................................................8

*Fair Housing Council of San Fernando Valley v. Roommate.com,
LLC*, 666 F.3d 1216 (9th Cir. 2012) .................................................................16

*Fair Housing Council of San Fernando Valley v. Roommates.com*,
521 F.3d 1157 (9th Cir. 2008) .................................................. 9, 15, 17, 21, 22

*Federal Trade Commission v. Accusearch*, 570 F.3d 1187 (10th Cir.
2009) ................................................................ 8, 15, 17, 18, 19, 21, 22, 23, 24

*Global Royalties, Ltd. v. Xcentric Ventures, LLC*, 544 F. Supp. 2d 929
(D. Ariz. 2008).................................................................................20

*Green v. America Online (AOL)*, 318 F.3d 465 (3d Cir. 2003)............... 8, 9, 13, 25

*GW Equity LLC v. Xcentric Ventures LLC*, Civil Action No. 3:07-CV-
976-O, 2009 WL 62173 (N.D. Tex. Jan. 9, 2009)............................................21

*Hurt v. Coyne Cylinder Co.*, 956 F.2d 1319 (6th Cir. 1992)...................................13

*Johnson v. Arden*, 614 F.3d 785 (8th Cir. 2010) ......................................... 8, 22, 25

*Jones v. Dirty World Entertainment Recordings, LLC,* 766 F. Supp. 2d
    828 (E.D. Ky. 2011)..................................................................................3, 13

*Jones v. Dirty World Entertainment Recordings*, LLC, 840 F. Supp.
    2d 1008 (E.D. Ky. 2012) ................................................................ 3, 15, 18, 19

*Jones v. Dirty World Entertainment Recordings, LLC*, Civil Action
    No. 09-219-WOB, --- F. Supp. 2d ---, 2013 WL 4068780 (E.D.
    Ky. Aug. 12, 2013) ................................................. 4, 12, 15, 22, 23

*Milkovich v. Lorain Journal Co.,* 497 U.S. 1 (1990)..............................................19

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250
    (4th Cir. 2009).......................................................................... 8, 9, 25

*Parker v. Google, Inc.*, 242 F. App'x 833 (3d Cir. 2007) .........................................9

*S.C. v. Dirty World, LLC*, No. 11-CV-00392-DW, 2012 WL 3335284,
    at *3 (W.D. Mo. Mar. 12, 2012)......................................................................20

*Seaton v. TripAdvisor LLC*, 728 F.3d 592 n.8 (6th Cir. 2013) .................................8

*Stratton Oakmont, Inc. v. Prodigy Services Co.*, Trial IAS Part 34,
    1995 WL 323710 (N.Y. Supr. Ct. May 24, 1995)..................................... 10, 11

*Universal Communication Systems, Inc. v. Lycos, Inc.*, 478 F.3d 413
    (1st Cir. 2007) ..........................................................................................8, 9

*Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997) ....................... 8, 9, 11

## STATUTES

15 U.S.C. § 45(a) .................................................................................................17

47 U.S.C. § 230....................................................................................... passim

RESTATEMENT (SECOND) OF TORTS § 578 (1977)....................................................10

## OTHER AUTHORITIES

141 CONG. REC. at H8469-H8470; H8471 ............................................................11

## INTRODUCTION

In this case, Appellants were improperly held liable for publishing on their website defamatory statements written by a third party. In denying Appellants' repeat claims for immunity under federal law, the district court misapplied Section 230 of the Communications Decency Act, 47 U.S.C. § 230 ("Section 230") and erroneously permitted this case to proceed to trial. If upheld, the district court's ruling would be an outlier among the federal courts and could have a profound chilling effect on other providers of online services, threatening the broad diversity of protected speech on the Internet.

As passed by Congress and uniformly applied by courts across the country, Section 230 immunizes online service providers—such as broadband providers, hosting companies, and website operators like Appellants from liability based on material authored by users. Notwithstanding this protection, the district court found that Appellants effectively transformed their website into one unprotected by Section 230's blanket immunity through a series of actions unrelated to the creation of specific defamatory content: inviting users to submit gossipy material, commenting in reaction to such material, and naming the website "The Dirty." The district court's interpretation of Section 230 is contrary to the plain language of the statute and at odds with virtually every court to consider its application.

Appellant TheDirty.com hosts frequently offensive—and, indeed, sometimes actionable—gossip.[1]   Yet that fact, even in combination with the other factors observed by the district court, does not divest Appellants of Section 230's clear protections.  Nor should it.  Indeed, removing websites from the legal line of fire when their users engage in actionable behavior was one of the primary motivations behind the enactment of Section 230.

Whatever the district court's views about Appellants' conduct, that conduct is by definition not actionable.  The district court's analysis, in pinning liability to TheDirty.com's encouragement of a generally disparaging atmosphere, contains no limiting principles to prevent its application to a wide array of websites—for example, sites that collect, aggregate, display and react to consumer reviews or reports of malfeasance—that solicit and host critical speech.  The judgment below represents a departure from the current consensus among the federal courts recognizing Section 230's robust immunity from liability for the speech of others.

*Amici curiae*, representing a wide range of organizations and constituencies dedicated to protecting First Amendment interests, urge this Court to reverse the

---

[1] It is worth noting that gossip is not in and of itself defamatory; in fact, gossip—including some hosted by TheDirty.com—frequently includes speech on matters of undisputed public concern. *See, e.g.,* Katie Glueck, *TheDirty.com: Ben Quayle, now Anthony Weiner*, *available at* http://www.politico.com/story/2013/07/thedirtycom-first-ben-quayle-now-anthony-weiner-94801.html (last visited Nov. 15, 2013) (detailing how TheDirty.com's content, including intimate photos of Representative Weiner, has repeatedly "rocked the political world.").

judgment below and to preserve the broad speech-protective immunity intended by Congress and regularly applied nationwide.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellee Sarah Jones sued Appellants Dirty World, LLC, operator of the website TheDirty.com, and Appellant Nik Richie, a blogger who serves as its editor-in-chief and publisher, claiming that they published defamatory material about her.[2] The complaint made no allegation that Appellants had themselves created or developed any actionable content.[3] Accordingly, Appellants moved for dismissal and summary judgment, arguing that they were entitled to immunity under Section 230 of the CDA. Section 230 provides immunity to website operators and other online providers for content created by third parties unless plaintiffs can show that the operators themselves created or developed the content at issue.  47 U.S.C. § 230 (c); 47 U.S.C. § 230 (f)(3).

The district court denied Appellants immunity on the basis that they "encouraged" defamatory content from third parties.  *Jones v. Dirty World Entertainment Recordings, LLC,* 766 F. Supp. 2d 828, 829 (E.D. Ky. 2011) ("*Jones I*"); *Jones v. Dirty World Entertainment Recordings*, LLC, 840 F. Supp. 2d 1008, 1012 (E.D. Ky. 2012) ("*Jones II*").  A jury ruled in favor of Jones, and awarded her $338,000 in compensatory and punitive damages.  The district court

---

[2] Second Am. Compl., RE 22, Page ID# 74-81, ¶9.

[3] *See id*.

3

then denied Richie and TheDirty.com's motion for judgment as a matter of law. *Jones v. Dirty World Entertainment Recordings, LLC*, Civil Action No. 09-219-WOB, --- F. Supp. 2d ---, 2013 WL 4068780, at *4 (E.D. Ky. Aug. 12, 2013) ("*Jones III*").  This appeal followed.

**INTERESTS OF AMICI**

The American Civil Liberties Union ("ACLU") is a nationwide, non-partisan organization with over 500,000 members and supporters dedicated to the principles of liberty and equality embodied in the United States Constitution.  The ACLU's Speech, Privacy & Technology Project works to promote and safeguard individuals' constitutional and statutory speech rights, particularly as developing technology presents new challenges to and opportunities for free speech.  The ACLU of Kentucky—the ACLU's state affiliate in the Commonwealth—has a long history of advocating for the civil rights and civil liberties of Kentuckians under both the United States and Kentucky Constitutions.

The Electronic Frontier Foundation ("EFF") is a non-profit, member-supported civil liberties organization that works to protect rights in the digital world. EFF encourages and challenges industry, government and the courts to support free expression, privacy, and openness in the information society. It is particularly concerned that laws and regulations not be used to stifle free expression on the Internet by holding intermediaries liable where the content in

question originates with a third party. EFF supports a broad interpretation of Section 230 of the Communications Decency Act because this statute has played a vital role in allowing millions of people to create and disseminate user-generated content through the Internet, enriching the diversity of offerings online. EFF has participated in a significant number of cases addressing the interpretation of this statute.

The Center for Democracy & Technology ("CDT") is a non-profit public interest and Internet policy organization.  CDT represents the public's interest in an open, decentralized Internet reflecting constitutional and democratic values of free expression, privacy, and individual liberty.  CDT has litigated or otherwise participated in a broad range of Internet free expression cases, and works to protect the ability of websites and other service providers to offer new opportunities for online speech unfettered by government regulation or censorship.

The Digital Media Law Project ("DMLP") is an unincorporated association hosted by the Berkman Center for Internet & Society at Harvard University. The DMLP is an academic research project that studies challenges to online journalism and networked communication and responds with publicly accessible tools and legal resources. The DMLP frequently appears as amicus curiae in cases where the application of law will have a significant effect on the use of digital media to inform the public.

5

The Public Participation Project ("PPP") is a national non-profit organization dedicated to protecting citizens from lawsuits designed to chill their ability to speak out on issues of public interest.  Because many states still do not provide sufficient protections for such speech and petitioning activities, PPP is working to pass federal anti-SLAPP legislation.  PPP also assists in efforts to pass similar legislation in individual states, and it monitors SLAPP developments in legislatures and courts across the country.  Consistent with its support for legislation that protects against SLAPPSs, PPP supports Section 230 of the Communications Decency Act.  Defendants "SLAPPed" in retaliation for online speech often invoke the protections of Section 230.  Section 230 is essential to ensuring that free speech rights guaranteed by the First Amendment are upheld in the digital age.  PPP is very concerned about the precedent that this case could set for Internet content providers that publish user generated content on their sites.

Wendy Seltzer is a Fellow with the Berkman Center for Internet & Society at Harvard University. She founded and developed the Chilling Effects Clearinghouse, a public resource providing a database of "cease and desist" communications sent regarding Internet content. Adam Holland is a Project Coordinator at the Berkman Center, and the Project Coordinator for Chilling Effects.  Chilling Effects gathers submissions from online service providers, users of online services, and copyright holders and makes those submissions available

with annotations and categorization for review and study by scholars and interested members of the general public through its website, www.chillingeffects.org.

## ARGUMENT

The district court's decisions in this case denying Appellants immunity are in direct conflict with the text of Section 230 and relevant case law. Section 230 provides that no Internet provider may be held liable for content it hosts unless it is itself "responsible, in whole or in part, for the creation or development of [such] information." 47 U.S.C. § 230(f)(3). Federal courts have consistently held that website operators may be held responsible for developing unlawful material only if the facts demonstrate that the operator unambiguously solicited or induced content that is itself unlawful. No such facts have been found in this case.

### A. Section 230 Broadly Immunizes Content Providers Against Liability for Information Created by Others.

Under 47 U.S.C. § 230 (c), "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." *See also* 47 U.S.C. § 230 (f)(3) ("The term 'information content provider' means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."). The statute thus immunizes Internet providers from liability for material provided by third parties, *i.e.*, other "information content provider[s]." *See Seaton v. TripAdvisor LLC*, 728

7

F.3d 592, 599 n.8 (6th Cir. 2013); *Green v. America Online (AOL)*, 318 F.3d 465,

471 (3d Cir. 2003) (Section 230 "bars 'lawsuits seeking to hold a service provider

liable for its exercise of a publisher's traditional editorial functions.'") (quoting

*Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)).

When the broad immunity of § 230(c)(1) is read alongside § 230(e)(3),

which prohibits liability under state or local laws inconsistent with the immunity

provision, "these provisions bar state-law plaintiffs from holding interactive

computer service providers legally responsible for information created and

developed by third parties." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,

591 F.3d 250, 254 (4th Cir. 2009) (citation omitted). Thus, "[c]ourts have

construed the immunity provisions in § 230 broadly in all cases arising from the

publication of user-generated content." *Doe v. MySpace, Inc.*, 528 F.3d 413, 418

(5th Cir. 2008).[4]

Website operators can waive Section 230 immunity by specifically

"developing" illegal content. *See, e.g., Federal Trade Commission v. Accusearch*,

570 F.3d 1187, 1197-98 (10th Cir. 2009); *see also Fair Housing Council of San*

---

[4] *See also Johnson v. Arden*, 614 F.3d 785, 791 (8th Cir. 2010); *Universal Communication Systems, Inc. v. Lycos, Inc.*, 478 F.3d 413, 419 (1st Cir. 2007); *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321-22 (11th Cir. 2006); *Green*, 318 F.3d at 471; *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003); *Ben Ezra, Weinstein, and Company, Inc. v. America Online, Inc.*, 206 F.3d 980, 984-85 (10th Cir. 2000).

*Fernando Valley v. Roommates.com*, 521 F.3d 1157, 1175 (9th Cir. 2008).  Such a waiver does not happen easily, however.  "Congress . . . established a general rule that providers of interactive computer services are liable only for speech that is properly attributable to them."  *Nemet Chevrolet*, 591 F.3d at 254.  The statute "precludes courts from entertaining claims that would place a computer service provider in a publisher's role."  *Zeran*, 129 F.3d at 330.  This means that "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred."  *Zeran*, 129 F.3d at 330.

Thus, Section 230 broadly immunizes a website operator from state law claims if the claim "would treat [the website provider] 'as the publisher or speaker' of that [information]."  *Lycos*, 478 F.3d at 422; *see also Parker v. Google, Inc.*, 242 F. App'x 833, 838 (3d Cir. 2007); *Green*, 318 F.3d at 471.  Because Appellants' role as publisher was precisely the source of liability in the judgment below, it must be reversed as inconsistent with Section 230.

### B.    A Broad Application of Section 230 Immunity Is Consistent With Congressional Intent.

A principal goal of the Communications Decency Act was to "remove disincentives" for Internet users and providers to screen objectionable material

from their services. 47 U.S.C. § 230(b)(4).[5]  Congress accomplished that objective as part of a comprehensive legislative package that preserved the Internet's dynamic nature.  *See* 47 U.S.C. § 230(1)-(2) (noting congressional intent "to preserve the vibrant and competitive free market" on the Internet "unfettered by Federal or State regulations").  Congress established powerful structural protections to guide the Internet's development:  service providers would be uniformly protected from suit based on users' behavior, and if service providers voluntarily removed objectionable content, they could do so without fear of legal consequences.  These protections are enshrined in Section 230.

The specific impetus for Section 230 was a critical question regarding how the Internet would develop: could service providers be held responsible as common law "publishers" for content on their websites?[6]  In the mid-1990s, courts struggled to apply traditional common law doctrines to this new technology.  One federal court took the view that common law republication liability could not be used against a website that republished content generated entirely by a third party.  *See*

---

[5] As discussed more fully below, these "disincentives" were created by legal opinions holding Internet providers liable for third-party content because they had chosen to filter out *other* content.  *See Stratton Oakmont, Inc. v. Prodigy Services Co.*, Trial IAS Part 34, 1995 WL 323710, at *4 (N.Y. Supr. Ct. May 24, 1995).

[6] RESTATEMENT (SECOND) OF TORTS § 578 (1977) specifies the circumstances in which a republisher of third-party content will be liable for defamation:  "[e]xcept as to those who only deliver or transmit defamation published by a third person, one who repeats or otherwise republishes defamatory matter is subject to liability as if he had originally published it."

*Cubby, Inc. v. CompuServe*, *Inc.*, 776 F. Supp. 135, 140-41 (S.D.N.Y. 1991) (recognizing that because websites obtain and share information instantaneously, it is impossible for a website operator to verify the truthfulness of all republished content). Another court found a website operator liable under the republication doctrine for hosting a bulletin board that included an allegedly defamatory post from a third party. *Stratton Oakmont*, at *4 (relying on fact that website operator controlled third party content on the website through the use of screening and moderators that enforced decency guidelines).

Congress enacted Section 230 to eliminate the uncertainty with which the providers in *Cubby* and *Stratton Oakmont* grappled. The two competing opinions were explicitly cited during congressional debates over the statute's language, which effectively reversed *Stratton Oakmont*. 141 CONG. REC. at H8469-H8470 (statement of Rep. Cox); *see also id*. at H8471 (statement of Rep. Goodlatte) ("We are talking about something that is far larger than our daily newspaper. We are talking about something that is going to be thousands of pages of information every day, and to have that imposition [republication liability] imposed on them is wrong."); *Zeran*, 129 F.3d at 331 ("Congress enacted § 230 to remove the disincentives to selfregulation [sic] created by the *Stratton Oakmont* decision.").

Citing a Seventh Circuit decision, the district court in this case suggested "that [Section 230] does not provide a 'grant of comprehensive immunity from

11

civil liability for content provided by a third party.'" *Jones III* at *1 (quoting *Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 670 (7th Cir. 2008)).  The district court's overbroad reading of *Craigslist* to determine that Appellants were categorically ineligible for Section 230 immunity was inconsistent with the clear judicial consensus regarding the statute.  While the Seventh Circuit described Section 230's immunity provision as a definitional clause, the Seventh Circuit's analysis is functionally consistent with other federal courts interpreting Section 230.  *Craigslist*, 519 F.3d at 670 (quotation omitted).  *Craigslist* merely reinforces what the majority of federal courts already agree upon—that "[w]hat § 230(c)(1) says is that an online information system must not 'be treated as the publisher or speaker of any information provided by' someone else."  *Id*. at 671.  In other words, if a cause of action derives from treating a website operator as the "publisher" of content provided by another, then immunity is available.

At heart, Congress sought to minimize government regulation of the Internet by declining to apply the republication doctrine to the fast-developing Internet world.  The district court's attempt to carve out an exception to this broad grant of immunity based on collateral (and ultimately legally irrelevant) considerations such as broadly inviting users to engage in disparaging (though certainly not necessarily actionable) speech or subsequently commenting on that speech

12

squarely conflicts with Congress' attempt to protect intermediaries from liability in such disputes. The District Court's analysis must be rejected.

### C. The District Court Erred In Refusing to Extend Section 230 Immunity to Appellants.

Appellants did not author, create, or develop the defamatory content at issue in this case; instead, they provided a platform on which others posted their own material.[7] Indeed, nothing makes that plainer than the text of Jury Instruction No. 3 from the second *Jones* trial: it states that Appellants "had the same duties and liabilities for re-publishing libelous material as the author of such materials."[8] The instruction flatly conflicts with the text of Section 230 and directed jurors toward a finding prohibited by law. 47 U.S.C. § 230 (f)(3); *see also Green*, 318 F.3d at 471. Accordingly, the jury instruction alone constitutes prejudicial and reversible error. *Hurt v. Coyne Cylinder Co.*, 956 F.2d 1319, 1324 (6th Cir. 1992).

Nonetheless, the district court ruled that the application of liability was proper because Appellants were ineligible for immunity under Section 230. The court held that although they did not *create* unlawful content, Appellants implicitly *developed* unlawful content posted by others by encouraging a generally critical

---

[7] The record reflects that while Richie commented on the defamatory material and added "taglines," he did not alter the original content and posted it as submitted, adding his editorial comments at bottom. "[T]he exclusion of 'publisher' liability necessarily precludes liability for exercising the usual prerogative of publishers to choose among proffered material and to edit the material published while retaining its basic form and message." *Batzel v. Smith*, 333 F.3d 1018, 1031 (9th Cir. 2003).

[8] Jury Instructions, No. 3, RE 207, Page ID# 3120.

and ribald environment.   Specifically, the court pointed to factors such as the website's name (TheDirty.com) and Appellant Richie's encouragement of Internet commenters' negative commentary as proof that Appellants were responsible for developing the specific defamatory content at issue in this case.   The district court was incorrect.   This holding is in direct conflict with the purpose of the CDA, the text of Section 230, and relevant case law.

       **1.**     **The District Court Misapplied Relevant Case Law in Determining that Appellants Developed Unlawful Material.**

The key question before this Court is whether Appellants themselves created or developed the defamatory content at issue, removing themselves from Section 230's protection. 47 U.S.C. § 230(f)(3) (defining a content provider as one "responsible . . . for the creation or development of information."). The district court ruled Appellants ineligible for Section 230 immunity based on the erroneous conclusion that they "developed" the content in question. Specifically, the court held:

> [T]hese postings and others like them were invited and encouraged by the defendants by using the name "Dirty.com" for the website and inciting the viewers of the site to form a loose organization dubbed "the Dirty Army," which was urged to have "a war mentality" against anyone who dared to object to having their character assassinated.

*Jones III*, at \*3; *see also Jones II*, 840 F. Supp. 2d at 1012-13.  The district court's conclusion was incorrect.

Section 230 does not define the terms "responsible" or "development." *See Roommates.com*, 521 F.3d at 1162.  In *Jones II*, the district court correctly cited *Roommates.com* and *Accusearch* as seminal opinions in which federal circuit courts have defined—and found—liability based on a website operator's "development" of unlawful content.[9]  *Jones II*, 840 F. Supp. 2d at 1010.  Both the Ninth and Tenth Circuits were careful to limit development-based liability to parties that actively, knowingly, and materially participate in the *unlawful* aspect of actionable content. The district court's analysis, on the other hand, dramatically expands possible avenues for development-based liability in a manner that poses risks for any website that encourages critical—though not unlawful—speech.

Both appellate decisions addressed materially different conduct than that at issue here.  *Roommates.com* involved a website designed to "match people renting out spare rooms with people looking for a place to live."  *Roommates*, 521 F.3d at 1161.  Before individuals could use the website, they were required to provide information about themselves and their housing preferences—including their sex,

---

[9] While the *Accusearch* opinion separately parsed out the definition of the words "responsible" and "development," 570 F.3d at 1198-99, this brief cites that decision's final holdings in determining when a user is *responsible for developing* content. This brief refers to that analysis, taken as a whole, as "development-based liability."

sexual orientation, and willingness to live with a roommate with children—that was allegedly banned by the federal Fair Housing Act.[10]   *Id*.   The Ninth Circuit began its analysis by noting that "[t]he CDA does not grant immunity for inducing third parties to express illegal preferences." *Id*. at 1165.   The court found that the website's search function *required* users to input discriminatory criteria.   *See id*. at 1166-67; *see also id*. at 1175.   In the court's view, because the website's design required users to provide unlawful content to use the service, the website operator was itself responsible for developing the content. The court defined the operator's development as "not merely . . . augmenting the content generally, but . . . materially contributing to its alleged unlawfulness."   *Id*. at 1167-68.   The court explained that:

> By requiring subscribers to provide the information *as a condition of accessing its service*, and by providing a limited set of pre-populated answers, Roommate becomes much more than a passive transmitter of information provided by others; it becomes the developer, at least in part, of that information.

*Id*. at 1166 (emphasis added).

---

[10] Notwithstanding its decision that the website operator's conduct brought it outside of Section 230's protections, the Ninth Circuit ultimately held that the Fair Housing Act did not apply to the selection of roommates, and therefore that the website's "facilitation of discriminatory roommate searches [did] not violate the FHA."   *Fair Housing Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1222 (9th Cir. 2012).

16

*Accusearch* involved a similar allegation against an online provider hosting unlawful material. The website in *Accusearch* sold personal data, including confidential records protected under the Telecommunications Act, 15 U.S.C. § 45(a), to customers who paid an "administrative search fee." *Accusearch*, 570 F.3d at 1191-92. The website retained researchers to find personal data, and in turn provided that confidential information to requesting customers. *Id.* As in *Roommates.com*, the website claimed Section 230 immunity. *Id.* at 1195. Analyzing whether the website was responsible for the development of legally-protected information, the Tenth Circuit explained that "a service provider is 'responsible' for the development of offensive content only if it in some way *specifically encourages development of what is offensive about the content.*" *Id.* at 1199 (emphasis added).[11]

The *Accusearch* court found that the website operator knew "that its researchers were obtaining the information through fraud or other illegality," *id.*, and that it directly encouraged that illegality "[b]y paying its researchers to acquire telephone records, knowing that the confidentiality of the records was protected by law . . . ." *Id.* at 1200. Thus, by knowingly paying for illegal content—when that

---

[11] The *Accusearch* opinion uses the word "offensive" as synonymous with "actionable." *Cf. Accusearch*, 570 F.3d 1199-1200. As there is little doubt the content on TheDirty.com is colloquially *offensive*, it is important to note that the *Accusearch* opinion never suggested that liability could attach to any speech that was distasteful but not specifically unlawful.

content was the website's "*raison d'être*"—the website in *Accusearch* specifically "developed" the unlawful aspects of the content, preventing Section 230 immunity. *Id.*

Both opinions condition the loss of Section 230 immunity on an online service provider's direct and intentional participation in unlawful acts. In *Roommates.com*, the website could not be used without the provision of unlawful content. In *Accusearch*, the consumer product was only available due to the website's knowing payment for content obtained illegally. No comparable requirements or behavior exist here. While TheDirty.com may host distasteful and potentially actionable content, it does not require or request the submission of unlawful material.[12] While some of the material hosted on its site may be offensive, and while some of Appellants' actions (such as subsequently commenting about offensive content) may be unseemly, they are neither independently unlawful nor sufficient to trigger the loss of Section 230 immunity.

> **2.    The District Court's Application of an "Encouragement Test" Was an Error of Law.**

In its opinions applying Section 230, the district court erred in two distinct ways. In its first order, *Jones II,* the district court relied largely on an "encouragement" theory of liability, 840 F.Supp. 2d at 1012-13; in *Jones III*, it also

---

[12] On the contrary, the Appellants took steps to prevent it: in order to access TheDirty.com, users must agree not to post any defamatory or otherwise unlawful material.

found Appellants' "ratification" of unlawful content made them ineligible for immunity. *See Jones III*, at \*4. These analyses both constitute errors of law.

In *Jones II*, the district court engaged in its first significant analysis of Appellants' claim for immunity. Specifically, the court held:

> This Court holds by reason of the very name of the site, the manner in which it is managed, and the personal comments of defendant Richie, the defendants have specifically encouraged development of what is offensive about the content of the site. One could hardly be more encouraging of the posting of such content than by saying to one's fans (known not coincidentally as "the Dirty Army"): "I love how the Dirty Army has war mentality."

*Jones II*, 840 F. Supp. 2d at 1012-1013. In so holding, the court relied on two authorities: a law review article and a dissent. *Id.* at n.5. This is unsurprising, as no other case has extended development-based liability so far.

The flaw in the *Jones II* logic is that no factor found dispositive by the court—the name of the site (TheDirty.com), the manner in which it is managed (selecting posts and reacting to users' comments), nor the comments of Appellant Richie (*per se* non-defamatory postings and encouragement of the site's commenters' "war mentality," *Jones II*, 840 F. Supp. 2d at 1012-13)—is tethered to any illegality. "Dirt" is gossip, not per se defamation. *See, e.g., Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 15-16 (1990) (explaining constitutional limits on defamatory content, and noting requirements of both factual falsity and fault). Reacting to user comments is the very nature of the Internet, not to mention the precise behavior distinguished by the *Accusearch* opinion as the "prototypical"

activity qualifying for Section 230 immunity.[13]  And Richie's encouragement of reactive criticism by the sites' users ("war mentality") reflects no inherent illegality.  Section 230 immunity cannot and does not depend on the extent to which users exceed the scope of any specific encouragement of a service provider and independently engage in actionable behavior themselves.

The specific factors cited by the district court do not alter the conclusion that Section 230 immunity must apply.  The website name "TheDirty.com" and Appellant Richie's non-defamatory musings both constitute protected speech and provide no support for undermining their statutory immunity.  *See, e.g.*, *Global Royalties, Ltd. v. Xcentric Ventures, LLC*, 544 F. Supp. 2d 929, 933 (D. Ariz. 2008) ("[T]here is no authority for the proposition that [the website title] makes the website operator responsible, in whole or in part, for the 'creation or development' of every post on the site.").  Indeed, website operators routinely receive immunity under Section 230 despite providing instructions for third party posts and supplementing those posts with captions, titles, comments, and metadata.[14]

---

[13] "The prototypical service qualifying for this statutory immunity is an online messaging board (or bulletin board) on which Internet subscribers post comments and respond to comments posted by others."  *Accusearch*, 570 F.3d at 1195 (quotation omitted).  As Section 230 covers Internet providers and users alike, the district court's analysis here could equally (and problematically) be applied to a bulletin board commenter who reacts favorably to another's unlawful speech.

[14] *See, e.g.*, *S.C. v. Dirty World, LLC*, No. 11-CV-00392-DW, 2012 WL 3335284, at *3 (W.D. Mo. Mar. 12, 2012) (comments by website operator on third-party *(footnote continued on following page)*

To the extent the district court opinions take refuge in *Roommates.com* and *Accusearch*, such refuge is misplaced. As previously discussed, the two circuit opinions contain narrow holdings that the activity solicited, induced, or "encouraged" by the website must itself be unlawful to establish development-based liability. Conversely, when a website provider creates an open platform on which users may engage in actionable behavior, Section 230's categorical immunity applies. In *Roommates.com*, for example, a separate section of the website prompted users to describe themselves and their preferences for a roommate. Even though that open-ended interface permitted a user to engage in actionable behavior on his or her own, the Ninth Circuit held that Section 230 immunity applied to this process. *Roommates.com*, 521 F.3d at 1173-74. The website published the comments as written, did not provide any "specific guidance" as to what users should write, and did not require users to submit discriminatory preferences. *Id*. Accordingly, that portion of the website "[was] not responsible, in whole or in part, for the development of [that] content, which [came] entirely from subscribers and [was] passively displayed by [the website]."

---

*(footnote continued from preceding page)*
posts); *Asia Economic Institute v. Xcentric Ventures, LLC*, No. CV 10-01360 SVW (PJWX), 2011 WL 2469822, at *3, 6-7 (C.D. Cal. May 4, 2011) (offering of "style guidelines" and addition of "meta tags" to third-party posts by operator); *GW Equity LLC v. Xcentric Ventures LLC*, Civil Action No. 3:07-CV-976-O, 2009 WL 62173, at *6-7 (N.D. Tex. Jan. 9, 2009) (addition of title to third party's posts).

*Id*. at 1174.  The portion of the *Roommates.com* website that *was* held ineligible for immunity did more than merely encourage unlawful content; it *required* users to input unlawful content in order to access the site.  *Id*. at 1166-67.  Similarly, the website in *Accusearch* developed unlawful content by knowingly paying researchers to engage in illegal conduct.  *Accusearch*, 570 F.3d at 1200.

The court below made no findings that Appellants required or solicited unlawful content.  The facts relied on by the district court—the website's name and creation of comment sections where users may post critical commentary—are the sort of passive encouragement the Ninth Circuit explicitly anticipated and held non-actionable in *Roommates.com*.  *Roommates.com*, 521 F.3d at 1175 ("[T]ext prompt with no direct encouragement to perform illegal searches or to publish illegal content" is "entirely immune from liability"); *see also Accusearch,* 570 F.3d at 1195.[15]

The gravamen of the district court's finding is that Appellants' web presence is insulting and critical.  Without a specific solicitation or requirement that third

---

[15] The District Court pointed to *Arden*, in which the Eighth Circuit suggested in dicta that a website operator could lose immunity if it "designed its website to be a portal for defamatory material or [did] anything to induce defamatory postings." *Jones III* at *2, citing 614 F.3d at 792.  But nothing in *Arden*, which found the defendants eligible for CDA immunity, suggested the court was deviating from the development-based liability analysis laid out in *Accusearch*, on which it relied, 614 F.3d at 791, and which require website operators to be directly responsible for the *illegal* nature of actionable content to defeat immunity.

parties find and submit defamatory content about Appellee, Richie and TheDirty.com were not legally responsible for the defamatory content and cannot qualify as information content providers. As such, the district court's initial Section 230 analysis is wrong as a matter of law, has no support in circuit case law, and should be overturned by this Court.

### 3. The District Court's Application of a "Neutrality Test" Was an Error of Law.

In *Jones III*, the court expanded its erroneous Section 230 analysis by finding that Appellant Richie's "adoption" of actionable comments prevented Section 230 immunity. In reaching its conclusion, the district court cited a single line from *Accusearch:* "That is, one is not 'responsible' for the development of offensive content if one's conduct was neutral with respect to the offensiveness of the content." *Jones III*, at *2 (quoting *Accusearch*, 570 F.3d at 1199). The district court relied on this statement to conclude that in "add[ing] his own comments to the defamatory posts," *Jones III*, at *2, Richie "effectively ratified and adopted the defamatory third-party post" and was therefore not "neutral." *Id*. at *4. This separate line of the district court's reasoning is also erroneous and must be reversed.

In essence, the district court adopted a "neutrality" test independent of actual development: if a website *reacts* to actionable material in a favorable way, it is not "neutral," and thus directly liable for the third party's speech. The district court,

23

while relying on *Accusearch,* neglected to follow the rule enunciated just three sentences later in the opinion: "We therefore conclude that a service provider is 'responsible' for the development of offensive content only if it in some way *specifically encourages development* of what is offensive about the content."[16] *Accusearch,* 570 F.3d at 1199 (emphasis added).  *Accusearch* provides no support for the district court's rule that an after-the-fact reaction to an actionable post can in any way have "specifically encouraged" the illegality of the prior post.

There is no support in Section 230 for a holding that reactive speech, not itself defamatory nor instructing others to engage in actionable behavior, can retroactively develop the comment it is reacting to.  That analysis defies case law and common sense.  As with the "encouragement" analysis, the court makes its distaste for Appellants clear.  But the law requires more:  a specific finding that Appellants knowingly, specifically, and intentionally developed the defamatory posts that third parties placed on TheDirty.com.  That finding has not been made in the court below, and the judgment should therefore be reversed.

### 4.    The District Court Should Have Determined the Applicability of Section 230 at the Earliest Possible Stage.

Because Section 230 provides broad, robust immunity from tort liability, the District Court should have "aim[ed] to resolve the question of § 230 immunity at the earliest possible stage of the case because that immunity protects websites not

---

[16] *See supra* n.10.

only from 'ultimate liability,' but also from 'having to fight costly and protracted legal battles.'" *Nemet Chevrolet*, 591 F.3d at 255.

Tellingly, the Second Amended Complaint in this case cites Appellants' *republication* of content as the basis for liability, noting only that TheDirty.com and Richie "publish[ed] an article about the Plaintiff."[17]  Once again, there are no facts suggesting Appellants created or developed defamatory content.  In the absence of such facts, Appellants enjoyed Section 230 immunity that should have been granted at the earliest opportunity.  *See, e.g., DiMeo v. Max*, 248 F. App'x 280, 282 (3d Cir. 2007) (affirming case dismissal because plaintiff did not allege that the website operator created or developed the posts on the website); *see also Arden*, 614 F.3d at 791 (finding immunity when it was undisputed that damaging material originated from third party); *Green*, 318 F.3d at 470 (same).  As the complaint cited no evidence that Appellants were information content providers under Section 230, immediate dismissal of all claims would have been the proper action.

### D.    The District Court Opinion Threatens Other Online Platforms That Make Available a Wide Range of Divergent and Valuable Speech.

*Amici* file this brief not only to reiterate the legal standard that should govern this case but also to underscore that the district court's opinion, if upheld, would

---

[17] Second Am. Compl., RE 22, Page ID# 74-81, ¶9.

undermine intermediary immunity for other sites, threatening the existence of platforms that welcome undeniably legal though critical speech.

It is crucial for this Court to distinguish between the explicit solicitation of actionable information from users, and the general solicitation of information that might *turn out* to be actionable, or simply damaging to particular individuals or businesses.  Revoking a website's protection under Section 230 because the site solicits "negative" content in the abstract would threaten a wide variety of specific sites and projects that serve undeniably important public purposes by leaving them vulnerable to precisely the kind of expensive legal challenge that followed here.

Like Appellants, the following websites: (1) solicit and encourage users to provide truthful content damaging to businesses or individuals; (2) collect, aggregate, and display the content submitted by their users; and (3) rely on, and react to, this user-generated data in providing services to the public.  Any legal test that turned on these websites' "encouragement" of disparaging content or their "adoption" of users' claims would eviscerate the certainty of protection they currently enjoy under Section 230.

***Chilling Effects*** (http://chillingeffects.org) collects cease and desist notices relating to online speech from a wide variety of sources and compiles them in a searchable online database.  This database allows researchers to identify how such

notices are used in certain contexts and the effect of these notices on freedom of expression online.

*Fraud.org* (http://fraud.org) collects thousands of consumer complaints and actively shares them with a network of more than ninety law enforcement organizations that have partnered with the organization. *Id*. This large database allows law enforcement to identify "patterns of fraud," an essential element of stopping online fraud. Scam FAQs, Fraud.org, http://fraud.org /learn/faqs (last visited Nov. 13, 2013).

*Frack Check WV* (http://www.frackcheckwv.net) asks West Virginians to report their experiences with fracking in their communities in order to "provide[] readers with information to help influence public policy decisions" on fracking, to describe negative "environmental impacts [that] can result from Marcellus shale gas well drilling," and to "document what's happening locally" and "organize accordingly." Your Report, Frack Check WV, http://www.frackcheckwv.net/your-report/ (last visited Nov. 13, 2013).

*The Brian Lehrer Show: Are You Being Gouged?* (http://www.wnyc.org/shows/bl/2007/sep/24/are-you-being- gouged). In 2007, The Brian Lehrer Show on NPR affiliate WNYC Radio asked listeners to report online the cost of milk, beer, and lettuce at their local grocery stores and based on user comments, built a map showing the most and least expensive places to

27

purchase the items.  The show was awarded a Peabody Award for excellence in journalism, in part because of its innovative use of citizen participation.

*Clear Health Costs* (http://clearhealthcosts.com) brings transparency to the health care market in the United States using an online database providing users with data on the cost of medical procedures at different health care providers. Some of this data comes from users, who submit information on what they paid for medical services.  *See* Clear Health Costs, FAQ, http://clearhealthcosts.com/faq (last visited Nov. 15, 2013).  It would be extremely difficult to create a comparable database of healthcare costs without relying on user contributions.  *See generally* U.S. Gov't Accountability Office, Health Care Price Transparency: Meaningful Price Information is Difficult for Consumers to Obtain Prior to Receiving Care (2011), *available at* http://www.gao.gov/products/GAO-11-791.

*The Bed Bug Registry* (http://www.bedbugregistry.com) is a public database containing user-submitted reports of bed bugs in public spaces throughout Canada and the United States.  According to its home page, in the last several years "the site has collected about 20,000 reports covering 12,000 locations."  As businesses are very unlikely to volunteer information about bed bug infestations on their property, the user-generated nature of the registry enables this public service.

All of the providers listed above rely upon third parties to contribute content to their platforms and specifically invite them to contribute *potentially* damaging

content.  In response to such invitations, it is possible that users may submit information that is actionable.  And in turn, websites like those above assume the truthfulness of user-submitted content and "adopt" users' damaging speech by, for example, creating their own content (such as blogs or reports) relying on the accuracy of user-submitted data, reporting user complaints to law enforcement, or developing tools or databases incorporating user content as true.  These websites, in seeking speech that is inherently damaging about others, provide a public service—even if some of that damaging speech should turn out to be defamatory.

The existence of this type of user-generated watchdog site is made possible by Section 230, under which the responsibility for any actionable postings falls squarely on the individuals who contributed them and not on the platform providers themselves.  Absent such protection, providers such as these will likely refrain from such groundbreaking contributions that are unquestionably in the public interest, undermining one of Congress' explicit policy priorities.  *See* 47 U.S.C. § 230(a)(3) ("The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.").

## CONCLUSION

The district court's refusal to dismiss this action was a clear error of law. Section 230 of the Communications Decency Act was passed precisely to protect

website operators from being constantly hauled into court over the speech of their

users.  This Court should reverse and remand with an order of dismissal.

Respectfully submitted,

s/ Junis L. Baldon
Junis L. Baldon
Mark A. Flores
Brandon W. Gearhart
FROST BROWN TODD LLC
400 West Market Street, 32nd Floor
Louisville, KY  40202
(502) 589-5400
(502) 581-1087 (FAX)
jbaldon@fbtlaw.com
mflores@fbtlaw.com
bgearhart@fbtlaw.com
*ACLU of Kentucky Cooperating Attorneys*

William E. Sharp
ACLU OF KENTUCKY
315 Guthrie Street, Suite 300
Louisville, KY  40202
(502) 581-9746
(502) 589-9687 (FAX)
sharp@aclu-ky.org
*Attorney for amicus curiae*
*ACLU of Kentucky*

Lee Rowland
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street, 18th Floor
New York, NY  10004
(212) 549-2500
(212) 549-2654 (FAX)
lrowland@aclu.org
*Attorney for amicus curiae ACLU*

Matthew Zimmerman
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA  94109
(415) 436-9333
(415) 436-9993 (FAX)
mattz@eff.org
*Attorney for amicus curiae EFF*

Emma J. Llansó
CENTER FOR DEMOCRACY & TECHNOLOGY
1634 I Street NW, Suite 1100
Washington, DC  20006
(202) 637-9800
(202) 637-0968 (FAX)
ellanso@ctt.org
*Attorney for amicus curiae CDT*

Jeffrey P. Hermes
Andrew F. Sellars
DIGITAL MEDIA LAW PROJECT
BERKMAN CENTER FOR INTERNET &
SOCIETY
Harvard University
23 Eerett St., 2nd Floor
Cambridge, MA  02138
(617) 495-7547
(617) 495-7641 (FAX)
staff@dmlp.org

Christopher T. Bavitz
CYBERLAW CLINIC
BERKMAN CENTER FOR INTERNET &
SOCIETY
Harvard Law School
23 Everett St., 2nd Floor
Cambridge, MA  02138
(617) 495-7547
(617) 495-7641 (FAX)
clinic@berkman.harvard.edu

*Attorneys for amicus curiae*
*Digital Media Law Project*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because the brief contains 6,870 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word in fourteen-point Times New Roman font.


Date:   November 19, 2013             s/ Junis L. Baldon
                                      Junis L. Baldon
                                      Mark A. Flores
                                      Brandon W. Gearhart
                                      FROST BROWN TODD LLC
                                      400 West Market Street, 32nd Floor
                                      Louisville, KY  40202
                                      (502) 589-5400
                                      (502) 581-1087 (FAX)
                                      jbaldon@fbtlaw.com
                                      mflores@fbtlaw.com
                                      bgearhart@fbtlaw.com
                                      *ACLU of Kentucky Cooperating Attorneys*

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2013, I electronically filed the foregoing with the Clerk of the U.S. Court of Appeals for the Sixth Circuit through the CM/ECF system, which will send a Notice of Electronic Filing to registered CM/ECF participants.

<div style="margin-left: 40%;">

s/ Junis L. Baldon
Junis L. Baldon
Mark A. Flores
Brandon W. Gearhart
FROST BROWN TODD LLC
400 West Market Street, 32nd Floor
Louisville, KY  40202
(502) 589-5400
(502) 581-1087 (FAX)
jbaldon@fbtlaw.com
mflores@fbtlaw.com
bgearhart@fbtlaw.com
*ACLU of Kentucky Cooperating Attorneys*

</div>

LOULibrary 0110802.0609352  1578366v1